**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action No.

SCPS, LLC and SSPS, LLC,

                Plaintiffs,

vs.

KIND LAW, BEN TRAVIS LAW, and
INDIVIDUALS IDENTIFIED ON
ATTACHMENT A,

                Defendants,

-and-

AMERICAN ARBITRATION ASSOCIATION,

                Nominal Defendant.

---

**PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION FOR PRELIMINARY RELIEF**

---

IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
(202) 524-4157

LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ..............................................................................................................1

FACTUAL BACKGROUND ..............................................................................................3

    A.    Background ...........................................................................................3

    B.    Kind Law and Ben Travis Law Conduct a Social Media Advertising Campaign and Then File Hundreds of AAA Arbitration Demands. .......................5

    C.    Zula's and Sportzino's Investigation of the Demands. ...........................................9

    D.    Subsequent Events Make Clear that Kind Law and Ben Travis Law Failed to Secure Their Purported Clients' Authorization to File Arbitrations against Zula and Sportzino......................................................................................11

ARGUMENT ...................................................................................................................13

I.    THE COURT SHOULD ENJOIN THE NON-USER CLAIMANTS FROM PURSUING THE AAA PROCEEDINGS AND THE AAA FROM ADMINISTERING SUCH PROCEEDINGS....................................................................13

    A.    The Court Decides Issues Of Contract Formation. .................................................13

    B.    Plaintiffs Satisfy The Elements Necessary For Immediate Injunctive Relief......................................................................................................................14

        1.    Likelihood Of Success. ..............................................................................14

        2.    Irreparable Harm. .......................................................................................14

        3.    Balance of Equities and Public Interest. .....................................................16

II.    THE COURT SHOULD COMPEL THE WRONG-TRIBUNAL CLAIMANTS TO ARBITRATE BEFORE ADR CHAMBERS IN CANADA, AND ENJOIN THE AAA FROM ADMINISTERING, AND THE WRONG-TRIBUNAL CLAIMANTS FROM PURSUING, THE AAA PROCEEDINGS..................................16

    A.    The FAA Authorizes the Court to Compel Arbitration in a Foreign State Pursuant to the Convention.....................................................................................16

        1.    A Valid, Enforceable Arbitration Agreement Exists Between Plaintiffs and the Wrong-Tribunal Claimants...........................................18

        2.    Plaintiffs Easily Satisfy The Requirements For Compelling
              Arbitration Pursuant To The Convention. ..................................................21

    B.    The Court Should Enjoin The AAA Proceedings..................................................23

        1.    The Court Has Authority To Enjoin The AAA Proceedings.....................23

        2.    Plaintiffs Satisfy The Elements Necessary For Immediate
              Injunctive Relief........................................................................................24

III.    THE COURT SHOULD ENJOIN ANY REMAINING AAA PROCEEDINGS
        UNTIL AND UNLESS KIND LAW AND BEN TRAVIS LAW
        DEMONSTRATE ADEQUATE DISCLOSURE TO CLIENTS AND CLIENT
        AUTHORIZATION TO FILE THE ARBITRATION DEMANDS. ...............................25

CONCLUSION...........................................................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abadi v. Nat'l R.R. Passenger Corp.*,
No. 1:22-CV-03684 (TNM), 2024 WL 1344403 (D.D.C. Mar. 29, 2024)..............................18

*ADP, LLC v. Lynch*,
678 F. App'x 77 (3d Cir. 2017) ...........................................................................................19

*Alberts v. Royal Caribbean Cruises, Ltd.*,
834 F.3d 1202 (11th Cir. 2016) ..........................................................................................22

*Carson v. LendingTree LLC*,
456 F. App'x 234 (4th Cir. 2011)........................................................................................19

*In re Centurylink Sales Practices & Sec. Litig.*,
MDL No. 17-2795, 2020 WL 3513547 (D. Minn. June 29, 2020)........................................28

*Chicago Sch. Reform Bd. of Trs. v. Diversified Pharm. Servs., Inc.*,
40 F. Supp. 2d 987 (N.D. Ill. 1999) .....................................................................................15

*Crescent Petroleum Co. Int'l Ltd. v. Nat'l Iranian Oil Co.*,
No. 22-CV-1361 (JMC), 2024 WL 1885498 (D.D.C. Apr. 30, 2024) ..................................18

*Diag Human, S.E. v. Czech-Ministry of Health*,
824 F.3d 131 (D.C. Cir. 2016)............................................................................................21

*Dye v. Tamko Bldg. Prod., Inc.*,
908 F.3d 675 (11th Cir. 2018) ............................................................................................19

*Emmanuel v. Handy Techs., Inc.*,
992 F.3d 1 (1st Cir. 2021)...................................................................................................19

*Forrest v. Verizon Commc'ns, Inc.*,
805 A.2d 1007 (D.C. 2002) ................................................................................................18

*Foster v. Walmart, Inc.*,
15 F.4th 860 (8th Cir. 2021) ...............................................................................................19

*Freudensprung v. Offshore Tech. Servs., Inc.*,
379 F.3d 327 (5th Cir. 2004) ..............................................................................................22

*Ganem v. Heckler*,
746 F.2d 844 (D.C. Cir. 1984) ...........................................................................................19

*Griva v. Davison*,
    637 A.2d 830 (D.C. 1994) ..................................................................................28

*Hancock v. Am. Tel. & Tel. Co.*,
    701 F.3d 1248 (10th Cir. 2012) .........................................................................19

*Invista N. Am., S.A.R.L. v. Rhodia Polyamide Intermediates S.A.S.*,
    503 F. Supp. 2d 195 (D.D.C. 2007)...................................................................17

*KenAmerican Res., Inc. v. Int'l Union, United Mine Workers of Am.*,
    99 F.3d 1161 (D.C. Cir. 1996)...........................................................................13

*McLauglin Gormley King Co. v. Terminix Int'l Co., L.P.*,
    105 F. 3d 1192 (8th Cir. 1997) ....................................................................14, 24

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
    337 F. 3d 125 (2d Cir. 2003)........................................................................14, 24

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)................................................................................19

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..........................................................................................17

*Morgan Keegan & Co. v. McPoland*,
    829 F. Supp. 2d 1031 (W.D. Wash. 2011).......................................................15

*Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*,
    850 F.2d 756 (D.C. Cir. 1988)..........................................................................13

*Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.*,
    330 F.3d 523 (D.C. Cir. 2003) .........................................................................14

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ..........................................................................19

*Osvatics v. Lyft, Inc.*,
    535 F. Supp. 3d 1 (D.D.C. 2021)......................................................................18

*Postal Police Officers Ass'n v. United States Postal Serv.*,
    502 F. Supp. 3d 411 (D.D.C. 2020)..................................................................24

*Realogy Holdings Corp. v. Jongebloed*,
    957 F.3d 523 (5th Cir. 2020) ............................................................................19

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021).............................................................................19

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) ..............................................................................................19

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022)..................................................................................................13

*So v. Suchanek*,
670 F.3d 1304 (D.C. Cir. 2012)..............................................................................................28

*Sprint Sols., Inc. v. Mobile Now, Inc.*,
No. CV 19-3752 (JDB), 2020 WL 136285 (D.D.C. Jan. 13, 2020) .................................24, 28

*Starling v. OnProcess Tech., Inc.*,
No. 1:23-CV-10949-JEK, 2024 WL 1258501 (D. Mass. Mar. 25, 2024) ........................15, 16

*Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Sys., Inc.*,
448 F. Supp. 2d 64 (D.D.C. 2006) ..........................................................................................16

*Sunlight Prod. Techs., Ltd. v. MPOWERD Inc.*,
No. CV 15-0126-MWF (JEMx), 2015 WL 12655472 (C.D. Cal. Mar. 23, 2015)............14, 16

*Teltschik v. Williams & Jensen, PLLC*,
683 F. Supp. 2d 33 (D.D.C. 2010)..........................................................................................27

*Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*,
No.LA CV15-08048 JAK (RAOxX), 2018 WL 10152573 (C.D. Cal. July 10, 2018),
*aff'd*, 772 F. App'x 585 (9th Cir. 2019)..................................................................................21

*Treiber & Straub, Inc. v. U.P.S., Inc.*,
474 F.3d 379 (7th Cir. 2007) ..................................................................................................19

*UBS Sec., LLC v. Voegeli*,
405 F. App'x 550 (2d Cir. 2011) ............................................................................................15

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989)................................................................................................................14

*Washington Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*,
113 F. Supp. 3d 121 (D.D.C. 2015) ..................................................................................15, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................................................13

*World Grp. Sec. v. Tiu*, No. CV 03-2609 NM SHSX,
2003 WL 26119461, at *7 (C.D. Cal. July 22, 2003) .............................................................15

*Zhongshan Fucheng Indus. Inv. Co. LTD v. Nigeria*,
No. 23-7016, 2024 WL 3733341 (D.C. Cir. Aug. 9, 2024).....................................................22

**STATUTES**

9 U.S.C. § 2 ..............................................................................................................16, 21

9 U.S.C. § 4 ..............................................................................................................16, 17

9 U.S.C. § 201 ............................................................................................................1, 17

9 U.S.C. § 202 ....................................................................................................18, 21, 22

9 U.S.C. § 203 .................................................................................................................1

9 U.S.C. § 206 ..........................................................................................................16, 17

D.C. Code § 16-4426 ......................................................................................................13

Uniform Interstate and International Procedure Act, art. 4, § 402 ................................20

**RULES**

Cal. Rules of Pro. Conduct,
    Rule 1.0 *et seq.* ..........................................................................................................26

D.D.C. Local Rule 65.1 ...................................................................................................1

Fed. R. Civ. P. Rule 44.1 ...............................................................................................19

Fed. R. Civ. P. Rule 65 ................................................................................................1, 2

N.J. Rules of Pro. Conduct,
    RPC 1.0 *et seq.* ..........................................................................................................26

Nev. Rules of Pro. Conduct,
    Rule 1.0 *et seq.* ..........................................................................................................26

N.Y. Rules of Pro. Conduct,
    22 NYCRR 1200.0 *et seq* ..........................................................................................26

Or. Rules of Pro. Conduct,
    RPC 1.0 *et seq.* ..........................................................................................................26

Am. Bar Ass'n Model Rules of Pro. Conduct Rule 1.2 ............................................26, 27

Am. Bar Ass'n Model Rules of Pro. Conduct Rule 1.4(a)(2).....................................26, 27

Am. Bar Ass'n Model Rules of Pro. Conduct Rule 1.4(b) ........................................26, 27

Am. Bar Ass'n Model Rules of Pro. Conduct Rule 3.1 .................................................26

**OTHER AUTHORITIES**

Am. Arb. Ass'n, *Mass Arbitration Supplementary Rules* MA-1(e) (2024),
    https://www.adr.org/sites/default/files/Mass_Arbitration_Supplementary_Rules.pdf............23

Am. Arb. Ass'n, *Consumer Mass Arbitration and Mediation Fee Schedule* (2024),
    https://www.adr.org/sites/default/files/Consumer_Mass_Arbitration_and_Mediation_
    Fee_Schedule.pdf.........................................................................................................................9

Plaintiffs SCPS, LLC ("Zula") and SSPS, LLC ("Sportzino," and together with Zula, "Plaintiffs") respectfully submit this memorandum of law in support of their motion seeking orders of preliminary relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, Local Rule 65.1, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"), as codified in Chapter Two of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201, 203.

## INTRODUCTION

Plaintiffs operate free-to-play social gaming websites provided and administered from Ontario, Canada, that allow users to play several different online games and offer a sweepstakes promotional model. Two law firms, Kind Law and Ben Travis Law, used a misleading social media advertising campaign to enroll thousands of purported "clients" to file arbitration demands against Zula and Sportzino. Thus far, those law firms have filed 966 individual demands for arbitration with the American Arbitration Association ("AAA") and have threatened to file several thousand more. These law firms thereby hope to coerce settlements from Plaintiffs – not, however, based upon the claims' legal basis, but rather due to the crushing administrative fees the AAA will charge for such a massive number of claims before reaching the merits. Indeed, Kind Law and Ben Travis Law aim to leverage the AAA's per-demand fees to foist a massive out-of-pocket expense on Plaintiffs (nearly $1.5 million for the 966 arbitration demands filed thus far). As Kind Law and Ben Travis Law purport to have over 3,000 supposed "clients," those potential administrative fees may triple in size as the law firms pile on ever-more arbitration demands.

Plaintiffs seek relief from this gamesmanship, in three distinct forms. *First*, it is evident that in their zeal to enroll as many claimants as possible through Facebook and other social media solicitations, Kind Law and Ben Travis Law performed little or no diligence on their purported clients. Indeed, the enrollment questionnaire used by their social media advertising campaign

asked individuals to place a check mark next to any of __97__ distinct online games. Zula and Sportzino are only two of those 97 games. Needless to say, this invites error. Thus, it is little surprise that Plaintiffs' records demonstrate that 186 of the 966 claimants on whose behalf Kind Law and Ben Travis Law filed arbitration demands are strangers to Zula and Sportzino. These 186 claimants are not parties to any pre-dispute arbitration provision and have no right to commence any arbitral proceeding. Accordingly, Plaintiffs ask this Court to enjoin these 186 individuals from pursuing arbitrations currently administered by the AAA and to enjoin the AAA from administering such arbitrations (collectively, the "AAA Proceedings"), pursuant to Rule 65.

*Second*, of the remaining 780 claimants, 464 accepted revised terms and conditions that require arbitration before a different arbitral tribunal, ADR Chambers in Ontario, Canada. Each one of these 464 individuals clicked a box to "Confirm" that they read those revised terms and conditions and "accept[ed] all the updates within these documents." Therefore, these individuals have no right to commence an arbitration before the AAA or force Plaintiffs to pay the AAA's burdensome administrative fees. Given that transnational arbitration agreements with a reasonable relation to a foreign state or that envisage performance outside the United States are enforced pursuant to an international treaty in the form of the Convention, Plaintiffs respectfully ask that the Court enforce the Convention and the FAA by compelling these 464 claimants to arbitrate their claims before ADR Chambers and enjoining those claimants and the AAA from proceeding with those claims.

*Finally*, emails received by Plaintiffs' customer service staff from the purported "clients" of Kind Law and Ben Travis Law reveal a disturbing lack of disclosure and a failure to secure client authorization to file the arbitration demands. Many individuals denied that they authorized Kind Law or Ben Travis Law to file anything on their behalf. Others expressed dismay that their

access to the Zula and Sportzino websites may be interrupted, which is the very outcome the Kind Law and Ben Travis Law arbitration demands seek.  One individual accused Kind Law and Ben Travis Law of running a "scam" on unsuspecting users.  These statements by the purported "clients" of Kind Law and Ben Travis Law evidence breaches of the ethical rules applicable to lawyer solicitation of clients.  To preserve the integrity of the arbitration process, the Court should enjoin the remaining arbitrations until and unless those firms demonstrate they have the requisite authorization to proceed based upon accurate disclosures.

## FACTUAL BACKGROUND

### A.   Background

Zula and Sportzino operate free-to-play social gaming websites that are provided and administered from Ontario, Canada.  These sites allow registered users to play various online games without the use of real money.  For playing purposes, users receive virtual "Gold" coins free of charge when they establish an account, log in to their account, or through other promotions. Users receive free Gold coins upon every login and also when their balance of Gold coins runs low.  Users may, but are not required to, purchase additional virtual Gold coins for use in the games.  Users cannot exchange their Gold coins for cash.  There are no "real world" prizes awarded through Gold coin games.  Rather, users may only win additional Gold coins, which can be used for further entertainment play.  Gold coins have no other use.  They can never be redeemed or transferred.[1]  (Declaration of Yuliy German ("German Decl.") ¶ 3.)

---

[1] For promotional purposes, Zula and Sportzino may also provide players with "Sweeps" coins. Sweeps coins and Sweeps coin games operate under the sweepstakes laws.  Sweeps coins are not available for purchase.  Rather, Sweeps coins are provided on a promotional basis for free, as a bonus with some purchases of Gold coins, as a sign up bonus, through social media promotions, or by submitting a written request to Zula or Sportzino.  (See German Decl. ¶ 4.)  As such, the Sweeps coins are similar to the sweepstakes commonly used by national consumer-product companies under well-established sweepstakes and promotions laws.

Only registered users may access and play the games on the Zula and Sportzino sites.  To become a registered user, an individual must create an account through an online enrollment process by providing certain information (name, address, telephone number, and email address), satisfying certain enrollment requirements, and choosing a unique username and password. Registered users must also accept the Zula or Sportzino Terms & Conditions of Use Agreement ("Terms & Conditions") and Privacy Policy, through a clickwrap agreement.  Zula's and Sportzino's customer databases track user registration and user website logins, among other information.  (*Id*. ¶¶ 6, 8, 13.)

Zula and Sportzino revise their Terms & Conditions from time to time.  The Terms & Conditions advise users of this fact:

> 18.1  We may amend, alter, delete or add to this Agreement at any time without notice to you.
>
> 18.2  Any changes made to this Agreement shall take effect immediately upon their publishing to the Website and your continued access or use of the Website.  You can check the "Date Updated" date at the top of these Terms of Use to determine the date of the last revision.
>
> 18.3  You agree to review this Agreement regularly to stay current with changes that have been made.

(*Id*. ¶ 10,Exs. C-H.)  When Zula and Sportzino implement such a change to the Terms & Conditions, registered users are informed of the change during their next account login.  During this process, users must acknowledge that they have reviewed and agree to the changes made in the Terms & Conditions.  In this fashion, Zula and Sportzino assure that their users are aware of and consent to any such changes.  If the users do not consent to the changes, they cannot access their accounts or use the websites.  (*Id*. ¶ 12, Ex. I.)

Section 12 of the Terms & Conditions contains a mandatory arbitration provision.  In the revision dated May 7, 2024, the Terms & Conditions required arbitration before the American Arbitration Association in Washington, DC.  (*Id.*, Ex. F.)  However, on June 28, 2024, Zula and Sportzino revised their Terms & Conditions to require arbitration before a different tribunal, ADR Chambers.  The revision further required the arbitration to be held in Ontario, Canada, from which the gaming websites are provided and administered.  (*Id.* ¶ 2, Exs. D, G.)  Every user who logged into an account on or after June 28, 2024, accepted the revised Terms & Conditions requiring arbitration before ADR Chambers in Ontario, Canada.  (*Id.* ¶ 12.)  By clicking a button labeled "Confirm," each such user affirmed "that I have read these documents and I accept all the updates within these documents."  (*Id.*, Ex. I.)

**B.    Kind Law and Ben Travis Law Conduct a Social Media Advertising Campaign and Then File Hundreds of AAA Arbitration Demands.**

Earlier this year, Kind Law and Ben Travis Law began an advertising campaign on social media platforms such as Facebook, seeking to recruit large numbers of individuals to file claims against companies that offer social gaming websites.  The advertisements target virtually the entire social gaming industry with a one-size-fits-all advertisement.  The law firms invited anyone who had made purchases to sign up in order to receive potential compensation:

> **If you made in-app purchases to play in social casino applications from certain developers in the last two years, you may be entitled to seek compensation.  Click to sign up to get more information and to have an attorney review your potential case.**

(Declaration of Gavin J. Rooney ("<u>Rooney Decl.</u>"), Ex. A (boldface in original).)  Individuals who clicked "to sign up" were then brought to an online questionnaire, which asked the individual to indicate whether they played any of **_97_** different online games offered by a wide variety of companies.  Zula and Sportzino were only two of those 97 online games.  (*Id.*)

Individuals who completed the questionnaire supposedly "retained" Kind Law and Ben Travis Law as their counsel.  (*Id.*, Exs. A-B.)  The preeminent goal of this process was the recruitment of mass numbers of individuals to assert claims against Zula and Sportzino.  Other considerations (such as disclosure of relevant information to would-be clients and appropriate diligence regarding individuals' standing to assert such claims) took a back seat to a desire to amass as many claimants as possible.  This is evident for several reasons.

*First*, the advertisements failed to advise would-be clients of the goals that Kind Law and Ben Travis Law sought to achieve—that is, a declaration that the Zula and Sportzino websites conducted "unlawful" gambling and an injunction prohibiting the websites "from engaging in the unlawful actions complained of herein."  (*Id.*, Ex. E (sample Demand for Arbitration, Request for Relief).)  The Kind Law and Ben Travis Law advertisements failed to advise prospective clients that the claims, if successful, would terminate their ability to use the websites.  As quoted above, the advertisement simply asked whether individuals had "made in-app purchases to play," asserted that "you may be entitled to seek compensation," and urged individuals to "sign up."  The ads disclosed nothing about terminating users' ability to play social games.  While other ads stated that "[d]evelopers of certain social casino mobile applications are suspected of having violated state gambling laws" (*Id.*, Exs. A-B), they too failed to disclose that the claims, if successful, would terminate users' ability to continue using Zula and Sportzino websites.  As explained further below, and based upon numerous expressions of dismay by claimants who fear the loss of their ability to play social games on Zula and Sportzino, this places the wishes of the prospective clients and the goals of Kind Law and Ben Travis Law in clear and direct conflict.

*Second*, the "client enrollment" process failed to perform basic due diligence to determine whether a potential client even had a potential claim against Zula or Sportzino.  Most egregiously,

Kind Law and Ben Travis Law had no evident process to diligence whether an individual who filled out a questionnaire regarding **_97_** different online games was, in fact, a registered Zula or Sportzino user.  The advertisements asked about a broad series of companies that have nothing to do with Zula or Sportzino (*e.g.*, Quick Hit Slots, Monopoly Slots, 88 Fortune Slots, Jackpot Party, Gold Fish Slots, MyVegas Slots, MyKonami Slots, Cash Franzy Casino Slots, or Jackpot World). (*Id.*, Ex. B.)  Kind Law and Ben Travis Law then used the responses to issue mass demands to all of these social gaming companies (and not just Zula and Sportzino).  Of course, asking individuals to check boxes for 97 different social games invites error, and Kind Law and Ben Travis Law plainly performed no further investigation or diligence to determine whether any individual was, in fact, an authorized Zula or Sportzino user.

    *Finally*, Kind Law and Ben Travis Law apparently performed no diligence to determine whether any individual who filled out an online questionnaire had, in fact, spent any money on the Zula or Sportzino sites—even though the ads themselves admitted that such purchases were a necessary predicate to a claim.  (*Id.*, Exs. A-B.)

    The advertising campaign succeeded in amassing thousands of claimants.  Kind Law and Ben Travis Law then began bombarding Zula and Sportzino with "notices of dispute" in purported compliance with the Terms & Conditions' informal-dispute resolution requirement.  Specifically, on June 19, 2024, Kind Law and Ben Travis served 595 such notices on Sportzino and 1,270 such notices on Zula.  On August 27, 2024 and August 30, 2024, they served an additional 848 such notices on Zula and 456 such notices on Sportzino.  (*Id.* ¶ 3, Exs. C-D.)  In total, to date, the firms have delivered 3,169 such notices.  While each is supposedly submitted on behalf of a single individual claimant, the notices are otherwise identical in text.  However, the notices only disclosed the claimant's name, and a name alone was insufficient to allow Zula and Sportzino to determine

whether these claimants were registered users of the websites. Kind Law and Ben Travis Law refused Zula's and Sportzino's request to provide further identifying information—notwithstanding the fact that they collected this very information through the questionnaires their "clients" completed. This refusal prevented Zula and Sportzino from verifying these individuals as actual users of Plaintiffs' websites.

Subsequently, on August 14 and 16, 2024, Kind Law and Ben Travis Law filed hundreds of demands for arbitration before the AAA (the "Demands"). Specifically, they filed 299 Demands for arbitration against Sportzino and 667 Demands for arbitration against Zula, seeking hearings in San Diego, California. (*Id.* ¶ 4, Exs. E-F.) By this time, of course, the Terms & Conditions had been revised to require arbitration before ADR Chambers in Ontario, Canada and did not permit arbitration before the AAA. In any event, the Terms & Conditions had never allowed arbitration in San Diego, California. Kind Law and Ben Travis Law just ignored these readily available facts.

The claimants named in these Demands originate from five states: New York, New Jersey, California, Nevada, and Oregon. Each Demand is the same, except for the name of the claimant. The Demands assert that the Zula and Sportzino sites "operate illegal gambling games." They seek damages under several theories, including the federal Racketeer Influences and Corrupt Organizations ("RICO") Act and various state-law and common-law causes of action. The Demands also seek a declaration that Zula and Sportzino conduct illegal gambling on their websites and an injunction to prohibit them from continuing to do so in the future. (*Id.*, Exs. E-F.)

The AAA has issued correspondence advising that it will apply its Mass Arbitration Rules to the Demands. (*Id.*, Exs. G-H.) Under the AAA Mass Arbitration Fee Schedule, Zula and Sportzino face potentially enormous administrative fees of up to $1,525 per Demand. In total,

these 966 Demands face Plaintiffs with the prospect of paying $1,464,275 in administrative fees alone.[2]  Of course, the 966 claimants on whose purported behalf Kind Law and Ben Travis Law filed demands represent less than a third of the 3,169 notices of dispute that the firms have served to date.  If, therefore, Kind Law and Ben Travis Law file Demands on behalf of all of their purported clients, they will expose Zula and Sportzino to several millions of dollars in potential AAA administrative fees, before the claims are even adjudicated.

        **C.**      <u>**Zula's and Sportzino's Investigation of the Demands.**</u>

Unlike the notices of dispute, the Demands provide further information regarding the claimants beyond simply their names—including addresses, telephone numbers, and email addresses, all presumably based upon the information submitted by claimants when they completed their online questionnaires.  Using this additional information, Zula and Sportzino investigated their customer databases for these individuals.  Two conclusions central to this motion emerged from that investigation.

*First*, many of the AAA claimants are not, in fact, registered users of the Zula and Sportzino websites.  Given the one-size-fits-all nature of the Kind Law and Ben Travis Law mass solicitations aimed at 97 distinct social games, this is hardly surprising.  Specifically, 128 individuals on whose behalf Demands were served against Zula and 58 individuals on whose behalf Demands were served against Sportzino are not registered users (collectively, the "<u>Non-User Claimants</u>").  (*See* German Decl. Exs. J-K.)  None of these claimants accepted any version of the Terms & Conditions.  None are parties to an arbitration agreement.  Moreover, none have a good-faith basis to assert any claim against Zula or Sportzino.  That Kind Law and Ben Travis Law asserted RICO claims on

---

[2] The AAA's *Consumer Mass Arbitration and Mediation Fee Schedule* may be found at https://www.adr.org/sites/default/files/Consumer_Mass_Arbitration_and_Mediation_Fee_Sched ule.pdf.

behalf of nearly two hundred individuals who are strangers to Zula and Sportzino illustrates a disturbing lack of diligence on their part to investigate the validity of the claims being asserted on behalf of their purported clients.  (*Id.* ¶¶ 16-17, Exs. J-K.)  This unethical behavior calls into question Kind Law's and Ben Travis Law's ability to represent any alleged Zula or Sportzino users.

*Second*, before filing the Demands, the majority of the remaining AAA claimants accepted the revised Terms & Conditions that require arbitration before ADR Chambers in Ontario, Canada. They therefore have no basis to file Demands before the AAA.  Specifically, 310 of the Zula claimants and 154 of the Sportzino claimants are registered users of those websites who accepted the June 28, 2024 (or later) versions of the Terms & Conditions requiring arbitration before ADR Chambers (collectively, the "Wrong-Tribunal Claimants").  (*See Id.* Exs. L-M.)  Each of these claimants was advised of the revision to the Terms & Conditions; and each such claimant confirmed that they read the revised Terms & Conditions and agreed to its changes.  (*Id.*, ¶¶ 18-19, Exs. L-M.)  Accordingly, the Wrong-Tribunal Claimants have no basis to file demands with the AAA and should be compelled to arbitrate their claims before ADR Chambers.

*Finally*, substantial numbers of the AAA claimants who established accounts nevertheless made no purchases from Zula and Sportzino and played the games for free.  Specifically, 132 of the Zula claimants and 52 of the Sportzino claimants (or nearly 24% of the 780 registered user claimants) bought nothing from those websites.  (*Id.*, ¶ 20.)  These individuals have no conceivable damages.  While even Kind Law's and Ben Travis Law's advertisements stated that a claimant needs to have made an "in-app purchase" to file a claim (Rooney Decl., Exs. A-B), those firms evidently performed no due diligence to determine whether, in fact, the claimants had spent any money on the Zula and Sportzino websites.  Their motive for ignoring such inconvenient facts is

obvious—their leverage comes from the total number of claims in order to drive massive AAA

fees, without regard to the claims' merit or whether the claimants even suffered a loss.

> **D.      Subsequent Events Make Clear that Kind Law and Ben Travis Law Failed to Secure Their Purported Clients' Authorization to File Arbitrations against Zula and Sportzino.**

The Demands assert that Zula's and Sportzino's social games are illegal.  Zula and

Sportzino are under no legal requirement to make their services available to any specific

individual, especially where, as here, that individual is purportedly alleging the illegality of the

activity.  Accordingly, Zula and Sportzino began suspending the accounts of some AAA claimants

whose Demands asserted the illegality of the social games.

The claimants' responses to those account suspensions is telling.  When informed of their

arbitration Demand filing, many claimants reported that they were unaware of it and denied that

they had authorized Kind Law and Ben Travis Law to file arbitration demands on their behalf.  As

one such claimant stated to both Zula and Sportzino:

> I am writing this message to clarify that I am NOT represented by
> any law firms such as Kind Law & Ben Travis, nor am I affiliated
> with them in any way.  I have also contacted these law firms
> personally via email and informed them that if they use my
> information against your site, I will be forced to seek legal
> representation, as I have not authorized any dispute or arbitration.
> Furthermore, I will seek legal representation against said law firms
> if necessary.

(German Decl., Ex. N).  When informed of their apparent AAA Demand filings, other supposed

Kind Law and Ben Travis Law "clients" stated as follows:

- "This is *false* and I have not done anything of the sort."

- "This information is *incorrect*.  *I am not being represented by any legal entity*."

- "No.  I have not done so *I have no lawyer or lawsuits against anyone if there is [it is] not with my consent*."

- "I've contacted the law firm that is stating they're representing me and I'm waiting for them to issue a letter to myself as well as Zula confirming I'm not pursuing any claim against Zula."

- "***I am not a part of the lawsuit against you***.  I corrected that with kind law dropping whatever they're doing."

(*Id.* (emphasis added).)  Other claimants denied that they had ever been in contact with Kind Law or Ben Travis Law at all, and had certainly not authorized them to file the arbitration Demand:

- "[***N]o one has contacted me about a law firm or anything like this*** so I'm not understanding what is doing on. . . .  [N]obody has ever contacted me about this so this does not make sense to me at all."

- "Hello what are y'all talking about?  ***I don't have any legal action against y'all that makes no sense.***"

- "I'm not [able] to access my account.  But I believe it has something to do with a legal issue that I am not involved in.  ***I am not represented by any legal councel*** [sic]."

(*Id.* (emphasis added).)  One claimant bluntly asked accused Kind Law and Ben Travis Law of running a "scam."  (*Id.* ("is this scam or what I never said or did any of the things u saying.").)

These comments raise disturbing questions as to what Kind Law and Ben Travis Law disclosed to their supposed "clients" and how they purportedly secured authorization to file the Demands at all.  At present, twenty-seven claimants have each affirmed the accuracy of the following statement as a predicate to reinstating their Zula or Sportzino accounts:

> I confirm that I do not have any legal action, arbitrations ("legal actions"), or any law firm representing me against Sportzino [or Zula].  I have not authorized any law firm or lawyers to work on my behalf to initiate or conduct a legal action.  If any law firm or lawyers claim that they represent me for a legal against Sportzino [or Zula], it is without my consent or authorization.  I intend to continue to enjoy the services offered by Sportzino [or Zula].

(*Id.*)  The number of claimants agreeing to this statement continues to grow by the day.

<u>ARGUMENT</u>

I.    **THE COURT SHOULD ENJOIN THE NON-USER CLAIMANTS FROM PURSUING THE AAA PROCEEDINGS AND THE AAA FROM ADMINISTERING SUCH PROCEEDINGS.**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). As discussed below, Plaintiffs readily meet this standard.

A.    <u>The Court Decides Issues Of Contract Formation.</u>

As a preliminary matter, the question of whether the Non-User Claimants are parties to an arbitration agreement with Plaintiffs is properly before this Court. As the D.C. Circuit Court of Appeals has made clear, "issues of formation . . . must always be decided by the courts[.]" *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988). Accordingly, "if the parties disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute." *Id.* (internal quotation marks and citation omitted); *see KenAmerican Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 99 F.3d 1161, 1163 (D.C. Cir. 1996). "Clearly, if there was never an agreement to arbitrate, there is no authority to require [Plaintiffs] to submit to arbitration." *Nat'l R.R.*, 850 F.2d at 761. Accordingly, this Court has the right to adjudicate whether the Non-User Claimants are even parties to an agreement allowing them to commence arbitrations.[3]

---

[3] This issue is properly decided in this Court, which has both (1) subject matter jurisdiction under diversity and federal question jurisdiction, and (2) personal jurisdiction based on the choice of law and forum provisions of the terms and conditions relied upon by the underlying claimants, the FAA, and D.C. Code § 16-4426.

B.    **Plaintiffs Satisfy The Elements Necessary For Immediate Injunctive Relief.**

1.    **Likelihood Of Success.**

"[T]he FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989) (citation omitted); *see also Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523, 529 (D.C. Cir. 2003).

As established by the German Declaration, the Non-User Claimants are not parties to any arbitration agreement with Plaintiffs.  None established an account and none agreed to any version of the Terms & Conditions.  They are strangers to Zula and Sportzino.  While they might be users of the other social gaming sites discussed in the Kind Law and Ben Travis Law solicitations, Zula and Sportzino have no contract with Plaintiffs entitling them to commence an arbitration against them.  Accordingly, Plaintiffs have made a strong showing that they are likely to prevail on their claim that the Non-User Claimants' claims against Plaintiffs are not subject to arbitration.

2.    **Irreparable Harm.**

Absent a preliminary injunction enjoining the AAA Proceedings initiated by the Non-User Claimants, Plaintiffs will be irreparably harmed.  "Several Circuits have held that a party is irreparably harmed by incurring costs arbitrating a dispute that the court has concluded [is] non-arbitrable." *Sunlight Prod. Techs., Ltd. v. MPOWERD Inc.*, No. CV 15-0126-MWF (JEMx), 2015 WL 12655472, at *8 (C.D. Cal. Mar. 23, 2015) (internal quotation marks and citation omitted; alterations in original); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F. 3d 125, 129 (2d Cir. 2003) (a party resisting arbitration suffers irreparable harm when it is "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable"); *McLauglin Gormley King Co. v. Terminix Int'l Co., L.P.*, 105 F. 3d 1192, 1194 (8th Cir. 1997) (courts "uniformly hold that the party urging arbitration may be enjoined from

pursuing what would now be a futile arbitration, even if the threatened irreparable injury to the other party is only the cost of defending the arbitration and having the court set aside any unfavorable award").

Applying this rule, courts in this District and around the country have enjoined arbitrations seeking to adjudicate disputes that are not subject to arbitration. *See Chicago Sch. Reform Bd. of Trs. v. Diversified Pharm. Servs., Inc.*, 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999) ("[S]everal courts have held that forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes per se irreparable harm."); *Washington Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121, 128 (D.D.C. 2015) (citing with approval an opinion noting that a party "may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration after its contract expired") (internal quotation marks and citation omitted); *see, e.g., id.* (finding plaintiff would suffer irreparable harm if forced to arbitrate grievances not subject to arbitration); *UBS Sec., LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011) ("Because UBS is not legally obligated to arbitrate the Swiss Investors' claims, and the lack of an injunction would result in UBS effectively being required to do so, UBS satisfies the 'irreparable harm' and 'lack of adequate remedy at law' requirements for an injunction."); *Morgan Keegan & Co. v. McPoland*, 829 F. Supp. 2d 1031, 1036 (W.D. Wash. 2011) (similar); *World Grp. Sec. v. Tiu*, No. CV 03-2609 NM SHSX, 2003 WL 26119461, at *7 (C.D. Cal. July 22, 2003) (similar); *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *9 (D. Mass. Mar. 25, 2024) (similar).

The Court should reach the same conclusion here. As noted, Plaintiffs are not parties to any arbitration agreement with the Non-User Claimants. Under black letter law, Plaintiffs cannot be forced to arbitrate claims that they never agreed to arbitrate. And forcing Plaintiffs to expend

time and resources arbitrating claims that are not arbitrable will cause them irreparable harm, as recognized by courts.

### 3.    Balance of Equities and Public Interest.

Because the Non-User Claimants "ha[ve] no right to arbitrate" their claims against Plaintiffs, the "the balance of equities weighs in favor" Plaintiffs.  *Washington Metro.*, 113 F. Supp. 3d at 129; *see also Starling*, 2024 WL 1258501, at *9 (similar).  For the same reason, the "public interest will further be served by preventing [the Non-User Claimants] from requiring [Plaintiffs] to arbitrate this dispute."  *Starling*, 2024 WL 1258501, at *9; *see also Sunlight*, 2015 WL 12655472, at *9 (similar).

Accordingly, the Court should enter injunctive relief to prevent the Non-User Claimants from filing arbitration demands against Plaintiffs in any forum.

## II.    THE COURT SHOULD COMPEL THE WRONG-TRIBUNAL CLAIMANTS TO ARBITRATE BEFORE ADR CHAMBERS IN CANADA, AND ENJOIN THE AAA FROM ADMINISTERING, AND THE WRONG-TRIBUNAL CLAIMANTS FROM PURSUING, THE AAA PROCEEDINGS.

Unlike the Non-User Claimants, the Wrong-Tribunal Claimants are parties to a valid and enforceable arbitration agreement with one or both Plaintiffs.  But that agreement requires them to arbitrate before ADR Chambers in Ontario, Canada.  Pursuant to Chapter 2 of the FAA and the Convention, the Court should compel them to pursue their claims with ADR Chambers.

### A.    The FAA Authorizes the Court to Compel Arbitration in a Foreign State Pursuant to the Convention.

The FAA provides that "a written provision in . . . a contract to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable save upon any grounds as exist at law or in equity for revocation of any contract."  9 U.S.C. § 2; *Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Sys., Inc.*, 448 F. Supp. 2d 64, 67 (D.D.C. 2006).  Sections 4 and 206 of the FAA grant District Courts authority to compel

arbitration, within or without the United States, provided that a valid and enforceable arbitration agreement exists. *See* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."); 9 U.S.C. § 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.").[4]

Chapter 2 of the FAA codifies the Convention which, among other thing, grants federal courts the power to compel arbitration in signatory countries. *See* N.Y. Convention, June 10, 1958, 21 U.S.T. 2517 (entered into force with respect to the United States Dec. 29, 1970); *see also* 9 U.S.C. § 201 (stating that the Convention "shall be enforced in United States courts in accordance with this chapter"). The Convention requires courts to enforce agreements requiring arbitration outside of the United States. In particular, Article II, Section 3 of the Convention provides that "[t]he court of a Contracting State . . . *shall*, at the request of one of the parties, refer the parties to arbitration." N.Y. Convention art. 2, § 3 (emphasis added); *see also* 9 U.S.C. § 206. The United States Supreme Court has held that "the emphatic federal policy in favor of arbitral dispute resolution . . . applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

Unless an arbitration agreement "is null and void, inoperative, or incapable of being performed," a District Court must grant a motion to compel arbitration outside the United States

---

[4] "Section 208 of the FAA provides that Chapter 1 of the FAA also applies to any actions brought under Chapter 2. Accordingly, the Court's authority to compel arbitration arises from both Section 4 and Section 206 of the FAA." *Invista N. Am., S.A.R.L. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 201 n.2 (D.D.C. 2007).

if: (1) there is a written agreement to arbitrate; (2) the chosen arbitral forum is in a country that is a signatory to the Convention; (3) the dispute arises out of a commercial, legal relationship; and (4) at least one party to the arbitration agreement is not an American citizen, or, if the relationship is between two U.S. citizens, the relationship "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202; *see also Crescent Petroleum Co. Int'l Ltd. v. Nat'l Iranian Oil Co.*, No. 22-CV-1361 (JMC), 2024 WL 1885498, at *4 (D.D.C. Apr. 30, 2024).

### 1.    A Valid, Enforceable Arbitration Agreement Exists Between Plaintiffs and the Wrong-Tribunal Claimants.

The 464 Wrong-Tribunal Claimants are parties to a valid, enforceable arbitration agreement with one or both Plaintiffs that requires arbitration before the ADR Chambers in Ontario, Canada. Before commencing their AAA Proceedings, each of them accepted the June 28, 2024 Terms and Conditions imposing that requirement using standard procedures common in all types of electronic transactions: a clickwrap agreement. (German Decl. ¶¶ 18-19, Exs. L-M.)

It has long been settled that clickwrap agreements, like the ones agreed to by the Wrong-Tribunal Claimants, are an enforceable means of creating binding contractual arrangements. This is certainly true in the District of Columbia. *See, e.g.*, *Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010 (D.C. 2002) (forum-selection clause was enforceable where agreement was presented "in a scroll box on [users'] computer monitors, where only a small portion of the document [wa]s visible at any one time," and where "[t]he contract [wa]s entered into by the subscriber clicking an 'Accept' button"); *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 11 (D.D.C. 2021) (holding that "presenting the terms of the agreement and requiring users to click 'I Agree' before they can access the service—constitutes a valid means of offer and acceptance*."); Abadi v. Nat'l R.R. Passenger Corp.*, No. 1:22-CV-03684 (TNM), 2024 WL 1344403, at *3 (D.D.C. Mar.

29, 2024) (same). "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract. . . ." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016); *see also Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (sign-up screen which stated, directly above a link to Airbnb's terms of service, that "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms" placed plaintiff on reasonable notice that by signing up he agreed to Airbnb's terms of service).[5]

Clickwrap agreements are equally enforceable under the laws of Ontario, Canada, which govern the Terms and Conditions. (German Decl., Exs. C-E, G-H, § 13.) As set forth in the Declaration of Geoffrey Hall, Esq., a user of a service who clicks that they agree to amended terms of service before continuing to use the service is bound by that agreement; by accepting the revised Terms & Conditions posted on Plaintiffs' websites on or after June 28, 2024, the Wrong-Tribunal Claimants thus became bound by those revised Terms and Conditions, including the agreement to arbitrate their disputes before ADR Chambers in Ontario, Canada. (*See* Declaration of Geoffrey Hall, Esq. ("Hall Decl.")); *see generally* Fed. R. Civ. P. 44.1 (permitting the Court to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" in determining foreign law); *see also Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984) ("[W]ritten or oral expert testimony accompanied by

---

[5] Every circuit to have considered the question has enforced clickwrap agreements. *See, e.g., Emmanuel v. Handy Techs., Inc.*, 992 F.3d 1, 10 (1st Cir. 2021); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017); *ADP, LLC v. Lynch*, 678 F. App'x 77, 80 (3d Cir. 2017); *Carson v. LendingTree LLC*, 456 F. App'x 234, 236 (4th Cir. 2011); *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 531-32 (5th Cir. 2020); *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007); *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021); *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257 (10th Cir. 2012); *Dye v. Tamko Bldg. Prod., Inc.*, 908 F.3d 675, 678 (11th Cir. 2018). *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176-77 (9th Cir. 2014).

extracts from foreign legal material is the basic method by which foreign law is proved."); Uniform Interstate and International Procedure Act, art. 4, § 402 (to determine foreign law court may consider any relevant material or source).

Moreover, there can be no dispute that the Wrong-Tribunal Claimants' claims are subject to the parties' arbitration agreement, which broadly provides that "any . . . dispute, claim or controversy arising out of or relating to any purchase or transaction by You, your access to or use of the Service, or to this Arbitration Agreement, the Terms of Use, the Sweeps Rules, Rules of Sports Prediction or Privacy Policy . . . shall be determined by arbitration." (German Decl., Exs. F-H, § 12.2.; *see also id.* Exs. C-E, § 12.2.) Indeed, the Wrong-Tribunal Claimants have already conceded the point by filing arbitration demands with the AAA.

Finally, the fact that Kind Law and Ben Travis Law sent self-serving correspondence on behalf of some of their alleged "clients" purporting to "opt out" of the change of arbitral forum to ADR Chambers changes nothing. (Rooney Decl., Ex. G). Each and every one of the Wrong Tribunal Claimants accepted the revised Terms & Conditions requiring arbitration before ADR Chambers in Ontario, Canada. The Terms & Conditions do not offer users the right to exercise such a "line-item veto," to reject certain aspects of the Terms & Conditions they dislike while enforcing others. Rather, when users first create an account and accept the Terms & Conditions, they may, for a limited 30-day period, opt out of the entirety of Section 12 regarding arbitration. That opt-out right expires after 30 days and does not renew when the Terms and Conditions are revised or amended. Having accepted the arbitration provision, users do not have the right to reject a revision of such provision designating a new arbitral forum. If the Wrong-Tribunal Claimants did not wish to accept the change to ADR Chambers, they should not have clicked the button

confirming their acknowledgement and acceptance of that change. They are bound by their decision to do so.

### 2. Plaintiffs Easily Satisfy The Requirements For Compelling Arbitration Pursuant To The Convention.

The Court should enforce the parties' arbitration agreement requiring arbitration before ADR Chambers in Ontario, Canada because the four jurisdictional elements under the Convention have been met. As established above, a written agreement to arbitrate exists, and it provides for arbitration in Canada, which "is signatory to the Convention." *Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*, No. LA CV15-08048 JAK (RAOx), 2018 WL 10152573, at *7 (C.D. Cal. July 10, 2018), *aff'd*, 772 F. App'x 585 (9th Cir. 2019).

The arbitration agreement arises out of a "legal relationship" that is "commercial." Two parties share a legal relationship within the meaning of the Convention if there is an agreement, whether contractual or not, that (1) "explicitly contemplate[s] which parties it w[ill] obligate"; (2) determines "the extent of the obligations"; and (3) provides "the legal framework to govern the arrangement." *Diag Human, S.E. v. Czech-Ministry of Health*, 824 F.3d 131, 135 (D.C. Cir. 2016). The Wrong-Tribunal Claimants share a legal relationship with Plaintiffs because the Terms and Conditions outlined the parties' rights and responsibilities, specified that the parties would arbitrate their disputes, and specified the applicable law that would apply. Moreover, agreement to such Terms and Conditions was a precondition to being able to access Plaintiffs' services. This contractual arrangement clearly qualifies as a "legal relationship" under established law. *See, e.g., id.* (finding requirement met where the "agreement defined a relationship between the parties").

As for the "commercial" requirement, Section 202 of the FAA provides that a legal relationship considered as "commercial" includes "a transaction, contract, or agreement described in section 2 of this Title." In the international arbitration context, "commercial" is broadly

construed as "*anything* that 'has a connection with commerce,' whether transactional or not." *Zhongshan Fucheng Indus. Inv. Co. LTD v. Nigeria*, No. 23-7016, 2024 WL 3733341, at *8 (D.C. Cir. Aug. 9, 2024) (emphasis added).  This requirement is readily met here.  The Wrong-Tribunal Claimants use an online service provided by Canadian-based companies, and many of them have made purchases from those companies.  The Terms and Conditions govern the provision of social gaming services and purchases.  (German Decl. ¶¶ 8-12.)  Thus, the parties' relationship clearly has a connection to commerce.

Lastly, the parties' relationship both "envisages performance or enforcement abroad" and has a "reasonable relation with one or more foreign states."  9 U.S.C. § 202.  Plaintiffs are based in Ontario, Canada; they provide services to all users, including the Wrong-Tribunal Claimants, from their offices and facilities in Ontario, Canada; all of Plaintiffs' witnesses and sources of proof are located in Ontario, Canada; and Plaintiffs' performance under the Terms & Conditions occurs in Canada.  (German Decl. ¶¶ 1-2, 8, Exs. C-H.)  *See Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 340-41 (5th Cir. 2004) (agreement that envisaged "the performance of pipefitting services . . . in West Africa" constituted "performance or enforcement abroad"); *Alberts v. Royal Caribbean Cruises, Ltd.*, 834 F.3d 1202, 1204-05 (11th Cir. 2016) (same result for performance "in international waters on a cruise ship that calls on foreign ports").

In short, Plaintiffs easily meet all requirements necessary for enforcement of the Canadian arbitration agreement.  And there is no basis to find that the agreement is "null and void, inoperative or incapable of being performed," 9 U.S.C. § 202; indeed, the Wrong-Tribunal Claimants have already commenced arbitration (albeit before the wrong tribunal), thus conceding that their claims are subject to arbitration.  As such, this Court should enforce the arbitration

agreement in effect when the Wrong-Tribunal Claimants filed their Demands and compel those claimants to arbitrate their claims against Plaintiffs before ADR Chambers in Ontario, Canada.

**B.    <u>The Court Should Enjoin The AAA Proceedings.</u>**

In addition to compelling the Wrong-Tribunal Claimants to arbitrate their claims before ADR Chambers in Ontario, Canada, the Court should enjoin the AAA Proceedings.  Aside from being improper and violative of the arbitration agreements, the AAA Proceedings would serve no purpose if the Court compels arbitration in Canada.  Moreover, the AAA Mass Arbitration Supplementary Rules themselves contemplate that respondents such as Zula and Sportzino may seek injunctive relief from a court to halt such proceedings.  *See* Am. Arb. Ass'n, *Mass Arbitration Supplementary Rules* MA-1(e) (2024), https://www.adr.org/sites/default/files/Mass_Arbitration_Supplementary_Rules.pdf ("If, within 30 calendar days after the AAA-ICDR's commencement of administration, a party seeks judicial intervention with respect to cases to which these Supplementary Rules apply and provides the AAA-ICDR with documentation that judicial intervention has been sought, the AAA-ICDR will suspend administration of such cases for 60 calendar days to permit the party to obtain a stay of arbitration from the court.").

**1.    The Court Has Authority To Enjoin The AAA Proceedings.**

As an "[e]xception[]" to arbitration, the Terms and Conditions provide that "either you or we may bring an action in a court as authorized by Section 13 for temporary injunctive relief until an arbitrator has been empaneled and can determine whether to continue, terminate or modify such relief."  (German Decl., Exs. C-H § 12.13.)  The Terms and Conditions, therefore, expressly authorize the Court to enjoin the AAA Proceedings.  No arbitrator has been empaneled.

Even in the absence of this exception, "a court may issue an injunction if, in addition to the usual equitable concerns, the integrity of the arbitration process would be threatened absent interim

relief." *Sprint Sols., Inc. v. Mobile Now, Inc.*, No. CV 19-3752 (JDB), 2020 WL 136285, at *3 (D.D.C. Jan. 13, 2020) (internal quotation marks and citation omitted). "Such an injunction in aid of arbitration is appropriate . . . only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration, such that a favorable decision by an arbitrator would be but an empty victory." *Id.* (internal quotation marks and citation omitted, emphasis omitted, alteration in original).

Because the Wrong-Tribunal Claimants agreed to arbitrate their claims before the ADR Chambers in Canada (and should be compelled to do so, as noted above), parallel proceedings before the AAA would unquestionably threaten to compromise the integrity of the arbitration process. Indeed, it is difficult to imagine an action that would frustrate or vitiate the parties' bargain more than Plaintiffs being forced to arbitrate before the wrong tribunal in violation of the Terms & Conditions. *See generally Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 425 (D.D.C. 2020) ("The Supreme Court has therefore recognized that in certain situations where the parties are bound by an agreement to arbitrate disputes, a court may issue an injunction against an action that goes against the arbitration agreement itself."). Accordingly, the Court can and should enjoin the AAA from proceeding with Wrong-Tribunal Claimants.

### 2.    Plaintiffs Satisfy The Elements Necessary For Immediate Injunctive Relief.

As established above, there can be no dispute that the Wrong-Tribunal Claimants agreed to and are bound by the Terms and Conditions establishing the ADR Chambers as the arbitral tribunal with authority to adjudicate the parties' disputes. Therefore, Plaintiffs have established a substantial likelihood of succeeding on their claims. As for irreparable harm, because the AAA has no power to act, any award it issues "would not be enforceable," *Merrill Lynch*, 337 F. 3d at 129, and any arbitration before it would be "futile," *McLauglin*, 105 F. 3d at 1194. Accordingly,

forcing Plaintiffs to expend resources and costs arbitrating before the AAA would irreparably harm Plaintiffs, as noted above.  Indeed, in the event the Court compels Wrong-Tribunal Claimants to initiate arbitration before ADR Chambers, the proceedings before the AAA would serve no purpose.  Finally, because the Wrong-Tribunal Claimants have no right to arbitrate before the AAA, the balance of hardships favors Plaintiffs, and the public interest would be served by enjoining the Wrong-Tribunal Claimants from violating the arbitration provisions of the Terms & Conditions.

### III.  THE COURT SHOULD ENJOIN ANY REMAINING AAA PROCEEDINGS UNTIL AND UNLESS KIND LAW AND BEN TRAVIS LAW DEMONSTRATE ADEQUATE DISCLOSURE TO CLIENTS AND CLIENT AUTHORIZATION TO FILE THE ARBITRATION DEMANDS.

The record demonstrates a clear and disturbing disconnect between the wishes of the claimants and the goals of the Demands filed by Kind Law and Ben Travis Law.  The Demands seek a declaration that the Zula and Sportzino websites constitute illegal gambling and an injunction to shut them down.  However, when select claimants effectively achieved this result through account suspension, the claimants themselves cried foul.  They reached out in dismay to Zula and Sportzino customer service, denying that they had retained Kind Law or Ben Travis Law, denying that they authorized the filing of any arbitration, and accusing the law firms of running a "scam."  It is further evident that the claimants appreciate the social gaming websites and want them to remain available; for that very reason, these individuals requested the immediate re-activation of their accounts.  This fact makes clear that the claimants do not share the goal of Kind Law and Ben Travis Law in shutting down the websites, and that the aims of the lawyers are in conflict with the interests of their supposed clients.

These failings are all the more significant given how Kind Law and Ben Travis Law accumulated their 3,000-plus collection of supposed claimants.  Unlike virtually all other attorney-

client relationships that result in litigation or arbitration, there was no evident person-to-person contact here that allowed for communication of goals and strategies to achieve those goals. Instead, the lawyers enrolled thousands of supposed clients where each client is little more than a spreadsheet entry. The social media solicitations promised compensation for unspecified reasons and (not surprisingly) the clients responded with willingness to accept free money. All the individuals had to do was enter their names and address through an online web page, and thereby became "clients" or Kind Law and Ben Travis Law.

Needless to say, Kind Law's and Ben Travis Law's conduct must abide by the American Bar Association's Model Rules of Professional Conduct, versions of which are applicable in the jurisdictions of potential relevance here.[6]  Model Rule 1.2 requires the attorney to "abide by a client's decisions concerning the objectives of representation. . . ."  Model Rule 1.4(a)(2) requires the attorney to "consult with the client about the means by which the client's objective are to be accomplished."  Additionally, Model Rule 1.4(b) requires the attorney to "explain a matter to the extent reasonably necessary to permit the client to make informed representations regarding the representation."  Further, Model Rule 3.1 provides that a lawyer "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law or fact for doing so that is not frivolous. . . ."

The record demonstrates clear violation of these principles.  Kind Law and Ben Travis Law did not secure many of their purported clients' authorization to file the Demands, advance these allegations, or seek the relief requested in the Demands.  Proof of these facts arises from the

---

[6] *See* N.Y. Rules of Pro. Conduct, 22 NYCRR 1200.0 *et seq.* (adopted 2009); N.J. Rules of Pro. Conduct, RPC 1.0 *et seq.* (adopted 1984); Cal. Rules of Pro. Conduct, Rule 1.0 *et seq.* (adopted 2018); Nev. Rules of Pro. Conduct, Rule 1.0 *et seq.* (adopted 2006); Or. Rules of Pro. Conduct, RPC 1.0 *et seq.* (adopted 2005).

claimant's own statements – *e.g.*, "I am not being represented by any legal entity"; "I have no lawyer or lawsuits against anyone if there is [it is] not with my consent"; "no one has contacted me about a law firm or anything like this so I'm not understanding what is doing on"; "Hello what are y'all talking about?  I don't have any legal action against y'all that makes no sense"; and "I'm not [able] to access my account.  But I believe it has something to do with a legal issue that I am not involved in.  I am not represented by any legal councel [sic]."  (German Decl., Ex. N.)  This violates Model Rules 1.2 and 1.4(a)(2).  Further, Kind Law and Ben Travis Law did not explain to their purported clients that they sought to shut down the Zula and Sportzino websites.  This is proven by the claimants' dismay and objections when their accounts were suspended.  This violates Model Rules 1.4(b) and 1.2.  *See* Comment 5 to Model Rule 1.4(b) ("In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that are likely to result in significant expense or to injure or coerce others.").  They did not perform an investigation to determine whether their purported clients were even authorized users of the Zula and Sportzino websites, and in fact filed Demands on behalf of 186 individuals who are strangers to those websites.  This violates Model Rule 3.1.

Presumably, Kind Law and Ben Travis Law rely upon a standard-form agreement to claim authority to represent the claimants and file the Demands.  Importantly, however, the relationship between attorney and client is not an arms-length, commercial one.  The attorney owes a fiduciary duty of candor and disclosure to the client.  *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 51 (D.D.C. 2010) (finding a breach of an attorney's fiduciary duty when she failed to update the client as to his status as a litigant).  To satisfy that duty, it is not enough to include fine print in an online agreement especially where, as here, correspondence with Zula and Sportzino customer service make clear the claimants do not understand and do not agree with the actions taken by

Kind Law and Ben Travis Law on their purported behalf. The record is clear is that Kind Law and Ben Travis Law are acting without informed consent and authorization from their clients, irrespective of what the fine print might say.

"Under District of Columbia law, a violation of the Rules of Professional Conduct 'can constitute a breach of the attorney's common law fiduciary duty to the client,'" which courts have the power to adjudicate and enforce. *So v. Suchanek*, 670 F.3d 1304, 1307-08 (D.C. Cir. 2012) (quoting *Griva v. Davison*, 637 A.2d 830, 846-47 (D.C. 1994)). This, too, goes to "the integrity of the arbitration process" and therefore allows the Court to enter injunctive relief. *Sprint Sols., Inc.*, 2020 WL 136285, at *3; *see also In re Centurylink Sales Practices & Sec. Litig.*, MDL No. 17-2795, 2020 WL 3513547, at *7 (D. Minn. June 29, 2020) ("The Court has a strong interest in ensuring that each class member makes an informed and voluntary decision regarding whether to object, opt out, or file a claim," requiring safeguards to ensure "that each class member received clear, informative notice. . . ."). Accordingly, the Court should enjoin the Defendants from proceeding with any of the 966 AAA arbitration proceedings until and unless Kind Law and Ben Travis Law proffer sufficient evidence that they have made adequate disclosure of their claims and goals and have secured authority from their purported clients to proceed.

## CONCLUSION

For the reasons stated above, the Court should enter an order that (1) enjoins the Non-User Claimants from arbitrating before the AAA and the AAA from administering such proceedings, (2) compels the Wrong-Tribunal Claimants to arbitrate their clams before ADR Chambers, and enjoins the AAA from administering arbitrations involving the Wrong-Tribunal Claimants, and (3) enjoins the AAA from proceeding with any remaining claimants until and unless Kind Law and Ben Travis Law demonstrate that they have made adequate disclosure and secured authorization from their purported clients to proceed.

Respectfully submitted,

IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
(202) 524-4157
*Attorneys for Plaintiffs*

DATED:  September 27, 2024                By: */s/ George Calhoun*_____

Of Counsel:

LOWENSTEIN SANDLER LLP
1251 Avenue of The Americas
New York, NY 10020
(212) 262-6700
*Attorneys for Plaintiffs*
*Pro Hac Vice Forthcoming*