**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

SCPS, LLC and SSPS, LLC,

     **Plaintiffs,**

 **v.**

           **Case No.: 1:24-cv-02768-PLF**

Kind Law, Ben Travis Law, and
Individuals Identified on Attachment A,

     **Defendants.**

---

**EMERGENCY MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

By limited appearance, Kind Law and Ben Travis Law ("Claimants' Counsel") hereby, through counsel, move this Court, in accordance with Fed. R. Civ. P. 65(a), (b) and LCvR 65.1, for issuance of a temporary restraining order and preliminary injunction against SCPS, LLC ("Zula") and SSPS, LLC ("Sportzino" and jointly as "Plaintiffs").[1]

This motion is based upon the accompanying memorandum of points and authorities, Declarations of Michael Kind and Matthew Carpenter, all papers and records on file herein and on such oral arguments which may be presented at the hearing of the motion.

---

[1] By submitting to this Court for the limited purpose of requesting the relief sought herein, Claimants' Counsel in no way waive any arguments, and specifically any jurisdictional arguments, on behalf of Claimants: they have not been served, there is no personal jurisdiction because they have no connection to this District, and venue is improper. Moreover, Claimants' Counsel do not waive and incorporate by reference those arguments raised in the accompanying motion to dismiss.

# Table of contents

I.   Introduction ........................................................................................................... 1

II.   Relevant facts ...................................................................................................... 2

   A.   Plaintiffs' "Sweeps Coin" scheme and operation of unlicensed online casinos ................. 2

   B.   Zula's March 7, 2024, AAA Arbitration Agreement ............................................ 4

   C.   Sportzino's May 7, 2024, AAA Arbitration Agreement ....................................... 4

   D.   Claimants submitted their pre-arbitration notices for claims ............................... 5

   E.   Zula and Sportzino updated their arbitration Terms to move the arbitrations to Canada, in an inferior forum ....................................................................................... 5

   F.   Unlike the AAA, ADR Chambers is oppressive to American consumers ......................... 6

   G.   Claimants opted out of the New Terms ............................................................. 8

   H.   Claimants filed their claims in the AAA, under the applicable Original Terms ................. 8

   I.   Plaintiffs, at their attorneys' direction, used dirty tactics to intimidate and threaten Claimants who were represented by counsel ............................................................... 9

III.  Legal Standard ................................................................................................... 11

IV.  Relief sought ...................................................................................................... 12

V.   Argument ........................................................................................................... 12

   A.   There is a strong likelihood of success .......................................................... 12

      1.   A Court will likely find that the Original Terms apply so the parties must arbitrate in the AAA ....................................................................................... 13

      2.   A Court will likely find that the New Terms are unenforceable ................................. 15

a.   The New Terms do not apply because they were only published *after* Claimants initiated their disputes under the Original Terms ............................................... 16

b.   Any supposed "consent" to the New Terms that Plaintiffs obtained through the coercive and deceptive popup is unenforceable............................................... 16

c.   Claimants opted out of the New Terms ..................................................... 19

d.   The New Terms are unconscionable because the forum selection clause requires Claimants to travel to Canada ........................................................................ 21

e.   The New Terms are unconscionable given the choice of law clauses ..................... 22

f.   The New Terms are unconscionable due to prohibitive fees .................................... 25

g.   The New Terms are unconscionable because of the lack of availability of fee waivers ............................................................................................................. 26

h.   The New Terms are unconscionable because ADR Chambers is inadequate .......... 27

i.   The New Terms are unconscionable to the extent that they bar opt-outs ................ 28

3.   The arbitrability issues raised in this case are for the AAA arbitrator to determine .... 28

4.   A Court will likely find that the Retaliatory Arbitrations are frivolous and, in any case, moot ............................................................................................................... 30

B.   Absent a TRO, Claimants will suffer imminent and irreparable harm ............................ 31

C.   A balance of equities and public interest favors granting this motion............................. 32

1.   Effect on the parties ................................................................................... 33

2.   Public interest............................................................................................. 34

VI.  Conclusion ........................................................................................................ 34

Cases

*1836 S St. Tenants Ass'n v. Estate of B. Battle*, 965 A.2d 832 (D.C. 2009) ................................. 19

*Aamer v. Obama*, 742 F.3d 1023, 408 U.S. App. D.C. 291 (D.C. Cir. 2014) ........................ 11, 31

*Abdullah v. Obama*, 753 F.3d 193, 410 U.S. App. D.C. 80 (D.C. Cir. 2014) .............................. 11

*Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002) ........................................................... 13

*Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 5, 108 Cal. Rptr. 2d 699, 702 (2001) .. 21,

22

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740, 1749 (2011) ...................... 16

*Baker v. Phx. Ins. Co.*, No. C12-1788JLR, 2014 U.S. Dist. LEXIS 190502 (W.D. Wash. Feb. 12,

2014) ................................................................................................................................. 31, 33

*Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377 (S.D.N.Y. 2002) ........................................ 17

*Bridgewell Res. Ltd. Liab. Co. v. Tanamera Constr., Ltd. Liab. Co.*, No. 3:20-cv-00518-YY,

2021 U.S. Dist. LEXIS 165294 (D. Or. June 1, 2021) ............................................................ 22

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, (2006) ............................................... 15

*Car Credit, Inc. v. Pitts*, 643 S.W.3d 366 (Mo. 2022) ................................................................. 28

*Chron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ............................... 14

*Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277 (9th Cir. 2009) .................................... 14

*Commc'ns Workers of Am. v. AT&T Inc.*, 453 U.S. App. D.C. 462, 6 F.4th 1344 (2021) ........... 29

*Conte v. Blossom Homes L.L.C.*, 2016-Ohio-7480, ¶ 35, 63 N.E.3d 1245, 1254 (Ct. App) ........ 25

*Costa v. Bazron*, 456 F. Supp. 3d 126 (D.D.C. 2020) ................................................................. 11

*Dancor Constr., Inc. v. FXR Constr., Inc.*, 2016 IL App (2d) 150839, ¶ 47, 407 Ill. Dec. 997,

1008, 64 N.E.3d 796, 807) (Ill. App. 2016) ............................................................................ 22

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 387 U.S. App. D.C. 205 (D.C. Cir. 2009) ............................................................................................................................ 12

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) ............................................. 13

*Douglas v. United States Dist. Court*, 495 F.3d 1062, (9th Cir. 2007) ......................... 16

*EpicentRx, Inc. v. Superior Court*, 95 Cal. App. 5th 890, 313 Cal. Rptr. 3d 782 (2023) ............ 22

*Fed. Maritime Comm'n v. City of Los Angeles*, 607 F. Supp. 2d 192 (D.D.C. 2009) ................. 32

*G Cos. Mgmt., LLC v. LREP Ariz., LLC*, 88 Cal. App. 5th 342, 304 Cal. Rptr. 3d 651 (2023) ... 23

*Garcia v. Stanley*, No. 14-cv-01806-BLF, 2017 U.S. Dist. LEXIS 32550 (N.D. Cal. Mar. 7, 2017) ......................................................................................................................... 24

*Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020) .......................................... 23

*Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) ................................ 23

*Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) ............................................. 23

*Graziano v. Harrison*, 950 F.2d 107 (3d Cir. 1991) ..................................................... 24

*Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000) ................................................................................................................ 24

*Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, (2008) ................................... 13

*Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 123 S. Ct. 588, 591 (2002).............................. 19

*In re BAM Trading Servs. Sec. Litig.*, No. 22-cv-03461-JSC, 2024 U.S. Dist. LEXIS 76712 (N.D. Cal. Apr. 26, 2024) ............................................................................................... 6

*Johnson v. Whaleco, Inc.*, 2023 U.S. Dist. LEXIS 184104 (M.D. Fla. 2023) ............................. 17

*Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055 (W.D. Wash. 2019) ................... 16, 18, 28

*Klayman v. Porter*, Civil Action No. 20-3109 (RBW), 2022 U.S. Dist. LEXIS 155227 (D.D.C. Aug. 29, 2022) ........................................................................................................ 30, 33

*Klos v. Lotnicze*, 133 F.3d 164 (2d Cir. 1997) ............................................................ 17

*Lipsett v. Banco Popular N. Am.*, 2022 U.S. Dist. LEXIS 222495 (S.D.N.Y. Dec. 9, 2022)  16, 20

*Losapio v. Comcast Corp.*, No. 1:10-CV-3438-RWS, 2011 U.S. Dist. LEXIS 42257 (N.D. Ga.

    Apr. 18, 2011) .......................................................................................................... 28

*Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125 (C.D. Cal. 2006) ...................................... 25

*MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022)...................... 27

*Moses H.* Cone Mem. *Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) .................... 14

*Mundi v. Union Sec. Life Insur. Co.*, 555 F.3d 1042 (9th Cir. 2009) .......................... 14

*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006)............................... 15, 21

*New Hampshire v. Maine*, 532 U.S. 742, 121 S. Ct. 1808 (2001)................................. 33

*Newton v. Am. Debt Servs., Inc.*, 549 Fed. App'x 692 (9th Cir. 2013)........................ 21

*Northland Capital Corp. v. Silver*, 735 F.2d 1421, n.10, 236 U.S. App. D.C. 390 (D.C. Cir. 1984)

    .................................................................................................................................. 19

*Oconner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020) ........................ 17

*Pope v. Sonatype, Inc.*, No. 5:15-cv-00956-RMW, 2015 U.S. Dist. LEXIS 60815 (N.D. Cal. May

    8, 2015) .................................................................................................................... 21

*Preston v. Ferrer*, 552 U.S. 346 (2008) ...................................................................... 13

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, (1967) ................... 15

*RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127 (D.D.C. 2011) .......................... 19

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 130 S. Ct. 2772, 2775 (2010) ................. 13, 28

*Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469 (9th Cir. 1997)...................... 14

*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, 8 Cal. App. 5th 1, 11, 213 Cal. Rptr. 3d

    410 (2017)................................................................................................................ 21

*Rubio-Virgen v. Nekzad Auto*, 2019 Cal. Super. LEXIS 92153 (Cal. Super. Mar. 8, 2019) ........ 25

*Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711 (E.D.N.Y. 2017) .............................. 28

*Segar v. Mukasey*, 390 U.S. App. D.C. 16, 508 F.3d 16, 25 (2007)............................................ 12

*Sibley v. Obama*, 810 F. Supp. 2d 309 (D.D.C. 2011)................................................................. 11

*Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999).......................................................... 14

*Soars v. Easter Seals Midwest*, 563 S.W.3d 111 (Mo. 2018) ...................................................... 29

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)..................................... 13, 14

*TK Servs. v. RWD Consulting, LLC*, 263 F. Supp. 3d 64 (D.D.C. 2017) ..................................... 29

*United States v. Facebook, Inc.*, Civil Action No. 19-2184 (TJK), 2024 U.S. Dist. LEXIS 15539

(D.D.C. Jan. 12, 2024) ........................................................................................................ 32

*United States v. Thorne*, 548 F. Supp. 3d 70 (D.D.C. 2021) ....................................................... 20

*Volt Infor. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)14

*Watson v. Gold N Diamonds, Inc.*, 736 F. Supp. 2d 266 (D.D.C. 2010) ..................................... 13

*Weaver v. Bratt*, 421 F. Supp. 2d 25 (D.D.C. 2006)................................................................... 18

*Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208 (D. Or. 2012)....................... 21

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249

(2008)................................................................................................................................... 12

*Zaborowski v. MHN Gov't Servs.*, 936 F. Supp. 2d 1145 (N.D. Cal. 2013) ............................... 25

Statutes

28 U.S.C. § 1915.......................................................................................................................... 26

29 U.S.C. § 1140.......................................................................................................................... 33

29 U.S.C. § 158............................................................................................................................ 33

42 U.S.C. § 12203........................................................................................................................ 33

42 U.S.C. § 2000e-3 .................................................................................................... 33

5 U.S.C. § 2302 ........................................................................................................... 33

Cal. Code Civ. Proc. § 1281.92 .................................................................................... 26

Cal. Code Civ. Proc. § 1281.98 .................................................................................... 26

Cal. Code Civ. Proc. § 1284.3(b)(3) ............................................................................. 26

California Government Code § 68630 ........................................................................... 26

California Rules of Court, Rule 3.55 ............................................................................. 26

N.J. Court Rule 1:13-2 ................................................................................................. 26

NRS 12.015 .................................................................................................................. 26

NRS 97B.100(1) ........................................................................................................... 22

NRS 97B.100(2) ........................................................................................................... 21

NY CPLR § 1101 (2023) .............................................................................................. 26

ORS 21.682 .................................................................................................................. 26

<u>Rules</u>

ABA Model Rules of Professional Conduct R. 4.1 (1983) ............................................. 11

DCRPC 4.1 ................................................................................................................... 11

DCRPC 4.4 ................................................................................................................... 11

<u>**Memorandum of Points and Authorities**</u>

## I.    Introduction

Plaintiffs run illegal online casinos that offer highly addictive games. Claimants are largely unsophisticated consumers who have all lost money gambling in Plaintiffs' online casinos. Claimants all retained Claimants' Counsel to file claims against Plaintiffs. In June 2024, Claimants began initiating their claims against Plaintiffs in the American Arbitration Association (the "AAA").

In a frenzied response to Claimants' arbitration claims, Plaintiffs published new terms on its websites that changed the arbitration forum from the AAA to ADR Chambers, in Canada (the "New Terms"). Then, after filing this suit, Plaintiffs also filed claims in Canada against certain Claimants, seeking a declaratory ruling that Claimants should not have filed their claims in the AAA and further seeking monetary damages (the "Retaliatory Arbitrations"). Plaintiffs threatened to obtain defaults unless Claimants appeared in the Retaliatory Arbitrations within 15 days.[2]

However, the New Terms are unenforceable, and the Retaliatory Arbitrations should not have been brought. Given the looming 15-day deadline for Claimants to appear in the Retaliatory Arbitrations and avoid default, and Plaintiffs' and their attorneys' unethical behavior toward Claimants,[3] this Court should protect Claimants and bar Plaintiffs from proceeding in the

---

[2] Claimants' Counsel have requested that Plaintiffs stay the Retaliatory Arbitrations until this Court rules on the pending issues. *E.g.*, Email to Gavin Rooney, Ex. 28 (dated Oct. 10, 2024). Plaintiffs have not agreed to stay the Retaliatory Arbitrations and appear interested in moving forward expeditiously in those proceedings.

[3] Most of Plaintiffs' and Plaintiffs' attorneys' erratic conduct, including unethical and deceptive direct communications with Claimants, is addressed in the accompanying Motion for Protective Order.

Retaliatory Arbitrations until a Court can determine whether Claimants properly filed their claims in the AAA.

Enjoining Plaintiffs' conduct is proper because Claimants are likely to succeed on the merits, will suffer irreparable harm absent this Court's protection, and a balance of the effect on the parties and public interest will conclude that this Court's protection is needed and appropriate.

## II.  Relevant facts

### A.  Plaintiffs' "Sweeps Coin" scheme and operation of unlicensed online casinos

Plaintiffs operate online casinos, where players wager real money on online slot machines to win real money, just like a land-based casino. In an attempt to avoid casino licensing laws and regulatory oversight, Plaintiffs devised a scheme:

- Gold Coins ("GCs") are purchased with USD;

- Sweeps Coins ("SCs") come "free" with purchases of GCs;

- Players can gamble SCs to win more SCs; and

- SCs are redeemed for USD (1 SC = $1 USD).

Zula Store, Ex. 4 (showing that, for example, $4.99 buys 5.05 "free" SCs; Zula Purchase Screenshot, Ex. 1 (showing purchase of GCs and SCs); Zula Website, Ex. 5 ("Earn free Sweeps Coins by . . . purchasing Gold Coins."); *Id.* ("You can also bulk up your SC coins by making a purchase at our store"); Zula, About Us, Ex. 6 ("As you acquire Gold Coins . . . through . . . purchases, additional Sweeps Coins will accompany it."); Sportzino Website, Ex. 7 ("Get Sweeps Coins for free when purchasing Gold Coins."); Zula Knowledge Base, Ex. 8 ("Every time you purchase Gold Coins, we will throw in a few Sweeps Coins for free."); Zula Knowledge Base, Ex. 9 ("we offer Sweeps Coins as an additional benefit, obtainable with each acquisition of Gold Coins. . . . Sweeps Coins can be utilized for participating in games. The Sweeps Coins (SCs) you earn by

winning can later be redeemed for real-monetary prizes."); Zula Knowledge Base, Ex. 10 ("Sweeps Coins can be redeemed for cash prizes, for each 1 Sweeps Coin you redeem you will receive $1"); *see also* Exs. 2-3 (showing redemption of SCs at a 1:1 value for USD).

The amount of "free" SCs that the player receives is usually approximately a 1:1 ratio of the USD spent on GCs. So, as an example, a player might purchase $100 on GCs and receive approximately 100 SCs for "free." Then, when finished gambling, the player can cash out the 100 SCs for $100. Players can use USD to buy SCs. *Id.* Players then use the SCs to gamble on various casino games or make sports bets online. *Id.* If the player wins, the player can then redeem their SCs for USD. *Id.*

Recognizing the risk that such illegal casino operators pose to the public, authorities have begun to take action to shut down such illegal gambling operations. *See*, *e.g.*, Michigan Department of Attorney General, *Attorney General Nessel Shuts Down Internet Gambling Corporation's Illegal Michigan Operations* (Sept. 12, 2023)[4] (observing that "[u]nlicensed gaming robs our schools and our government of essential funding and leaves consumers unprotected," and that when such companies "attempt to circumvent Michigan's gaming laws, they create the false impression that their games are legal and safe for consumers."); American Gaming Association, *Regulatory Vigilance Critical to Ensure "Sweepstakes" Don't Threaten Consumers and Undermine Gaming Regulation* (August 2024)[5] (calling for "regulators and state attorneys general

---

[4] Available at www.michigan.gov/ag/news/press-releases/2023/09/12/attorney-general-nessel-shuts-down-internet-gambling-corporations-illegal-michigan-operations#.
[5] Available at https://gamblingcompliance.vixio.com/sites/default/files/inline-files/AGA%20Sweepstakes%20Memo%20(1).pdf.

[to] investigate companies or platforms that offer "sweepstakes" model [casinos] and take appropriate action.").

**B. Zula's March 7, 2024, AAA Arbitration Agreement**

On March 7, 2024, Zula published its Terms, including an agreement to arbitrate any disputes before the AAA (the "Zula Original Terms"). Zula Original Terms, ECF No. 3-1, p. 12. Under the AAA Terms, the "scope" is defined very broadly, including:

> "any . . . dispute . . . arising out of or relating to any . . . use of the Service, or to this Arbitration Agreement, the Terms of Use, the Sweeps Rules or Privacy Policy (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability, or arbitrability of this Agreement or the Terms of Use)."

*Id.* at ¶ 12.2. There is a pre-arbitration notice requirement: "Before filing a claim against SCPC LLC, you agree to try to resolve the Dispute informally by contacting Customer Support." *Id.* at ¶ 12.4.

The Zula Original Terms call for arbitration to be held through the AAA. *Id.* at ¶ 12.5 ("The arbitration shall be conducted by the American Arbitration Association ("AAA") pursuant to its Consumer Arbitration Rules."); *Id.* at ¶ 12.6(a) ("the . . . AAA . . . will administer the arbitration under its Consumer Rules."

The Zula Original Terms state that "except as otherwise may be required by the AAA Rules, the arbitration will be held in Washington DC." *Id.* at ¶ 12.6(e). The Zula Original Terms also provide that "the laws of Ontario, Canada" govern. *Id.* at ¶ 13.

**C. Sportzino's May 7, 2024, AAA Arbitration Agreement**

Sportzino's May 7, 2024, Terms (the "Sportzino Original Terms" and together with the Zula Original Terms, referred herein as the "Original Terms") are identical in every material way to the Zula Original Terms. Sportzino Original Terms, ECF No. 3-1, p. 84; *see Id.* at ¶¶ 12.2 (same

"scope"), 12.4 (same pre-arbitration notice requirement), 12.5 (the AAA shall conduct the arbitration), 12.6(a) (same), 12.6(e) (locale of arbitration).

The only difference is that the Sportzino Original Terms provide that "the laws of Delaware, USA" govern. *Id.* at ¶ 13.

### D. Claimants submitted their pre-arbitration notices for claims

Starting on June 19, 2024, Claimants began submitting their notices to Zula and Sportzino under the Original Terms. *E.g.*, Sample Zula NOD, Ex. 11 (dated 6/19/2024); Sample Sportzino NOD, Ex. 12 (dated 6/19/2024).

In the notices, Claimants stated that they were seeking to bring claims in arbitration under various consumer protection statutes for Zula's and Sportzino's deceptive practices, including:

> (1) operating illegal social casino applications in violation of state and federal gambling laws; (2) designing the social casino applications with dark patterns that deceptively induced me to make in-app purchases; (3) failing to disclose material information about the social casino applications, including the odds for each game and how the odds may be manipulated based on a given player's status and profile; (4) deceptively advertising "deals" based on limited time discounts or on implied values that were false and untrue; and (5) engaging in this conduct consistently with others in a coordinated fashion in what amounts to a pattern of racketeering activity. Sportzino [and Zula] also utilized tracking pixels and other surveillance tools to intercept and gather information and data from visitors to its website, which Sportzino then disseminated to third parties such as Facebook and others.

*Id.*

### E. Zula and Sportzino updated their arbitration Terms to move the arbitrations to Canada, in an inferior forum

On June 28, 2024, both Zula and Sportzino updated their Terms (the "New Terms"). Zula New Terms, Ex. D, ECF No. 3-1, p. 36; Sportzino New Terms, Ex. G, ECF No. 3-1, p. 111.

The New Terms replace consumers' rights to arbitrate under United States law with Canadian law. *Id.* Under section 12.3, the agreement is now governed by the "Arbitration Act,

Ontario," instead of the Federal Arbitration Act ("FAA.") *Id.* Under section 12.5, the arbitration forum is now in Canada's ADR Chambers instead of the AAA. *Id.* Under section 12.5, ADR Chambers' rules now apply instead of the AAA's rules. *Id.* Under section 12.6(e), arbitrations will now be held in Ontario, Canada. *Id.* Under section 13, the governing law is now "Ontario, Canada" instead of Delaware (for Sportzino). *Id.*; Side by Side of Sportzino Original Terms *with* Sportzino New Terms, Ex. 14.

### F. Unlike the AAA, ADR Chambers is oppressive to American consumers

The AAA maintains extensive rules designed to ensure due process in consumer cases, including in cases where multiple claimants have brought similar claims against a single company. The AAA provides services to resolve American disputes, including complex consumer cases, taking into account the various laws and consumer protections throughout the States. *E.g.*, *In re BAM Trading Servs. Sec. Litig.*, No. 22-cv-03461-JSC, 2024 U.S. Dist. LEXIS 76712, at *33 (N.D. Cal. Apr. 26, 2024) (citing approvingly the AAA rules and the AAA Consumer Rules Fee Schedule).

On the other hand, ADR Chambers is designed to resolve Canadian disputes. ADR Chambers has no such protections.

In addition, the AAA's Mass Arbitration Protocols are designed to efficiently handle cases where numerous claimants assert claims against a single company. Under the Protocols, each side pays a relatively small "flat" filing fee ($3,125 for the individuals as a group and $8,125 for the business).[6] A Process Arbitrator is then assigned—under Rule MA-6(c) of the Mass Arbitration

---

[6] AAA, Mass Arbitration Fee Schedule, available at https://www.adr.org/sites/default/files/Consumer_Mass_Arbitration_and_Mediation_Fee_Schedule.pdf

Rules—to determine procedural issues, including which terms apply, which claimants qualify to be included in the case, the locale, and other procedural issues.[7]

ADR Chambers has no such procedures.

| | AAA | ADR Chambers |
|---|---|---|
| **Consumer rules** | Comprehensive consumer rules and protections to ensure fairness and due process[8] | None |
| **Fee waivers** | Consumer have the right to request a fee waiver[9] | None |
| **Consumer's initial Filing fees** | $225[10] | $500 plus tax[11] |
| **Arbitration fees** | $0.00 | Rate: $250 to $800 per hour, "plus HST"[12] |

---

[7] AAA, Mass Arbitration Supplementary Rules, https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf

[8] AAA, Consumer Arbitration Rules, available at https://adr.org/sites/default/files/Consumer%20Rules.pdf; AAA, Consumer Due Process Protocol Statement of Principles, available at https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20Protocol%20(1).pdf

[9] *E.g.*, AAA California fee waiver form, available at https://adr.org/sites/default/files/Waiver_of_Fees_CA_Only.pdf

[10] AAA Consumer Arbitration Costs, available at https://www.adr.org/sites/default/files/Consumer_Fee_Schedule_3.pdf

[11] https://adrchambers.com/arbitration/fees/

[12] ADR Chambers Fees, available at https://adrchambers.com/arbitration/fees/

| | | Billed 50/50 to the parties[13] |
|---|---|---|
| **Mass arbitration rules** | Extensive rules to handle cases where 25 or more claimants submits claims against a single company[14] | None |

### G. Claimants opted out of the New Terms

On July 23, 2024, Claimants opted out of the New Terms that were published only days after Claimants issued their NODs. Ex. 15 (Sample opt out of Sportzino's New Terms); Ex. 16 (Sample opt out of Zula's New Terms).[15]

### H. Claimants filed their claims in the AAA, under the applicable Original Terms

On August 14, 2024, Claimants filed their claims in the AAA against Zula. Sample Zula AAA Demand and Complaint, Ex. 17 (dated 8/14/2024).

On August 16, 2024, Claimants filed their claims in the AAA against Sportzino. Sample Sportzino AAA Demand and Complaint, Ex. 18 (dated 8/16/2024).

The AAA Complaints alleged violations of state gambling laws, violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1961 *et seq.* ("RICO"), violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), violations of the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2510, violations of state

---

[13] ADR Chambers Rules, Rule 21.3, available at https://adrchambers.com/arbitration/rules/
[14] AAA, Mass Arbitration Supplementary Rules, https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf
[15] In their motion, Plaintiffs attach only NODs from August, in an effort to try to deceive this Court to believe that Claimants initiated their claims *after* the New Terms were published. In fact, as seen here, Claimants' claims were initiated under the AAA Terms, before the Terms were updated.

wiretapping statutes, violations of state unfair and deceptive trade practices statutes, common law breaches of contract and implied contract, unjust enrichment, and negligence. *Id.*

**I. Plaintiffs, at their attorneys' direction, used dirty tactics to intimidate and threaten Claimants who were represented by counsel**

Despite knowing that Claimants were represented by Claimants' Counsel, Plaintiffs began contacting Claimants directly to coerce and intimidate Claimants to withdraw their claims, deceive them, and drive a wedge between Claimants and Claimants' counsel. These direct communications with Claimants were made at the direction of Plaintiffs' attorneys.

First, Plaintiffs emailed Claimants directly, threatening that "if the complaint is found to be false or causes reputational or other damages, we reserve the right to take appropriate actions on our end against you." *E.g.*, Ex. 13 (calling Claimants' claims "a potentially illegal action against us.").

Second, Plaintiffs directly communicated with Claimants, through an online popup, to attempt to deceive Claimants to accept the New Terms. Popup, ECF No. 3-1, p. 165. Plaintiffs did not notify Claimants' Counsel of these direct communications. Kind Decl., ¶¶ 6-14 This is another example of Plaintiffs' attempts to drive a wedge between Claimants and Claimants' Counsel and to attempt to prevent Claimants from bringing their meritorious claims.

Next, Plaintiffs suspended access to Claimants' accounts and refused to refund any funds remaining in those accounts unless Claimants sent an email drafted by Plaintiffs and Plaintiffs' attorneys:

> I confirm that I do not have any legal action, arbitrations ("legal action"), or any law firm representing me against Sportzino . I have not authorized any law firm or lawyers to work on my behalf to initiate or conduct a legal action. If any law firm or lawyers claim that they represent me for a legal action against Sportzino, it is without my consent or authorization. I intend to continue to enjoy the services offered by Sportzino.

*E.g.*, Emails between Sportzino and Claimant Matthew Carpenter, ECF No 3-1, p. 189, Ex. N.

Not surprisingly, several Claimants responded to Plaintiffs with the pre-written statement because they needed to access their accounts to retrieve their funds. *E.g.*, Carpenter Decl., ¶¶ 4-6 ("I did not expect Sportzino to unilaterally close my account, while I still had SCs (with a real money value) in my account. Sportzino did not give me the ability to redeem the SCs in my account . . . Although I believe that Sportzino took retaliatory action against me, I had no choice but to say that I did not have a case, in order for Sportzino to unblock my account.").

Additionally, after Plaintiffs, and Plaintiffs' attorneys filed this baseless action, Plaintiffs' attorneys at Lowenstein Sandler emailed Claimants directly "to request that you agree to waive service" and included attachments and a link to various documents. Kind Decl., ¶¶ 6-14, Ex. 24 (Sample email from Lowenstein Sandler to Claimants). Of course, Plaintiffs' attorney had no permission from Claimants' Counsel to contact Claimants directly. *Id.* This was another effort to drive a wedge between Claimants and Claimants' Counsel and a further attempt to chill and intimidate Claimants into withdrawing their meritorious claims.

Most recently, in October 2024, Plaintiffs' attorneys in Canada, Addario Law Group, emailed Claimants that it had filed claims in Canada seeking to bar Claimants from bringing their claims in the United States and further seeking monetary damages ("Plaintiff-Initiated Arbitration"). Kind Decl., ¶¶ 6-14, 46, Exs. 27 (sample email from Addario Law Group to Claimants); 27.1 (letter from Addario stating, "SSPS is open to resolving this dispute . . . with you directly" and providing a 15-day deadline for a response); 27.2 (copy of a sample Plaintiff-Initiated

Arbitration). These documents and statements were communicated to Claimants directly by Plaintiffs' attorneys. *Id.*[16]

## III.    Legal Standard

A TRO is analyzed using the same "factors applicable to preliminary injunctive relief," and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020) (quoting *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011)). To obtain a TRO, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038, 408 U.S. App. D.C. 291 (D.C. Cir. 2014). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197, 410 U.S. App. D.C. 80 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292, 387 U.S. App. D.C. 205 (D.C. Cir. 2009)) (internal quotation marks omitted).

_____

[16] In addition to the direct communications with Claimants, Plaintiffs also used a dirty tactic and misrepresented to Claimants' Counsel that they were a potential client to try to improperly obtain evidence and information. *E.g.*, ABA Model Rules of Professional Conduct R. 4.1, cmt. 1 (1983) ("A lawyer is required to be truthful when dealing with others on a client's behalf. . . . A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false."); DCRPC 4.1, cmt. 1 (same); DCRPC 4.4 (it is unethical to "knowingly use methods of obtaining evidence that violate the legal rights" of a third person). Here, Plaintiffs contacted Claimants' Counsel to try to trick them by pretending to be a potential client and even attempted to sign up for representation by Kind Law. Kind Decl., ¶ 14. These acts, taken at the direction of Plaintiffs' attorneys, are another example of Plaintiffs' and their attorneys' disregard for the law and their ethical obligations.

Moreover, in analyzing the parties' agreement, "any ambiguity in a contractual provision must be construed against the drafter." *Segar v. Mukasey*, 390 U.S. App. D.C. 16, 25, 508 F.3d 16, 25 (2007).

## IV.   Relief sought

To prevent additional harm to Claimants caused by the Retaliatory Arbitrations, Claimants' Counsel request that the Court enter the accompanying proposed order, barring Plaintiffs from filing any new actions, or proceed in any filed actions, against Claimants, without first making an application to and receiving the consent of this Court.

Such relief is supported by the caselaw and is necessary and proportional to the harm faced by Claimants, as discussed herein.

## V.   Argument

A TRO and preliminary injunction should be issued because (1) there is a strong likelihood of success, (2) absent such relief, Claimants will suffer an imminent and irreparable harm, and (3) a balance of equities and public interests favor granting this motion.

### A.  There is a strong likelihood of success

To obtain a TRO or preliminary injunction, a party must establish that it is likely to succeed on the merits. *E.g.*, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

Here, there is a strong likelihood that a Court will rule that Claimants' claims belong in the AAA because (1) under the Original Terms, the underlying disputes between Claimants and Plaintiffs belong in the AAA, (2) the New Terms are not enforceable because Claimants opted out and because the New Terms are unconscionable, (3) the arbitrability issues raised by Plaintiffs in

this case are for the AAA arbitrator to determine, and (4) the Retaliatory Arbitrations are frivolous and, in any case, moot.

### 1. A Court will likely find that the Original Terms apply so the parties must arbitrate in the AAA

There is no question that the Original Terms call for the parties to arbitrate all disputes through the AAA. Congress created the FAA to "replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). The FAA requires that "private agreements to arbitrate [be] enforced according to their terms." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). This national policy favoring arbitration "foreclose(s) state legislative attempts to undercut the enforceability of arbitration agreements." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008); *Watson v. Gold N Diamonds, Inc.*, 736 F. Supp. 2d 266, 268 (D.D.C. 2010) ("Federal policy favors arbitration."). Under the FAA, "courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The party moving to enforce an arbitration clause has the burden to prove that the arbitration agreement is valid. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 65, 130 S. Ct. 2772, 2775 (2010); *see also Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002).

Here, the parties agreed to resolve all disputes in arbitration in the AAA. Zula Original Terms, ECF No. 3-1, p. 12, ¶ 12 (broad arbitration scope; calling for all disputes to be arbitrated before the AAA); Sportzino Original Terms, ECF No. 3-1, p. 84, ¶ 12 (same). Moreover, starting on June 19, 2024, Claimants began submitting their notices to Zula and Sportzino under the Original Terms. *E.g.*, Sample Zula NOD, Ex. 11 (dated 6/19/2024); Sample Sportzino NOD, Ex.

12 (dated 6/19/2024). At the time the claims were initiated, there is no question that the Original Terms applied. Therefore, the Original Terms apply and a Court will likely rule that the claims belong in the AAA.

Second, the agreement to arbitrate in the AAA covers Claimants' claims. Any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Chron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000). There is a presumption for arbitration. *E.g.*, *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (internal quotation marks omitted); *Mundi v. Union Sec. Life Insur. Co.*, 555 F.3d 1042 (9th Cir. 2009) (internal quotation marks omitted). "[T]he central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Cor*p., 559 U.S. 662, 682 (2010) (quoting *Volt Infor. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and if the court is satisfied that creation of the agreement for arbitration is not an issue, the court must order arbitration. *Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (internal quotation marks omitted); *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 474 (9th Cir. 1997).

Here, the parties' dispute falls within the broad scope of the AAA arbitration agreement in the Original Terms. Zula Original Terms, ECF No. 3-1, p. 12, ¶ 12.2 (covering "any . . . dispute . . . arising out of or relating to any . . . use of the Service, or to this Arbitration Agreement, the Terms of Use, the Sweeps Rules or Privacy Policy (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability, or

arbitrability of this Agreement or the Terms of Use)"); Sportzino Original Terms, ECF No. 3-1, p. 84, ¶ 12.2 (same).

Finally, and as discussed further below, because there is a binding arbitration agreement to resolve the parties' disputes in the AAA, a Court will likely rule that any remaining issues—including the enforceability of the agreement—should be resolved through arbitration in the AAA. The law is clear is that whether a contract containing an agreement to arbitrate is enforceable is a question for the arbitrator, not the court. *E.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, (2006); *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, (1967) (arguments that an agreement is unenforceable are for the arbitrator, and not the court, to decide); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1264 (9th Cir. 2006) (citing *Buckeye* and *Prima Paint Corp.*). Here, any question about the enforceability of the agreement should be left to the AAA arbitrator. This Court will therefore likely rule that the parties' disputes belong in the AAA.

**2. A Court will likely find that the New Terms are unenforceable**

The New Terms, that Plaintiffs published *after* Claimants initiated their disputes before the AAA, and in response to Claimants initiating their disputes, are not enforceable because: (1) the New Terms were published after Claimants already initiated their AAA claims; (2) any supposed "consent" to the New Terms that Plaintiffs obtained through the coercive and deceptive popup is unenforceable; and (3) Claimants opted out of the New Terms. Moreover, the New Terms are unenforceable and unconscionable because: (4) their forum selection clauses are oppressive, (5) their choice of law provisions are invalid; (6) they require Claimants to pay prohibitive fees; (7) they lack an availability of fee waivers; (8) ADR Chambers is unfit to serve as an arbitral forum in these matters; and (9) to the extent that they bar opt outs.

a.  The New Terms do not apply because they were only published *after* Claimants initiated their disputes under the Original Terms

First, a Court will likely find that the New Terms do not apply since, by the time they were published, Claimants had already initiated their disputes under the Original Terms. *E.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345, 131 S. Ct. 1740, 1749 (2011) (the FAA's goal is encouraging efficient, streamlined, and speedy procedures); *Douglas v. United States Dist. Court*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("a party can't unilaterally change the terms of a contract."). Here, Plaintiffs fail to cite any on-point support that they can unilaterally change the terms of the parties' arbitration agreement after Claimants were already performing under the Original Terms. Moreover, Claimants' claims are already pending in arbitration before the AAA, so allowing those claims to proceed, is in line with the FAA's goal of promoting efficient and speedy arbitrations. For these reasons, a Court will likely allow the claims to proceed in arbitration before the AAA.

b.  Any supposed "consent" to the New Terms that Plaintiffs obtained through the coercive and deceptive popup is unenforceable

Second, the New Terms are unenforceable to the extent that consent to the New Terms, if any, was obtained though deception. Courts find unconscionable arbitration provisions that are sprung on consumers using deceptive tactics. *See generally Lipsett v. Banco Popular N. Am.*, 2022 U.S. Dist. LEXIS 222495, at *30-31 (S.D.N.Y. Dec. 9, 2022) ("[S]uch tactics [of repeatedly updating the arbitration terms], insofar as they may open a door to deception, weigh heavily in favor of finding that the springing of the arbitration provision on Lipsett was unconscionable."); *Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) ("Many courts have found that a defendant's attempt to foist a new arbitration provision on putative class members is an improper communication.") (finding the popup in conjunction with the revised

terms "coercive and misleading"); *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) ("To determine whether a contract was validly formed, a court should focus on evidence of . . . deceptive tactics . . . and any disparity in experience and education, i.e., bargaining power, between the parties."); *see also Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) ("Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis with no opportunity to change the terms."); *Oconner v. Agilant Sols., Inc*., 444 F. Supp. 3d 593, 604 (S.D.N.Y. 2020) ("[A]rbitration agreements may be unconscionable if procured through misleading or deceptive communications."); *see also generally Johnson v. Whaleco, Inc.*, 2023 U.S. Dist. LEXIS 184104, at *6 (M.D. Fla. 2023) (A mere "popup" in an application is insufficient to provide notice to a consumer of updated terms where it does not highlight that there were changes to the arbitration provision).

Here, on June 19, 2024, Claimants initiated their arbitrations before the AAA by submitting their NODs. Exs. 15, 16. In response, Plaintiffs used a popup notification in their applications to deceive Claimants to accept the New Terms. Popup, ECF No. 3-1, p. 165. The supposed notice to Claimants failed to mention the ongoing claims or alert Claimants that the arbitration provision was updated. *Id.* No notice was given to Claimants' Counsel. Kind Decl., ¶¶ 6-14. The New Terms are therefore unenforceable because they were deceptively presented to Claimants.

Plaintiffs' popup notification is particularly deceptive and coercive given the addictive nature of Plaintiffs' games and the fact that many Claimants already purchased SCs that can only be accessed by agreeing to the New Terms. In *Kater v. Churchill Downs, Inc.*, also involving an online casino, the court issued a restraining order, barring the defendant from using a popup message to force new arbitration terms on putative class members:

> The pop-up message presents putative class members with a stark choice: relinquish your class action rights and continue playing or maintain your rights and forfeit access to Big Fish's games. This ultimatum is made more coercive by the addictive nature of Big Fish's games and the fact that many players have already purchased chips that can only be accessed by agreeing to the terms.

*Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019); *see also*, *e.g.*, *Weaver v. Bratt*, 421 F. Supp. 2d 25, 32 (D.D.C. 2006) ("A contract is also voidable at the innocent party's option when entered into under duress or coercion.") (citing 28 Richard A. Lord, WILLISTON ON CONTRACTS § 71:12).

Here, in response to Claimants' claims being brought in the AAA, Plaintiffs suspended access to Claimants' accounts, including any funds that Claimants purchased. *E.g.*, Emails between Sportzino and Claimant Matthew Carpenter, ECF No 3-1, p. 189 (Plaintiffs' direct communications with Claimants regarding the account suspensions); Carpenter Decl., ¶¶ 4-6 ("I did not expect Sportzino to unilaterally close my account, while I still had SCs (with a real money value) in my account."). Furthermore, online casinos are even more addictive than land-based casinos because they are so accessible. Promises Behavioral Health, *Online Gambling More Addictive?*, available at https://www.promises.com/addiction-blog/is-online-gambling-more-addictive/ (last accessed October 11, 2024) ("Online gambling can be more addictive due to its easy accessibility and convenience. Unlike traditional casinos, which require visiting a physical location, online gambling can be accessed 24/7 from anywhere with an internet connection.").

Given the addictive nature of the games, and Plaintiffs' suspension of Claimants' accounts, including the SCs in Claimants' accounts, a Court will likely find that any supposed "consent" that Plaintiffs obtained through the coercive and deceptive popup notification is unenforceable.

c.   <u>c.</u>   <u>Claimants opted out of the New Terms</u>

Third, Claimants each, through counsel, opted out of the New Terms. *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 141 (D.D.C. 2011) ("A meeting of the minds takes the form of an offer or proposal by one party followed by an acceptance by the other party.") (citing Restatement (Second) of Contracts § 22 (1981)) (with alterations); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1428 n.10, 236 U.S. App. D.C. 390 (D.C. Cir. 1984) ("To have mutual assent . . . one party must have accepted by word or deed an offer from the other."); *1836 S St. Tenants Ass'n v. Estate of B. Battle*, 965 A.2d 832, 839 (D.C. 2009) ("An offer is a manifestation of intent to be bound without further action on the part of the offeror."); *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83, 123 S. Ct. 588, 591 (2002) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

Here, Sportzino published the New Terms on June 28, 2024. ECF No. 3-1, p. 111. On July 23, 2024, Claimants, through counsel, opted out of the New Terms. July 23, 2024, letter to Sportzino, Ex. 15. The opt out letter stated that Claimants:

> hereby unequivocally reject and opt out of the changes to the terms of the arbitration agreement that SSPS LLC unilaterally attempted to implement on June 28, 2024, July 22, 2024, and any future versions of the terms and conditions and/or arbitration agreements that may be put in place. Instead, our clients intend to enforce the agreement that was mutually entered into prior to the attempted changes. Each of our clients have expressly authorized our firm to deliver this message on their behalf.

*Id.*

Similarly, Zula published its New Terms on June 28, 2024. ECF No. 3-1, p. 36. On July 23, 2024, Claimants, through counsel, opted out of the new terms. July 23, 2024 letter to Zula, Ex. 16 (similar language as quoted above); August 20, 2024 Opt Out Letter to Zula, Ex. 19 (same); August 28, 2024 Opt Out Letter to Zula, Ex. 20 (same); *see also*, *e.g.*, AAA Terms, ECF No, 3-1,

p. 75, ¶ 12.7 (proving right to opt out of arbitration terms "by sending written notice of your decision to opt-out" "within thirty (30) days"); New Terms, ECF No. 3-1, p. 51, ¶ 12.7 (same). In this way, Claimants opted out of the New Terms within 30 days of Plaintiffs' attempt to unilaterally update the Original Terms, even though Plaintiffs knew that the AAA arbitration proceedings had already been initiated and that Claimants were represented by Claimants' Counsel. Therefore, a Court will likely find that there was no "meeting of the minds" when Plaintiffs unilaterally attempted to update the parties' agreement since Claimants specifically and immediately rejected those updated terms.

Of course, a party has the right to opt out of new terms sprung upon her by another party. Plaintiffs' position, that Plaintiffs could unilaterally and repeatedly update their Terms and that Claimants have no right to opt out, is absurd. *See*, *e.g.*, *United States v. Thorne*, 548 F. Supp. 3d 70, 121 (D.D.C. 2021) (discussing "the absurd results doctrine"); *see generally Lipsett v. Banco Popular N. Am.*, 2022 U.S. Dist. LEXIS 222495, at *30-31 (S.D.N.Y. Dec. 9, 2022) (finding unconscionable such deceptive tactics where a company could "trap" consumers and "entrench[] customers in a perpetual cycle of needing to opt out every time the contract is amended."). If Plaintiffs were correct, a consumer may never bring a claim. Each time the consumer initiates arbitration, the company can simply update the Terms to select a different arbitrator provider (and, according to Plaintiffs, anywhere in the world). A Court will likely find that Claimants had the right to opt out of the new terms thrust upon them, especially after Claimants had already initiated their claims under the Original Terms.

> d.  The New Terms are unconscionable because the forum selection clause requires Claimants to travel to Canada

Fourth, a Court will likely find that the New Terms are unconscionable because they are oppressive insofar as they force Claimants to arbitrate their claims in Canada. *E.g.*, NRS 97B.100(2) (In Nevada, "[a] forum selection provision in a consumer form contract which provides that any claims or actions related to the consumer form contract must be litigated in a forum outside [Nevada] is void."); *Pope v. Sonatype, Inc.*, No. 5:15-cv-00956-RMW, 2015 U.S. Dist. LEXIS 60815, at *11 (N.D. Cal. May 8, 2015) ("The most oppressive aspect of the Arbitration Agreement is its requirement that arbitration take place in Washington D.C. Pope, a California resident, was hired . . . for a job in California and which he performed in California. To make such an employee . . . go to his employer's choice of venue seems oppressive."); *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1289 (9th Cir. 2006) (en banc) (the forum selection clause was unconscionable where it "would require a one-woman franchisee who operates from her home to fly across the country to arbitrate a contract signed and performed in California"); *Newton v. Am. Debt Servs., Inc.*, 549 Fed. App'x 692 (9th Cir. 2013) (in a consumer case, the forum selection clause was unconscionable where it "requires Newton, who resides in California, to arbitrate in Tulsa Oklahoma"); *Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208, 1220–1221 (D. Or. 2012) (the forum selection clause requiring Oregon resident to arbitrate in California was so "gravely difficult and inconvenient" that for all practical purposes the plaintiffs would be deprived of their day in court: "It is fair to conclude on this record that plaintiffs are not capable of paying for and participating in arbitration in San Joaquin County, California"); *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 5, 108 Cal. Rptr. 2d 699, 702 (2001) ("[F]orum selection and choice of law clauses would be the functional equivalent of a contractual waiver of the consumer protections under the

[California Consumers Legal Remedies Act] and, thus, is prohibited under California law.");

*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, 8 Cal. App. 5th 1, 11, 213 Cal. Rptr. 3d 410, 418 (2017) (The New York choice of law provision was unenforceable as to California residents because "[i]f California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy."); *see also Bridgewell Res. Ltd. Liab. Co. v. Tanamera Constr., Ltd. Liab. Co*., No. 3:20-cv-00518-YY, 2021 U.S. Dist. LEXIS 165294, at *50 (D. Or. June 1, 2021) ("[C]omity requires courts in one state to honor other states' laws voiding forum selection clauses.") (citing *Dancor Constr., Inc. v. FXR Constr., Inc.*, 2016 IL App (2d) 150839, ¶ 47, 407 Ill. Dec. 997, 1008, 64 N.E.3d 796, 807) (Ill. App. 2016)).

Here, Claimants were targeted by Plaintiffs' casinos in their home states and lost money to Plaintiffs in their home states. It is oppressive to require such consumers who seek to submit a claim against the casino operators to travel to Canada, and retain Canadian counsel, to bring their claims that arose in their home states. A Court will therefore likely find that the New Terms are unconscionable.

e.   The New Terms are unconscionable given the choice of law clauses

Fifth, a Court will likely find that the New Terms are unconscionable because they contain unfair choice of law provisions for Canadian law to apply—effectively extinguishing Claimants' federal and state statutory rights. *E.g.*, NRS 97B.100(1) (In Nevada, "[a] choice of law provision in a consumer form contract which provides that the consumer form contract is to be governed or interpreted pursuant to the laws of another state is void."); *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 5, 108 Cal. Rptr. 2d 699, 702 (2001) ("[F]orum selection and choice of law clauses would be the functional equivalent of a contractual waiver of the consumer protections under the

[California Consumers Legal Remedies Act] and, thus, is prohibited under California law."); *EpicentRx, Inc. v. Superior Court*, 95 Cal. App. 5th 890, 902, 313 Cal. Rptr. 3d 782, 792 (2023) (employer failed to meet its burden to show that Texas law would adequately protect Californian residents' employee rights); *Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286, 294 (4th Cir. 2020) (involving foreign Tribal choice of law and arbitration provisions, "because the effect of the choice-of-law provisions is to stymie the vindication of the federal statutory claims that the borrowers seek to enforce [including under RICO], they amount to a prospective waiver and render the delegation provisions unenforceable. Consequently, the entire arbitration agreement is unenforceable.") (citations and quotations omitted); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019) (The choice of law provision calling for Tribal law to apply was unconscionable because "Tribal law provides no guarantee that federal and state statutory rights could be pursued, much less vindicated."); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 340-41 (4th Cir. 2020) ("[T]he choice-of-law provisions providing for the application of tribal law to the exclusion of federal statutory law amounted to an 'unambiguous and categorical waiver of federal statutory rights,' thereby rendering the arbitration agreements unenforceable."); *G Cos. Mgmt., LLC v. LREP Ariz., LLC*, 88 Cal. App. 5th 342, 351, 304 Cal. Rptr. 3d 651, 657 (2023) ("While California does not have any public policy against a choice of law provision, where it is otherwise appropriate, an agreement designating a foreign law will not be given effect if it would violate a strong California public policy or result in an evasion of a statute of the forum protecting its citizens.").

Here, for the Nevada Claimants, under NRS 97B, and for all other Claimants under applicable caselaw discussing the public policy against waiving consumer rights, the choice of law provisions render the New Terms unconscionable. An application of Canada law would eviscerate Claimants' consumer rights. Unlike in the U.S., Canada's consumer protections are enforced

primarily by Canada's regulatory and governmental bodies and provide only very limited private rights of action to consumers. *E.g.*, Ontario Consumer Protection Act, available at https://www.ontario.ca/laws/statute/02c30 (2002). Canadian law is inadequate to protect American consumers. The Canadian government has no interest in enforcing consumer protection laws on behalf of Americans. Under the New Terms, Claimants would have no private right of action.

In addition, the choice of law provision is unconscionable because Canadian law does not provide for attorneys' fees and costs—an essential element of enforcing consumer protection laws in the United States—should Claimants prevail. Like with federal consumer protection statutes, the various States, including Nevada and California, often chose the "private attorney general approach" as a means to enforce consumer statutes. *See, e.g.*, *Garcia v. Stanley*, No. 14-cv-01806-BLF, 2017 U.S. Dist. LEXIS 32550, at *12 (N.D. Cal. Mar. 7, 2017); *Graziano v. Harrison*, 950 F.2d 107, 113 (3d Cir. 1991) ("[A]n award of attorney's fees as a means of fulfilling Congress's intent that the Act should be enforced by debtors acting as private attorneys general."). Under the private attorney general approach, the legislature provides in the statute for attorneys' fees to be awarded to a prevailing consumer. In this way, Congress and state legislatures intend that the consumer protection statutes be enforced by private consumers, through counsel, instead of by using government agency resources. *See Id.*

Here, Canadian consumer laws are primarily enforced by the Canadian government. Even if a consumer can bring a claim in Canada, there is no ability to recover attorneys' fees. *See* Ontario Consumer Protection Act, available at https://www.ontario.ca/laws/statute/02c30 (2002). Thus, a Court will likely rule that the choice of law provision renders the New Terms unconscionable because it would effectively extinguish Claimants' claims.

<u>The New Terms are unconscionable due to prohibitive fees</u>

A Court will also likely rule that the New Terms are unconscionable because they expose Claimants to prohibitive arbitration and other fees and costs. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 522, 148 L. Ed. 2d 373 (2000) ("It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum."); *Conte v. Blossom Homes L.L.C.*, 2016-Ohio-7480, ¶ 35, 63 N.E.3d 1245, 1254 (Ct. App) (finding that potential for high costs in arbitration "chills consumers" and finding that the loser-pays provision is unconscionable and against public policy); *Rubio-Virgen v. Nekzad Auto*, 2019 Cal. Super. LEXIS 92153, *2 (Cal. Super. Mar. 8, 2019) (An arbitration provision governing California residents must "not require an employee or consumer to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum"); *see also Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125, 1133 (C.D. Cal. 2006) (in California, an arbitration agreement that provides that an employee or consumer must pay fees and costs is unconscionable); *Zaborowski v. MHN Gov't Servs.*, 936 F. Supp. 2d 1145, 1155 (N.D. Cal. 2013) ("Thus, under California law, the fee shifting provision is unconscionable.").

Here, in the AAA, Claimants would only need to pay, at most, $225 and, usually less[17]—similar to the filing fee they would need to pay in court. However, under the New Terms, Claimants would need to pay uncapped arbitrator fees, up to $800 per hour "plus HST,"[18] in addition to a

---

[17] AAA Consumer Arbitration Costs, available at
https://www.adr.org/sites/default/files/Consumer_Fee_Schedule_3.pdf
[18] ADR Chambers Fees, available at https://adrchambers.com/arbitration/fees/

$500 plus tax[19] filing fee in the Canadian forum. If the New Terms are enforced, Claimants are likely to have to pay tens-of-thousands of dollars to an arbitrator, just to have their consumer case heard. A Court will likely find that such prohibitive fees would effectively render Claimants' claims unfeasible.

> g.  The New Terms are unconscionable because of the lack of availability of fee waivers

Seventh, the New Terms are unconscionable because—unlike all American arbitral forums, including the AAA, and all United States courts—the Canadian forum does not allow consumer fee waivers for Claimants who cannot afford filing fees, as well as other consumer protections. *E.g.*, Cal. Code Civ. Proc. § 1284.3(b)(3) "Any consumer requesting a waiver of fees or costs may establish his or her eligibility by making a declaration . . . stating his or her monthly income and the number of persons living in his or her household."); Cal. Code Civ. Proc. § 1281.92 (additional requirements by private arbitration companies administering consumer arbitrations); Cal. Code Civ. Proc. § 1281.98 (providing certain consumer rights in private arbitration).

Here, to ensure access to justice, American courts and arbitral forums allow a claimant to request fee waivers. *E.g.*, AAA Fee Waiver form;[20] AAA California fee waiver form;[21] JAMS fee waiver application;[22] 28 U.S.C. § 1915 (a federal court may authorize commencement of an action without prepayment of fees by a person who is unable to pay such fees); NRS 12.015 (Nevada's fee waiver provision for indigent persons); California Rules of Court, Rule 3.55 (California court's

---

[19] https://adrchambers.com/arbitration/fees/
[20] Available at
https://www.adr.org/sites/default/files/document_repository/Support_of_Hardship_Waiver_of_Fees.pdf
[21] Available at https://adr.org/sites/default/files/Waiver_of_Fees_CA_Only.pdf
[22] Available at https://www.jamsadr.com/files/uploads/documents/declaration-in-support-of-application-for-waiver-of-fees-consumers.pdf

fee waiver rule); California Government Code § 68630 ("[O]ur legal system cannot provide "equal justice under law" unless all persons have access to the courts without regard to their economic means."); NY CPLR § 1101 (2023) (New York); ORS 21.682 (Oregon); N.J. Court Rule 1:13-2 (New Jersey). The Canadian forum in the forum selection clause has no similar rule allowing for a party to see a fee waiver.[23] A Court will therefore likely conclude that New Terms are therefore unconscionable.

>    h.   The New Terms are unconscionable because ADR Chambers is inadequate

Eighth, the New Terms are likely to found unconscionable because ADR Chambers appears unfit to hear these cases. Given the central goals of arbitration, efficient and speedy resolution of claims, an arbitration provision that will cause delay is unconscionable and unenforceable. *E.g.*, *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040 (N.D. Cal. 2022).

Here, ADR Chambers only has a small roster of available arbitrators. *See* ADR Chambers Arbitrators.[24] ADR Chambers has no rules to assist with mass or complex actions. On the other hand, the AAA has "a panel of approximately 7,500 arbitrators and mediators." AAA Statement of Ethical Principles.[25] The AAA also has extensive rules for complex and mass actions. AAA,

---

[23] There are also many other problems with the Canadian forum's rules that lack any consumer protections. American arbitral providers, like the AAA, offer comprehensive consumer rules and protections to ensure fairness and due process. *E.g.*, AAA, Consumer Arbitration Rules, available at https://adr.org/sites/default/files/Consumer%20Rules.pdf; AAA, Consumer Due Process Protocol Statement of Principles, available at https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20Protocol%20(1).pdf; JAMS Consumer Standards, available at https://www.jamsadr.com/consumer-minimum-standards/. American consumers therefore reasonably expect that these standards and protections would be applied in any arbitration proceeding.

[24] Available at https://adrchambers.com/arbitrators/.

[25] Available at https://www.icdr.org/StatementofEthicalPrinciples#.

Mass Arbitration Supplementary Rules.[26] ADR Chambers has no such rules and, given its small size, is ill equipped to provide "speedy" arbitration services to Claimants.

> i. The New Terms are unconscionable to the extent that they bar opt-outs

Lastly, the New Terms are also likely to found to be unenforceable to the extent that they do not allow Claimants to opt-out of the arbitration provision. Courts have stressed the importance of opt-out provisions when concluding that arbitration agreements are enforceable. *Losapio v. Comcast Corp.*, No. 1:10-CV-3438-RWS, 2011 U.S. Dist. LEXIS 42257, at *18 (N.D. Ga. Apr. 18, 2011); *accord Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 731 (E.D.N.Y. 2017) (courts across the country have concluded that a 30-day opt-out provision precludes a finding of procedural unconscionability); *Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) ("Courts have also found communications improper when they coerce putative class members by exploiting a dependent relationship or giving no realistic opportunity to opt out of the defendant's new terms."). Here, as discussed above, Claimants *did* have the right to opt-out and Claimants did, in fact, opt-out of the New Terms. However, Plaintiffs argue that Claimants had no right to opt-out of the New Terms containing the new arbitration provision. If so, then the New Terms are likely to be rendered unconscionable.

**3. The arbitrability issues raised in this case are for the AAA arbitrator to determine**

A Court is likely to rule that questions about the enforceability and applicability of the arbitration agreement are delegated, under the Original Terms, to the AAA arbitrator to determine. A "delegation provision" is an agreement to arbitrate, not just the underlying dispute, but also any

---

[26] Available at https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf.

threshold issues concerning the arbitration agreement. *Car Credit, Inc. v. Pitts*, 643 S.W.3d 366, 371 (Mo. 2022) (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010) ("[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."). "A delegation provision giving an arbitrator the power to decide threshold issues of arbitrability 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Soars v. Easter Seals Midwest*, 563 S.W.3d 111, 114 (Mo. 2018) (quoting 9 U.S.C. § 2); *see also TK Servs. v. RWD Consulting, LLC*, 263 F. Supp. 3d 64, 74 (D.D.C. 2017) (denying the motion for preliminary injunction to stay the arbitration proceedings because the determination would inject the court into the merits of issues delegated to the arbitrator).

Here, the Original Terms call for the parties to arbitrate in the AAA "any Dispute concerning or relating to this Agreement—including the scope, validity, enforceability, or severability of this Agreement or its provisions, as well as the arbitrability of any claims." Original Terms, ECF No. 3-1, p. 24, ¶ 12.2. Thus, Claimants are likely to prevail on their position that issues of arbitrability and enforceability belong before a AAA arbitrator.

Moreover, Plaintiffs delegated the issues raised in this case to the arbitrator when they incorporated the AAA's Rules into the Original Terms. "[D]elegation occurs when the parties' agreement incorporates arbitral rules that in turn assign questions of arbitrability to the arbitrator." *E.g.*, *Commc'ns Workers of Am. v. AT&T Inc.*, 453 U.S. App. D.C. 462, 465, 6 F.4th 1344, 1347 (2021) ("[T]he Agreement expressly incorporates the AAA rules for arbitration, and those rules in turn assign threshold questions of arbitrability to the arbitrator. Under our precedents, then, the

parties clearly and unmistakably delegated arbitrability questions to the arbitrator by incorporating the AAA.")

Here, the Original Terms expressly incorporate the "AAA Rules," the AAA's "Consumer Arbitration Rules," and a link to the website where to find those rules. Original Terms, ECF No. 3-1, p. 25, ¶ 12.5. In turn, the AAA Rules "assign threshold questions of arbitrability to the arbitrator." *AT&T*, 453 U.S. App. D.C. 465, 6 F.4th 1347; *see also* AAA, Consumer Arbitration Rules, R-13[27] (The arbitrator has the power to rule on his or her own jurisdiction and issues of arbitrability). Therefore, the incorporation of the AAA's Rules in the Original Terms delegates to the arbitrator jurisdiction to decide the enforceability of the arbitration agreement.

A Court will therefore likely conclude that all of the parties' disputes are for the AAA arbitrator to decide.

### 4. A Court will likely find that the Retaliatory Arbitrations are frivolous and, in any case, moot

A TRO is proper because a Court will likely find that the Retaliatory Arbitrations are frivolous and, in any case, moot. *Klayman v. Porter*, Civil Action No. 20-3109 (RBW), 2022 U.S. Dist. LEXIS 155227, at *29 (D.D.C. Aug. 29, 2022) (granting the defendants' motion for an injunction to enjoin the plaintiff from filing any new retaliatory actions against, or serving any additional subpoenas on, the defendants, without "first making application to and receiving the consent of this Court or any other court where additional litigation is proposed") (alterations added). Here, in response to Claimants' AAA claims, Plaintiffs initiated dozens of Retaliatory Arbitrations. Ex. 27.2. The Retaliatory Arbitrations are retaliatory and vexatious as they seek

---

[27] Available at https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf.

damages from Claimants for bringing their claims in the AAA. *Id.* A Court will likely find that the Retaliatory Arbitrations are frivolous because, as discussed, Claimants had the right to bring their AAA claims. *Id.* Moreover, in the Retaliatory Arbitrations, Plaintiffs raise the exact same issues in this case: whether Claimants' claims belong in the AAA. Thus, the Retaliatory Arbitrations will be moot once a Court rules that the claims belonged in the AAA.

### B. Absent a TRO, Claimants will suffer imminent and irreparable harm

Addressing the second prong of the analysis to issue a TRO, Claimants will suffer irreparable harm if a TRO is not issued that bars the Retaliatory Arbitrations. *E.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1038, 408 U.S. App. D.C. 291 (D.C. Cir. 2014) (a moving party must show that he is likely to suffer irreparable harm in the absence of preliminary relief). Moreover, Plaintiffs are estopped from arguing that Claimants will not suffer "irreparable harm" because Plaintiffs made that exact argument in their motion. *See generally* Plaintiffs' Mot., ECF No. 3, pp. 22-24 ("forcing Plaintiffs to expend time and resources arbitrating claims that are not arbitrable will cause them irreparable harm");[28] *e.g.*, *Baker v. Phx. Ins. Co.*, No. C12-1788JLR, 2014 U.S. Dist. LEXIS 190502, at *3 (W.D. Wash. Feb. 12, 2014) ("What is good for the goose is good for the gander") (citations and quotations omitted).

Here, Claimants will suffer imminent irreparable harm if the Retaliatory Arbitrations are not enjoined temporarily because (1) Claimants only have 15 business days to respond; Plaintiffs'

---

[28] Claimants' Counsel do not waive any argument that merely being forced to arbitrate is not "irreparable harm" under the applicable caselaw. However, here, irreparable harm exists, not just because Claimants are being forced to arbitrate their disputes but given the circumstances: the short timeline (only 15 days), the forum (in Canada), the choice of law (Canadian law), the looming default should Claimants not timely appear, Plaintiffs' attempts at improper forum shopping, the retaliatory and deceptive nature of the Retaliatory Arbitrations, and the other reasons discussed herein.

Notice of Arbitration, Ex. 27.1 (15 day deadline for Claimant to respond or face "an award in your absence and without further notice to you"); (2) the forum is located in Canada, making it especially difficult for these American Claimants; *Id.*; (3) the arbitral rules provide that Claimants face an immediate default (without any further notice) should they not timely appear; *Id.*; (4) Plaintiffs are engaged in improper forum shopping since Claimants first filed their claims in the AAA; and (5) the Retaliatory Arbitrations are retaliatory and deceptive in nature as they are designed to quickly obtain a decision in the Retaliatory Arbitrations before the issue can be determined here in the United States (either in arbitration, before this Court, or before another court).

Therefore, this Court should issue a TRO, barring Plaintiffs from filing any new claims in arbitration against Claimants and barring any defaults from being taken against Claimants until a Court rules on the issue of which arbitration forum is applicable.

### C. A balance of equities and public interest favors granting this motion

"The Court must also balance the competing claims of injury, which involves considering the effect on each party of the granting or withholding of the requested relief." *United States v. Facebook, Inc.*, Civil Action No. 19-2184 (TJK), 2024 U.S. Dist. LEXIS 15539, at *8 (D.D.C. Jan. 12, 2024) (citations and alterations omitted); *Fed. Maritime Comm'n v. City of Los Angeles*, 607 F. Supp. 2d 192, 203 (D.D.C. 2009) ("In considering these merged factors, the Court must balance the competing claims of injury and the effect an injunction would have on each party while paying particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations and alterations omitted). "Though the likelihood-of-success-on-the-merits and irreparable-harm prongs are typically the most critical, these last two are by no means an after-thought." *Id.* (citations and alterations omitted).

A balance of (1) the effect on the parties and (2) public interest will conclude that a TRO is proper.

### 1. Effect on the parties

The Court should protect Claimants and issue a TRO, barring the Retaliatory Arbitrations. This will allow time for a Court to determine the applicability and enforceability of the Original Terms versus the New Terms. Plaintiffs are estopped from arguing that an injunction is improper as to the Retaliatory Arbitrations since that is exactly what Plaintiffs request as to the AAA arbitration proceedings. *E.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001) (a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory); *Baker v. Phx. Ins. Co.*, No. C12-1788JLR, 2014 U.S. Dist. LEXIS 190502, at *3 (W.D. Wash. Feb. 12, 2014) ("What is good for the goose is good for the gander") (citations and quotations omitted). Here, Claimants will benefit from a TRO so that enough time passes for a Court to rule on the parties' disputes regarding which arbitration forum applies. This Court should issue a TRO barring the Retaliatory Arbitrations from proceeding.

On the other hand, Plaintiffs will not be harmed. The sole claim that Plaintiffs make in the Retaliatory Arbitrations is that Claimants' claims were improperly brought in the AAA. Notice of Arbitration, Ex. 27.1, p. 9 (seeking a declaration that the AAA proceedings were improperly brought). Plaintiffs have already asked this Court to address that very issue, so Plaintiffs do not need a "second bite at the apple" in a Canadian forum. In addition, since a Court is likely to find that the claims were properly brought in the AAA, as discussed, the Retaliatory Arbitrations would be moot. Therefore, a balance of the parties' interests strongly favors awarding a TRO.

### 2. Public interest

Public interest strongly favors a TRO to prevent Plaintiffs from continuing to proceed in the Retaliatory Arbitrations. There is a strong public policy to prevent retaliatory actions by companies against people who want to assert their claims. *E.g.*, 29 U.S.C. § 1140 (ERISA); 29 U.S.C. § 158 (NLRA); 5 U.S.C. § 2302 (Whistleblower Protection Act); 42 U.S.C. § 12203 (ADA); 42 U.S.C. § 2000e-3 (Title VII); *Klayman v. Porter*, Civil Action No. 20-3109 (RBW), 2022 U.S. Dist. LEXIS 155227, at *29 (D.D.C. Aug. 29, 2022) (granting the defendants' motion for an injunction to enjoin the plaintiff from filing any new retaliatory actions against, or serving any additional subpoenas on, the defendants, without "first making application to and receiving the consent of this Court or any other court where additional litigation is proposed") (alterations added). Here, Claimants sought to bring their meritorious claims in the AAA. Public policy dictates that this Court should enjoin Plaintiffs from bringing their Retaliatory Arbitrations, until a Court determines the appropriate arbitral forum.

There is no question that public policy favors a TRO and preliminary injunction under the circumstances, to enjoin Plaintiffs' retaliatory arbitration proceedings.

## VI. Conclusion

Respectfully, Claimants' Counsel request that this Court issue a TRO and preliminary injunction barring Plaintiffs from continuing to prosecute the Retaliatory Arbitrations or filing new ones, until a Court rules on the arbitrability issues presented in this case. The relief sought is proportional to Claimants' immediate needs to prevent the imminent and irreparable harm that the Retaliatory Arbitrations may cause.

Dated this 22nd day of October 2024.

Respectfully submitted,

*/s/ Max Maccoby*
D.C. Bar No. 462064
Washington Global Law Group PLLC
1701 Pennsylvania Ave., NW, Suite 200
Washington, DC 20006
202-248-5439 Office
773-960-8988 Cell
maccoby@washglobal-law.com
*Counsel for Claimants' Counsel*


## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 65.1

Under Local Rule 65.1, the undersigned hereby certifies that on October 22, 2024, the foregoing motion was filed and served through ECF on Plaintiffs' attorneys, who have entered their appearance in this action through the initial complaint.

Dated this 22nd day of October 2024.

*/s/ Max Maccoby*
*Counsel for Claimants' Counsel*