**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action No. 1:24-cv-02768

SCPS, LLC and SSPS, LLC,

                 Plaintiffs,

vs.

KIND LAW, BEN TRAVIS LAW, and
INDIVIDUALS IDENTIFIED ON
ATTACHMENT A,

                 Defendants.

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO KIND LAW AND BEN TRAVIS LAW'S
MOTION TO DISMISS**

---

IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
(202) 524-4157

LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................................2

   A.   Plaintiffs Zula and Sportzino. ................................................................................. 2

   B.   Plaintiffs Revise Terms & Conditions to Require Arbitration Before ADR
      Chambers. .............................................................................................................. 5

   C.   Kind Law and Ben Travis Law Conduct a Social Media Advertising Campaign and
      Then File Hundreds of AAA Arbitration Demands.................................................... 8

   D.   Kind Law and Ben Travis Law File Hundreds of Demands with the AAA. .............. 9

   E.   Zula's and Sportzino's Investigation of the Demands. ........................................... 10

   F.   Subsequent Events Make Clear that Kind Law and Ben Travis Law Failed to Secure
      Their Purported Clients' Authorization to File Arbitrations against Zula and
      Sportzino. ............................................................................................................ 11

   G.   Plaintiffs File a Complaint and Application for Injunctive Relief in This Court. .... 12

   H.   Plaintiffs Send Defendants Waiver of Service Forms in Accordance with Federal
      Rule of Civil Procedure 4. ..................................................................................... 13

ARGUMENT .................................................................................................................15

I.   THE COURT SHOULD DENY THE FIRMS' MOTION TO DISMISS. ......................15

   A.   The Firms Cannot Seek Relief On Behalf Of Claimants, Who Have Not Appeared In
      This Action .......................................................................................................... 15

   B.   Plaintiffs Have Standing To Assert Their Claims.................................................... 16

   C.   The Court Has Subject-Matter Jurisdiction To Adjudicate Plaintiffs' Claims. ........ 17

   D.   This Court Has Personal Jurisdiction Over The Firms. ........................................... 19

      1.   The Firms Waived Their Right To Challenge This Court's Jurisdiction By
          Seeking Affirmative Relief.…………………………………………   19

      2.   On The Merits, The Firms' Personal-Jurisdiction Defense Fails…………20

   E.   There Is No Basis To Transfer This Action To The Southern District Of California.
      ............................................................................................................................ 30

   F.   The Firms' Service Defense Is Moot. ..................................................................... 32

   G.   The Complaint States A Claim Against The Firms. ................................................. 33

CONCLUSION............................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Contractors Indem. Co. v. Atamian*,
  No. 08-2586-JWL, 2010 WL 11561550 (D. Kan. May 5, 2010) ...........................................15

*In re Am. Express Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011)...........................................................................................................23

*America Online, Inc. v. Super. Ct.*,
  108 Cal. Rptr. 2d 699 (Ct. App. 2001) ...................................................................................30

*Andra v. Left Gate Prop. Holding, Inc.*,
  453 S.W.3d 216 (Mo. 2015) .....................................................................................................22

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
  571 U.S. 49 (2013)......................................................................................................................31

*Bel-Ray Co. v. Chemrite (Pty) Ltd.*,
  181 F.3d 435 (3d Cir. 1999).............................................................................................19, 20

*Bradley v. Harris Research*,
  275 F.3d 884 (9th Cir. 2001) ....................................................................................................28

*Caples Co. v. United States*,
  243 F.2d 232 (D.C. Cir. 1957)...................................................................................................3

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991)....................................................................................................................26

*Casey v. Hill*,
  79 Cal. App. 5th 937 (2022) .....................................................................................................22

*Copper Bend Pharmacy, Inc. v. OptumRx*,
  2023 IL App (5th) 220211-U (2023) ......................................................................................29

*Crane v. N.Y. Zoological Soc.*,
  894 F.2d 454 (D.C. Cir. 1990)..................................................................................................21

*Doctor's Assocs., Inc. v. Kirksey*,
  No. 3:18-CV-963 (JCH), 2018 WL 6061573 (D. Conn. Nov. 20, 2018) ................................25

*Doctor's Assocs., Inc. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996)........................................................................................................32

*Ford Dealer Comput. Servs., Inc. v. Fullerton Motors, L.L.C.,*
    42 F. App'x 770 (6th Cir. 2002) ................................................................21

*GEO Specialty Chems., Inc. v. Husisian,*
    951 F. Supp. 2d 32 (D.D.C. 2013) ............................................................18

*Gipson v. Wells Fargo & Co.,*
    563 F. Supp. 2d 149 (D.D.C. 2008) ......................................................26, 28

*Great Lakes Ins. SE v. Raiders Retreat Realty Co.,*
    601 U.S. 65 (2024) ....................................................................................27

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.,*
    921 F.3d 522 (5th Cir. 2019) ....................................................................22

*Hara v. Hardcore Choppers, LLC,*
    904 F. Supp. 2d 22 (D.D.C. 2012) ............................................................26

*Hardaway v. Syneron, Inc.,*
    928 F. Supp. 2d 217 (D.D.C. 2013) ..........................................................26

*HealthplanCRM, LLC v. AvMed, Inc.,*
    458 F. Supp. 3d 308 (W.D. Pa. 2020) ......................................2, 21, 22, 25

*Hum. v. Czech Republic-Ministry of Health,*
    824 F.3d 131 (D.C. Cir. 2016) ..................................................................17

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.,*
    818 F.3d 193 (5th Cir. 2016) ....................................................................22

*Kasap v. Folger Nolan Fleming & Douglas, Inc.,*
    166 F.3d 1243 (D.C. Cir. 1999) ................................................................33

*KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.,*
    184 F.3d 42 (1st Cir. 1999) ......................................................................27

*L'Occitane, Inc. v. Zimmerman Reed LLP,*
    No. CV 24-1103 PA, 2024 WL 2227181 (C.D. Cal. Apr. 12, 2024) ....................17

*M/S Bremen v. Zapata Off-Shore Co.,*
    407 U.S. 1 (1972) ..............................................................................22, 26, 27

*Mann v. Castiel,*
    681 F.3d 368 (D.C. Cir. 2012) ............................................................19, 20

*Mercadante v. XE Servs., LLC,*
    78 F. Supp. 3d 131 (D.D.C. 2015) ............................................................25

*Milanovich v. Costa Crociere, S.p.A.*,
   954 F.2d 763 (D.C. Cir. 1992) .................................................................27

*Naegele v. Albers*,
   110 F. Supp. 3d 126 (D.D.C. 2015) ........................................................22

*Nagrampa v. MailCoups, Inc.*,
   469 F.3d 1257 (9th Cir. 2006) ................................................................29

*Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*,
   No. CIV.A. 87-1507, 1987 WL 16842 (D.D.C. Sept. 1, 1987) ................22

*Net2Phone, Inc. v. Super. Ct.*,
   135 Cal. Rptr. 2d 149 (Ct. App. 2003) ...................................................28

*New Pride Corp. v. Lee*,
   No. G059583, 2021 WL 3855640 (Cal. Ct. App. Aug. 30, 2021) ...........28

*Non-Dietary Exposure Task Force v. Tagros Chems. India, Ltd.*,
   309 F.R.D. 66 (D.D.C. 2015) ..............................................................2, 22

*One on One Basketball, Inc. v. Glob. Payments Direct, Inc.*,
   38 F. Supp. 3d 44 (D.D.C. 2014) ............................................................32

*OPE Int'l. LP v. Chet Morrison Contractors, Inc.*,
   258 F.3d 443 (5th Cir. 2001) ..................................................................28

*PaineWebber Inc. v. Chase Manhattan Priv. Bank*,
   260 F.3d 453 (5th Cir. 2001) .............................................................19, 20

*PCS 2000 LP v. Romulus Telecomms., Inc.*,
   148 F.3d 32 (1st Cir. 1998) .....................................................................23

*Polyflow, L.L.C. v. Specialty RTP, L.L.C.*,
   993 F.3d 295 (5th Cir. 2021) ..................................................................18

*Pope v. Sonatype, Inc.*,
   No. 5:15-CV-00956-RMW, 2015 WL 2174033 (N.D. Cal. May 8, 2015) ...........................29

*Rent–A–Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010) ..................................................................................25

*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*,
   8213 Cal. Rptr. 3d 410 (Ct. App. 2017) ..................................................30

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
   No. 16-CV-03662-JST, 2016 WL 6216874 (N.D. Cal. Oct. 25, 2016) .............................25, 30

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
    60 F. Supp. 3d 21 (D.D.C. 2014) ........................................................21

*Saline Parents v. Garland*,
    88 F.4th 298 (D.C. Cir. 2023) ............................................................16

*Sanchez v. Valencia Holding Co., LLC*,
    61 Cal. 4th 899 (2015) .......................................................................30

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007).............................................................................30

*Smith, Valentino & Smith, Inc. v. Super. Ct.*,
    17 Cal. 3d 491 (1976) .........................................................................28

*Song fi, Inc. v. Google Inc.*,
    72 F. Supp. 3d 53 (D.D.C. 2014) ........................................................26

*Sprint Sols., Inc. v. Mobile Now, Inc.*,
    No. CV 19-3752 (JDB), 2020 WL 136285 (D.D.C. Jan. 13, 2020) ........................................33

*St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*,
    270 F.3d 621 (8th Cir. 2001) .............................................................21

*Tompkins v. 23andMe, Inc.*,
    840 F.3d 1016 (9th Cir. 2016) ......................................................28, 29

*Vaden v. Discovery Bank*,
    556 U.S. 49 (2009)...........................................................................1, 18

*Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes*,
    336 F.2d 354 (2d Cir. 1964)...............................................................21

*Willis v. Nationwide Debt Settlement Grp.*,
    878 F. Supp. 2d 1208 (D. Or. 2012) ...................................................29

*Wright v. Interbank Cap., Inc.*,
    No. C 99–0091, 1999 WL 354516 (N.D. Cal. May 19, 1999) ................20

*Young Habliston v. Finra Regul., Inc.*,
    No. CV 15-2225 (ABJ), 2017 WL 396580 (D.D.C. Jan. 27, 2017) ........................................16

*Zephyr Fluid Sols., LLC v. Scholle IPN Packaging, Inc.*,
    No. 22-CV-00475-SRF, 2023 WL 1795798 (D. Del. Feb. 7, 2023) ........................................22

**Statutes**

9 U.S.C. §§ 1-16 ........................................................................................1

9 U.S.C. § 2..................................................................................................................28

9 U.S.C. § 4..................................................................................................17, 18, 23

9 U.S.C. § 203............................................................................................................1, 17

18 U.S.C. § 1961 *et seq*..........................................................................................1, 9, 18

28 U.S.C. § 1331............................................................................................................1

28 U.S.C. § 1332............................................................................................................1

28 U.S.C. § 1404......................................................................................................1, 30

**Rules**

Fed. R. Civ. P. 4........................................................................................................13, 32

Fed. R. Civ. P. 11(a)......................................................................................................15

Fed. R. Civ. P. 12(b)..................................................................................................1, 33

Fed. R. Civ. P. 65(a)(1)..................................................................................................13

Plaintiffs SCPS, LLC ("Zula") and SSPS, LLC ("Sportzino," and together with Zula, "Plaintiffs") respectfully submit this memorandum of law in opposition to the Motion to Dismiss the Complaint filed by Defendants Kind Law and Ben Travis Law (collectively, the "Firms") pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(3), (b)(4), and (b)(6), and/or to transfer the action to the Southern District of California pursuant to the doctrine of forum *non conveniens* and 28 U.S.C. § 1404.

## PRELIMINARY STATEMENT

This Court has subject-matter jurisdiction over this Complaint and personal jurisdiction over the Defendants.  Accordingly, the Motion to Dismiss filed by the Firms should be denied.

With respect to subject-matter jurisdiction, the Complaint pleads both federal-question jurisdiction under 28 U.S.C. § 1331 and diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332.  Contrary to the Firms' contention, Plaintiffs do not assert federal-question jurisdiction simply because they invoke the Federal Arbitration Act ("FAA").  As instructed by the Supreme Court, the Complaint "look[s] through" the FAA to examine whether the underlying claim at issue arises under federal law.  *Vaden v. Discovery Bank*, 556 U.S. 49, 62 (2009).  The underlying claims here allege violation of various federal statutes, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.; therefore, they arise under federal law. Likewise, 9 U.S.C. § 203 grants federal courts "original jurisdiction" over actions to compel international arbitrations pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").   That constitutes an independent basis for jurisdiction.  Finally, diversity jurisdiction exists because the Defendants are citizens of New York, New Jersey, California, Nevada, and Oregon; the Plaintiffs are citizens of Delaware and Canada; and the Complaint places $1.5 million in controversy.

This Court has personal jurisdiction over Defendants because Washington D.C. is the venue chosen by the arbitration provision invoked by the Firms and by each arbitration Claimant. Where, as here, parties agree to arbitrate their claims in a specific location, they impliedly consent to the jurisdiction and venue of the courts in that location to resolve any disputes consequent to the arbitration. The federal circuits are unanimous on this point, *see HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 319 (W.D. Pa. 2020) ("The Courts of Appeals for at least the First, Second, Fifth, Sixth, and Eighth Circuits have agreed; each holding that, by agreeing to arbitrate in a particular forum, parties impliedly consent to the jurisdiction of courts in that location for litigation of matters arising out of the arbitration given that those courts have jurisdiction under the FAA to compel arbitration.") (cleaned up), and that rule is also followed by this Court, *see, e.g.*, *Non-Dietary Exposure Task Force v. Tagros Chems. India, Ltd.*, 309 F.R.D. 66, 68–69 (D.D.C. 2015). Defendants have no basis to challenge the agreed-upon venue.

For these reasons, the Firms' Motion to Dismiss should be denied and the Court should proceed to address the merits of Plaintiffs' claims seeking injunctive relief.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Plaintiffs Zula and Sportzino.

Zula and Sportzino operate free-to-play social gaming websites that are provided and administered from Ontario, Canada. (Compl. ¶¶ 1, 13.) These sites allow registered users to play various online games without the use of real money. (*Id.* ¶ 13.) For playing purposes, users receive virtual "Gold" coins free of charge when they establish an account, log in to their account, or through other promotions. (*Id.* ¶ 14.) Users receive free Gold coins upon every login and also when their balance of Gold coins runs low. (*Id.*) Similar to many other sites with popular games (like "Candy Crush"), users may, but are not required to, purchase additional virtual Gold coins for use in the games. (*Id.*) Users cannot exchange their Gold coins for cash or any other "real

world" prizes.  (*Id.* at 15.)  There are no "real world" prizes awarded through Gold coin games.  (*Id.*)  Rather, users may only win additional Gold coins, which can be used for further entertainment play.  (*Id.*)  Gold coins have no other use.  (*Id.*)  They can never be redeemed or transferred.  (*Id.*)

For promotional purposes, Zula and Sportzino may also provide players with "Sweeps" coins.  Sweeps coins and Sweeps coin games operate under the longstanding state sweepstakes laws.  Sweepstakes are promotional tools to promote a good, product or service.  Regional, national and international companies, like Walmart[1], McDonald's, Snapple, Farmers Insurance, the Washington Nationals Baseball Club and other well-known brands regularly use sweepstakes to promote their products.  Here, the Sweeps coins promote the Zula and Sportzino free-to-play games and the brands more generally.  Sweeps coins are not available for purchase.  Rather, Sweeps coins are provided on a promotional basis for free, as a bonus with some purchases of Gold coins, as a sign up bonus, through social media promotions, or by submitting a written request to Zula or Sportzino.  (*See* Declaration of Yuliy German ("German Decl.") (ECF No. 3-1) ¶ 4.)  As such, the Sweeps coins are similar to the sweepstakes commonly used by national consumer-product companies under well-established sweepstakes and promotions laws.[2]

---

[1] *See, e.g., The 2024 Q4 Walmart November – January Sweepstakes Official Rules*, https://corporate.walmart.com/walmart-customer-satisfaction-sweepstakes-rules?clickid=xOL3rrRnzxyKRRkRYiQL41v%3AUkCWvoXdyxMX0g0&irgwc=1&sourceid=imp_xOL3rrRnzxyKRRkRYiQL41v%3AUkCWvoXdyxMX0g0&veh=aff&wmlspartner=imp_10579&affiliates_ad_id=565706&campaign_id=9383&sharedid= (last visited Oct. 31, 2024); *see also Official Rules 2024 Snapple® Instant Win*, https://snappleinstantwin.entertowinprizes.com/rules/ (last visited Oct. 31, 2024); *Nationals September 2024 Fan Sweepstakes Official Rules*, https://www.mlb.com/nationals/sponsorship/survey-sweepstakes (last visited Oct. 31, 2024).

[2] Under D.C. law (similar to the law across the country), a company may operate a promotional contest provided that players can participate free of charge – *i.e.*, without making a purchase.  For example, in *Caples Co. v. United States*, 243 F.2d 232, 234 (D.C. Cir. 1957), the Court permitted a television give-away program in which participating viewers used cards which could be obtained

Only registered users may access and play the games on the Zula and Sportzino sites. (Compl. ¶ 16.) To become a registered user, an individual must create an account through an online enrollment process by providing certain information (name, address, telephone number, and email address), satisfying certain enrollment requirements, and choosing a unique username and password. (*Id.* ¶ 17.) Registered users must also accept the Zula or Sportzino Terms & Conditions of Use Agreement ("Terms & Conditions") and Privacy Policy, through a clickwrap agreement. (*Id.* ¶ 18.) Zula's and Sportzino's customer databases track user registration and user website logins, among other information. (*Id.* ¶ 19.)

Zula and Sportzino revise their Terms & Conditions from time to time. (*Id.* ¶ 20.) The Terms & Conditions advise users of this fact:

> 18.1 We may amend, alter, delete or add to this Agreement at any time without notice to you.
>
> 18.2 Any changes made to this Agreement shall take effect immediately upon their publishing to the Website and your continued access or use of the Website. You can check the "Date Updated" date at the top of these Terms of Use to determine the date of the last revision.
>
> 18.3 You agree to review this Agreement regularly to stay current with changes that have been made.

(*Id.*) When Zula and Sportzino implement such a change to the Terms & Conditions, registered users are informed of the change during their next account login. (*Id.* ¶ 21.) During this process, users must acknowledge that they have reviewed and agree to the changes made in the Terms & Conditions. (*Id.*) In this fashion, Zula and Sportzino assure that their users are aware of and

---

free of charge in any quantity by anyone, without making a purchase. Here, players are not required to make a purchase in order to participate in the sweepstakes games or the free-to-play social gaming.

consent to any such changes.  (*Id.*)  If the users do not consent to the changes, they cannot access their accounts or use the websites.  (*Id.*)

Section 12 of the Terms & Conditions contains a mandatory arbitration provision.  (*Id.* ¶ 22.)  In the versions dated on or before May 7, 2024, the Terms & Conditions required arbitration before the American Arbitration Association ("AAA") in Washington, D.C.  (German Decl., Ex. F, § 12.6(e) ("[E]xcept as otherwise may be required by the AAA Rules, ***the arbitration will be held in Washington DC***." (emphasis added)).)  Accordingly, each user who accepted the Terms & Conditions agreed to Washington, D.C. as the venue for the resolution of disputes.  (*See* Defs.' Mot. to Dismiss ("Mov. Br.") at 6 (acknowledging that "Claimants began submitting their notices [of dispute] to Zula and Sportzino under *the Original Terms*." (emphasis added)).  Had they not done so, they would not have been able to create an account and play the games.

### B. Plaintiffs Revise Terms & Conditions to Require Arbitration Before ADR Chambers.

In mid-June 2024, the Firms sent correspondence to Zula and Sportzino threatening to commence enormous numbers of arbitrations against them.[3]  Zula and Sportzino amended their Terms & Conditions on June 28, 2024, to require arbitration before a different arbitral tribunal, ADR Chambers, in Canada, from which the Zulu and Sportzino businesses are supported and

---

[3] While styled "notices of dispute," this correspondence failed to satisfy the pre-dispute negotiation requirements of the Terms & Conditions.  Because the Firms' correspondence failed to sufficiently identify their alleged clients, Plaintiffs requested additional identifying information in order to further investigate the Firms' alleged clients' claims and address their concerns.  Rather than engage with Plaintiffs' counsel in good faith, the Firms refused to provide Zula and Sportzino with further information, including the information necessary to determine which, if any, of the alleged claimants were authorized users of the services and/or has made any purchases.  Indeed, the Firms had no actual interest in resolving their purported clients' "disputes" – their single goal was to file demands, which would trigger Plaintiffs' obligation to pay enormous administrative fees in hopes of extorting a quick settlement. Information provided months later in the Demands themselves revealed that 186 of these claimants were complete strangers to Zula and Sportzino with no rights under the Terms & Conditions at all.

operated.  ( Compl. ¶ 23.)  As its fee structure requires the parties to share equitably in the payment of arbitral fees, ADR Chambers eliminates the gamesmanship of zealous plaintiffs' attorneys seeking to use a mass of claims, and the massive AAA administrative fees they create, as a coercion tactic against respondents.

ADR Chambers is a reputable and widely used service for alternative dispute resolution, including arbitration, especially for Canadian-based companies such as Zula's and Sportzino's parent company and its affiliates.  For the last six years, ADR Chambers has been named the top alternative dispute resolution provider in Canadian Lawyer Magazine's *Readers' Choice Awards*.[4] The Supreme Court of Canada has granted ADR Chambers leave to intervene and argue as *amicus curiae* in at least five cases before Canada's highest court[5] and the decisions of ADR Chambers' arbitrators have been repeatedly upheld by Canadian courts.[6]  ADR Chambers has expertise in a

---

[4] Canadian Lawyer, *Readers' Choice Winners for 2023 Unveiled by Canadian Lawyer*, Canadian Lawyer (Nov. 29, 2023), https://www.canadianlawyermag.com/resources/legal-technology/readers-choice-winners-for-2023-unveiled-by-canadian-lawyer/381785;  Canadian Lawyer, *Readers' Choice 2022*, https://www.canadianlawyermag.com/rankings/readers-choice-2022/371394#winnersListSection;  Canadian Lawyer, *Readers' Choice 2021*, https://www.canadianlawyermag.com/rankings/readers-choice-2021/361466#winnersListSection; Tim Wilbur, *2020 Canadian Lawyer Readers' Choice Awards* (Nov. 18, 2020), https://www.canadianlawyermag.com/surveys-reports/readers-choice/2020-canadian-lawyer-readers-choice-awards/335249; Tim Wilbur, *2019 Canadian Lawyer Readers' Choice Awards* (Nov. 11, 2019), https://www.canadianlawyermag.com/surveys-reports/readers-choice/2019-canadian-lawyer-readers-choice-awards/321778; Tim Wilbur, *2018 Canadian Lawyer Readers' Choice Awards* (Oct. 1, 2018), https://www.canadianlawyermag.com/surveys-reports/readers-choice/2018-canadian-lawyer-readers-choice-awards/275502.

[5] *See Yugraneft Corp. v. Rexx Management Corp*., 2010 SCC 19 (Can.); *TELUS Communications Inc. v. Wellman*, 2019 SCC 19 (Can.); *Uber Technologies Inc. v. Heller*, 2020 SCC 16 (Can.); *Dell Computer Corp. v. Union des consommateurs*, 2007 SCC 34 (Can.); *Seidel v. TELUS Communications Inc.*, 2011 SCC 15 (Can.).

[6] *See, e.g., Inforica Inc. v. CGI Information Systems and Management Consultants Inc*, 2009 ONCA 642 (Can.); *Thiruchelvam v. RBC General Insurance Company*, 2022 ONSC 554 (Can.); *Waldock v. State Farm Mutual Automobile Insurance Company*, 2019 ONSC 6105 (Can.); *Cyr v. State Farm Mutual Automobile Insurance Company*, 2018 ONSC 563 (Can.).

wide array of subject matters, including consumer disputes. *See* ADR Chambers, *ADR Chambers Banking Ombuds Office Approved as an External Complaints Body for Banks by Government* (2024) (noting that the Banking Ombuds office of ADR Chambers has investigated consumer disputes against banks since 2008; Mediator Experts, *What Are Common Misconceptions About the Arbitration Process?* (April 18, 2024), available at https://adrchambers.com/news-articles/uncategorized/what-are-common-misconceptions-about-the-arbitration-process/ (acknowledging that consumer disputes are often required to be resolved by arbitration). ADR Chambers has resolved disputes with transnational parties, including disputes involving State Farm Automobile Insurance,[7] CGI Information Systems and Management Consultants,[8] Canada's Minister of Finance,[9] TD Bank,[10] and the Royal Bank of Canada.[11] Finally, ADR Chambers' capacity to process a large number of claims is supported by its record of offering 50% faster response times for banking disputes than its national, not-for-profit competitor, the Ombudsman for Banking Services and Investments.[12]

---

[7] *Waldock v. State Farm Mutual Automobile Insurance Company*, 2019 ONSC 6105 (Can.); *Cyr v. State Farm Mutual Automobile Insurance Company*, 2018 ONSC 563 (Can.)*.*

[8] *Inforica*, 2009 ONCA 642 (Can.).

[9] Philip Vineberg and Carol Lyons, *OBSI and ADRBO Approved as Banking External Complaint Bodie*, McMillan LLP Blog (July 2015), https://mcmillan.ca/insights/obsi-and-adrbo-approved-as-banking-external-complaint-bodies/.

[10] Theresa Tedesco, *TD Bank exits national ombudsman*, Financial Post (October 26, 2011), https://financialpost.com/news/fp-street/td-bank-exits-obsi.

[11] *Id.*

[12] *Id.* The National Ombudsman (Ombudsman for Banking Services and Investments) is a national, independent, not-for-profit organization that has assisted in resolving disputes between consumers and Canadian banks for over 25 years. Financial Consumer Agency of Canada, *Designation of Canada's single external complaints body for banking* (Oct. 17, 2023), https://www.canada.ca/en/financial-consumer-agency/news/2023/10/designation-dun-organisme-externe-de-traitement-des-plaintes-unique-pour-le-secteur-bancaire-au-canada.html.

The revised Terms & Conditions further required the arbitration to be held through virtual means from Ontario, Canada, where the Zula and Sportzino gaming websites are provided and administered and where their parent company and affiliates are located. (Compl. ¶ 23.) Every user who logged into an account on or after June 28, 2024, accepted the revised Terms & Conditions requiring arbitration before ADR Chambers in Ontario, Canada. (*Id.* ¶ 24.) By clicking a button labeled "Confirm," each such user affirmed "that I have read these documents and I accept all the updates within these documents." (*Id.*) The Terms & Conditions contain a revision log, which informs the reader which sections were changed at what specific times.

**C.    Kind Law and Ben Travis Law Conduct a Social Media Advertising Campaign and Then File Hundreds of AAA Arbitration Demands.**

Kind Law and Ben Travis Law conducted an advertising campaign on social media platforms such as Facebook, seeking to recruit large numbers of individuals to file claims against companies that offer social gaming websites. (*Id.* ¶ 25.) The advertisements target virtually the entire social gaming industry with a one-size-fits-all advertisement. (*Id.*) The Firms invited anyone who had made purchases to sign up in order to receive potential compensation:

> **If you made in-app purchases to play in social casino applications from certain developers in the last two years, you may be entitled to seek compensation. Click to sign up to get more information and to have an attorney review your potential case.**

(*Id.* ¶ 26.) Individuals who clicked "to sign up" were then brought to an online questionnaire, which asked the individual to indicate whether they played any of **_97_** different online games offered by a wide variety of companies. (*Id.* ¶ 27.) Zula and Sportzino were only two of those 97 online games. (*Id.*)

Individuals who completed the questionnaire supposedly "retained" the Firms as their counsel. (*Id.* ¶ 28.) The preeminent goal of this process was the recruitment of mass numbers of

individuals to assert claims against Zula and Sportzino. (*Id.*) Other considerations (such as disclosure of relevant information to would-be clients and appropriate diligence regarding individuals' standing to assert such claims) took a back seat to a desire to amass as many claimants as possible. (*Id.*)

      **D.**    <u>**Kind Law and Ben Travis Law File Hundreds of Demands with the AAA.**</u>

The advertising campaign succeeded in amassing thousands of claimants. On August 14 and 16, 2024, Kind Law and Ben Travis Law filed hundreds of identical demands for arbitration before the AAA (the "<u>Demands</u>"). (*Id.* ¶¶ 45, 46, 49.) Specifically, they filed 299 Demands for arbitration against Sportzino and 667 Demands for arbitration against Zula, seeking hearings in San Diego, California on behalf of their purported clients ("<u>Claimants</u>"). (*Id.* ¶¶ 45–46.) By this time, of course, the Terms & Conditions had been revised to require arbitration before ADR Chambers in Ontario, Canada, and many Claimants had already consented to those terms. (*Id.* ¶ 45.)

The Claimants do not hail from a single state—rather, they originate from five states on opposite coasts: New York, New Jersey, California, Nevada, and Oregon. (*Id.* ¶ 48.) The Demands assert that the Zula and Sportzino sites "operate illegal gambling games." (*Id.* ¶ 49.) They seek damages under several theories, including the federal RICO Act, 18 U.S.C § 1961 *et seq.*, and various state-law and common-law causes of action. (*Id.*) The Demands also seek a declaration that Zula and Sportzino conduct illegal gambling on their websites and an injunction to prohibit them from continuing to do so in the future. (*Id.*)

After the Claimants filed their demands with the AAA, the AAA issued correspondence advising that it would apply its Mass Arbitration Rules to the Demands. (*Id.* ¶ 51.) Under the AAA Mass Arbitration Fee Schedule, Zula and Sportzino face potentially enormous administrative fees of up to $1,525 per Demand. (*Id.*) In total, these 966 Demands face Plaintiffs with the

prospect of paying $1,464,275 in administrative fees alone.[13]  (*Id.*)  Moreover, the Firms purport to have thousands more clients to file arbitration demands against Zula and Sportzino.  (*Id.* ¶ 52.) If and when that happens, the Firms will expose Zula and Sportzino to several millions of dollars in potential AAA administrative fees, before the claims are even adjudicated.  (*Id.*)

E.    **Zula's and Sportzino's Investigation of the Demands.**

Using the information provided in the Demands, Plaintiffs investigated their customer databases for these individuals. (*Id.* ¶¶ 53–54.)   Three conclusions emerged from that investigation.

*First*, Plaintiffs determined that 186 of the Claimants were not, in fact, registered users of the Zula and Sportzino websites and therefore not parties to any agreement to arbitrate.  (*Id.* ¶ 55.)

*Second*, Plaintiffs determined that before filing the Demands, the majority of the remaining AAA claimants (464) accepted the revised Terms & Conditions that require arbitration before ADR Chambers in Ontario, Canada and therefore had no basis to file Demands before the AAA. (*Id.* ¶ 56.)

*Finally*, Plaintiffs determined that substantial numbers of the AAA claimants who established accounts nevertheless made no purchases from Zula and Sportzino and played the games for free, and therefore have no conceivable damages.  (*Id.* ¶ 57.)  While even Kind Law's and Ben Travis Law's advertisements stated that a claimant needs to have made an "in-app purchase" to file a claim, those firms evidently performed no diligence to determine whether, in fact, the claimants had spent any money on the Zula and Sportzino websites.  (*Id.* ¶ 58.)  Their motive for ignoring such inconvenient facts is obvious—their leverage comes from the total

---

[13] The AAA's *Consumer Mass Arbitration and Mediation Fee Schedule* may be found at https://www.adr.org/sites/default/files/Consumer_Mass_Arbitration_and_Mediation_Fee_Sched ule.pdf.

number of claims in order to drive massive AAA fees, without regard to the claims' merit or whether the claimants even suffered a loss.  (*Id.*)

F.  **Subsequent Events Make Clear that Kind Law and Ben Travis Law Failed to Secure Their Purported Clients' Authorization to File Arbitrations against Zula and Sportzino.**

The Demands assert that Zula's and Sportzino's social games are illegal.  (*Id.* ¶ 59.)  Zula and Sportzino are under no legal requirement to make their services available to any specific individual, especially where, as here, that individual is purportedly alleging the illegality of the activity.  (*Id.* ¶ 60.)  Accordingly, Zula and Sportzino began suspending the accounts of some AAA Claimants whose Demands asserted the illegality of the social games.  (*Id.*)

The Claimants' responses to those account suspensions are telling.  When informed of their arbitration Demand filing, many Claimants reported that they were unaware of it and denied that they had authorized Kind Law and Ben Travis Law to file arbitration demands on their behalf.  (*Id.* ¶ 62.)  As one such claimant stated to both Zula and Sportzino:

> I am writing this message to clarify that I am NOT represented by any law firms such as Kind Law & Ben Travis, nor am I affiliated with them in any way.  I have also contacted these law firms personally via email and informed them that if they use my information against your site, I will be forced to seek legal representation, as I have not authorized any dispute or arbitration. Furthermore, I will seek legal representation against said law firms if necessary.

(*Id.* ¶ 63.)  When informed of their apparent AAA Demand filings, other supposed Kind Law and Ben Travis Law "clients" stated as follows:

- "This is *false* and I have not done anything of the sort."

- "This information is *incorrect*.  *I am not being represented by any legal entity*."

- "No.  I have not done so *I have no lawyer or lawsuits against anyone if there is [it is] not with my consent*."

- "I've contacted the law firm that is stating they're representing me and I'm waiting for them to issue a letter to myself as well as Zula confirming I'm not pursuing any claim against Zula."

- "***I am not a part of the lawsuit against you***.  I corrected that with kind law dropping whatever they're doing."

(*Id.* ¶ 64; German Decl., Ex. N.)  Other claimants denied that they had ever been in contact with Kind Law or Ben Travis Law at all, and had certainly not authorized them to file the arbitration Demand:

- "***[N]o one has contacted me about a law firm or anything like this*** so I'm not understanding what is doing on. . . .  [N]obody has ever contacted me about this so this does not make sense to me at all."

- "Hello what are y'all talking about?  ***I don't have any legal action against y'all that makes no sense.***"

- "I'm not [able] to access my account.  But I believe it has something to do with a legal issue that I am not involved in.  ***I am not represented by any legal councel*** [sic]."

( Compl. ¶ 65.)  One claimant bluntly accused Kind Law and Ben Travis Law of running a "scam." (*Id.* ¶ 66.)

These comments raise disturbing questions as to what Kind Law and Ben Travis Law disclosed to their supposed "clients" and how they purportedly secured authorization to file the Demands at all.

### G.    Plaintiffs File a Complaint and Application for Injunctive Relief in This Court.

Faced with the prospect of owing several millions in arbitration fees stemming from AAA Demands improperly filed by (1) non-users of the Zula and Sportzino platforms, (2) registered users who accepted Zula and/or Sportzino's revised Terms & Conditions requiring arbitration before ADR Chambers, and who therefore have no right to commence arbitration before the AAA,

(3) individuals who have affirmatively disclaimed representation by the Firms and/or knowledge of the AAA proceedings, and who have no desire to cease using the Zula and/or Sportzino websites, and (4) other Claimants whose representation by the Firms is dubious (at best), on September 27, 2024, Plaintiffs filed the present action.

Plaintiffs named two categories of defendants: *first*, the 966 individual Claimants and, *second*, the Firms. [14]  They seek the following relief: (1) an order enjoining the non-user Claimants from proceeding with any arbitration; (2) an order compelling the Claimants who accepted the revised Terms & Conditions to comply with their agreement to arbitrate before ADR Chambers; and (3) an order enjoining the Firms from proceeding with arbitrations of the remaining Claimants, until and unless the Firms demonstrate they have the requisite authorization from the Claimants to do so based on accurate disclosures.  (*Id.*, Prayer for Relief, ¶¶ A–C .)

### H.    Plaintiffs Send Defendants Waiver of Service Forms in Accordance with Federal Rule of Civil Procedure 4.

Given Plaintiffs' request for emergent relief, Plaintiffs promptly provided the Firms with a copy of each of Plaintiffs' filings that same evening via email (Declaration of Naomi D. Barrowclough ("<u>Barrowclough Decl.</u>") ¶ 2, Exs. A, B), and provided the remaining individual Defendants with a copy of all filings the following business day, also via email (*id.* ¶ 3, Exs. C and D; *see also* ECF No. 4 (Certificate of Service); Fed. R. Civ. P. 65(a)(1)).  Due to the large number of Defendants, Plaintiffs enclosed a Waiver of the Service of Summons form (Form AO399) with their emails to Defendants and requested that they waive service of the summons and complaint by executing and returning the form.  (Barrowclough Decl. ¶¶ 2-3); *see* Fed. R. Civ. P. 4(d)(1) ("The plaintiff may notify ***such a defendant*** that an action has been commenced and request that

---

[14]   The Complaint also named the AAA as a nominal party, but the AAA was dismissed without prejudice on October 8, 2024.  (ECF No. 8.)

the defendant waive service of a summons." (emphasis added)).  Plaintiffs copied the Firms on their emails to the individual Defendants.  (Barrowclough Decl. ¶ 3.)

In response to receiving the Waiver of the Service of Summons form, supposed "clients" of the Firms continued to report that they had *not* retained either of the Firms and had *not* authorized them to file any arbitrations on their behalf.  (*Id.* ¶ 4.)   As the individuals stated in response to receiving the Waiver:

- "*I did not agree to be represented in this matter nor was I involved in anything against sportzino or zula. I gave no permission nor consent to anything having to do with either company listed in this complaint.*  What should I do? *I enjoy both sites and I want nothing to do with this*."

- "*I dont have any idea about this Lawsuit. I didnt file any lawsuit*"

(*Id.* ¶ 4, Exs. E and F (emphasis added).)

On October 15, 2024, Plaintiffs followed up with the Firms via email to inquire whether they intended to waive service on behalf of themselves and the hundreds of Claimants they purport to represent.  (*Id.* ¶ 5, Ex. G.)  Plaintiffs also informed the Firms that two copies of the waiver form would also be sent to them via first-class mail.  (*Id.*)  The Firms did not respond.  (*Id.* ¶ 6.)  On October 15, 2024, Plaintiffs mailed one copy of a Notice of a Lawsuit and Request to Waive Service of a Summons (Form AO398), two copies of a Waiver of the Service of Summons form (Form AO399), and a self-addressed stamped envelope to each Defendant.  (*Id.* ¶ 7.)

On October 31, 2024, the Firms signed the waivers and filed them and the docket.  (ECF Nos. 16, 17.)  To date, however, they have declined to accept service on behalf of their purported clients.  (Barrowclough Decl. ¶ 8.)  Indeed, as recently as October 28, 2024, Plaintiffs asked the Firm whether they would accept service on behalf of the Claimants.  (*Id.*)  They declined.  (*Id.*)

## ARGUMENT

## I.    THE COURT SHOULD DENY THE FIRMS' MOTION TO DISMISS.

### A.    The Firms Cannot Seek Relief On Behalf Of Claimants, Who Have Not Appeared In This Action.

Although the Firms' Motion to Dismiss is brought solely on their behalf (*see* Notice of Motion; ECF No. 11-1 (Proposed Order)), their brief tries to improperly sneak in relief for the Claimants too, on grounds that include purported lack of personal jurisdiction, improper venue, and improper service (*see, e.g.*, Mov. Br. at 2, 17-26), and the Proposed Order improperly seeks dismissal of "the Complaint[.]"  (ECF No. 11-1).  However, no Claimant has appeared in this action.  While the Firms could obviously appear on behalf of the Claimants, they have for their own tactical reasons chosen not to do so.

The Firms, as defendants in this action, cannot seek dismissal of the Complaint behalf of the Claimants without appearing on their behalf.  *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented."); *see, e.g.*, *Am. Contractors Indem. Co. v. Atamian*, No. 08-2586-JWL, 2010 WL 11561550, at *1 (D. Kan. May 5, 2010) (party cannot seek relief on behalf of another party).  Although the Firms purport to represent the individual defendants in the underlying AAA proceeding, neither the Firms nor their D.C. local counsel (*i.e.*, Max Maccoby of Washington Global Law Group, PLLC) have appeared on behalf of any Claimant in this action.  As the docket and pleadings in this case make clear, Mr. Maccoby represents only the Firms and not any of the Claimants.  Therefore, to the extent the Firms seek any relief by this motion on behalf of the Claimants, those requests are improper and the Complaint cannot be dismissed as to any of the Claimant defendants.

**B.**   **Plaintiffs Have Standing To Assert Their Claims.**

The Firms' lead argument attacking Plaintiffs' standing makes no sense.  They claim that the issues "are not ripe for judicial decision because the AAA proceedings are not moving forward at this time" and "are stayed."  (Mov. Br. at 15–16.)  But the Firms failed to inform the Court that the only reason the AAA proceedings are stayed is because Plaintiffs commenced this very action. *See* AAA Mass Arbitration Supplementary Rule MA-1(e) ("If, within 30 calendar days after the AAA-ICDR's commencement of administration, a party seeks judicial intervention with respect to cases to which these Supplementary Rules apply and provides the AAA-ICDR with documentation that judicial intervention has been sought, the AAA-ICDR will suspend administration of such cases for 60 calendar days to permit the party to obtain a stay of arbitration from the court.").[15]   As this rule makes clear, and the AAA already confirmed, the stay will automatically dissolve within 60 days of the AAA's decision (*i.e.*, on December 2, 2024) unless the parties agree or this Court orders otherwise.  (*See* Kind Decl., Exs. 25, 26.)  Obviously, then, not only are Plaintiffs' claims ripe, but they must also be adjudicated promptly in order to avoid a situation where the AAA restarts the proceedings before the Court has an opportunity to consider and rule upon the merits.  *See Saline Parents v. Garland*, 88 F.4th 298, 307 (D.C. Cir. 2023) ("A claim is premature and therefore unripe for judicial review if it depends on contingent future events that may not occur as anticipated, or indeed may not occur at all." (cleaned up)).

As the Firms do throughout their brief, they cite random cases without even attempting to explain how they have any relevance or support their (meritless) positions.  (Mov. Br. at 15–16.) They do not.  In none of those cases did the plaintiffs seek to enjoin pending arbitration proceedings that were filed by non-parties to, or in violation of, the parties' arbitration agreement.  *See Young*

---

[15] https://www.adr.org/sites/default/files/Mass_Arbitration_Supplementary_Rules.pdf.

*Habliston v. Finra Regul., Inc.*, No. CV 15-2225 (ABJ), 2017 WL 396580, at *5 (D.D.C. Jan. 27, 2017) (where plaintiffs complained about arbitrator bias and unfair rulings while arbitration was still ongoing, finding claims premature because "the arbitration has not yet concluded, and the outcome—which could be in plaintiffs' favor—is unknown"); *L'Occitane, Inc. v. Zimmerman Reed LLP*, No. CV 24-1103 PA (RAOx), 2024 WL 2227181, at *5 (C.D. Cal. Apr. 12, 2024) (claimants' motion to compel arbitration was denied, so there was no arbitration to enjoin). As Plaintiffs established in their Motion for Preliminary Relief, and Defendants do not dispute, the AAA proceedings have caused significant injures to Plaintiffs and will continue to do so unless enjoined by this Court. (ECF No. 3.)

**C.    The Court Has Subject-Matter Jurisdiction To Adjudicate Plaintiffs' Claims.**

The Firms' challenge to this Court's subject-matter jurisdiction is misguided. (Mov. Br. at 17.) Plaintiffs' Complaint establishes no less than three grounds for subject-matter jurisdiction, all of which the Firms ignore. (Compl. ¶¶ 8-10.) *First*, the Complaint pleads federal-question jurisdiction under the New York Convention, which is an international treaty that governs Plaintiffs' claim seeking to compel arbitration before the ADR Chambers. *See* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."); *Hum. v. Czech Republic-Ministry of Health*, 824 F.3d 131, 137 (D.C. Cir. 2016) ("We have already established that the New York Convention, as codified by the United States, grants federal courts jurisdiction over arbitration disputes that fall within its ambit.").

*Second*, the Complaint pleads federal-question jurisdiction under Section 4 of the FAA because the Claimants' underlying claims arise under federal law. As the United States Supreme

Court has held, "a federal court should determine its jurisdiction by 'looking through' a [FAA] § 4 petition to the parties' underlying substantive controversy." *Vaden v. Discovery Bank*, 556 U.S. 49, 62 (2009).  Here, the underlying AAA petitions all assert claims under numerous federal statutes, such as RICO, 18 U.S.C. § 1961, as the Firms acknowledge.  (Mov. Br. at 9.)  Because the underlying claims "'arise[] under' federal law," *Vaden*, 556 U.S. at 62, this Court has federal-question jurisdiction over Plaintiffs' claims under Section 4 of the FAA.  *See, e.g.*, *Polyflow, L.L.C. v. Specialty RTP, L.L.C.*, 993 F.3d 295, 302 (5th Cir. 2021) (finding jurisdiction where "arbitration demand included at least three federal statutory claims under the Lanham Act").

*Finally*, the Complaint pleads diversity jurisdiction over this dispute.  There is complete diversity because the Firms are citizens of California and Nevada (*see* Kind Decl. ¶¶ 15-16), while Plaintiffs are citizens of Canada and Delaware (*see* Compl. ¶¶ 1-3, 10; German Decl. ¶ 2.)  There is complete diversity with the Claimants too, as they are citizens of California, Oregon, Nevada, New York, and New Jersey.  (Compl. ¶ 6, Attachment A.)  The amount in controversy is also satisfied because, in the absence of injunctive relief, Plaintiffs face more than $1,000,000 in AAA fees, attorneys' fees and costs, and other substantial costs defending an improper and futile arbitration proceeding.  (*Id.* ¶ 10); *see also GEO Specialty Chems., Inc. v. Husisian*, 951 F. Supp. 2d 32, 39 (D.D.C. 2013) ("When the plaintiff seeks injunctive relief, the amount in controversy is measured by the value of the object of the litigation.  The Court may look either to the value of the right that plaintiff seeks to enforce or to protect, or to the cost to the defendants to remedy the alleged denial." (cleaned up)); *see generally id.* (noting that "a complaint should not be dismissed for want of the requisite jurisdictional amount unless it appears to a legal certainty that the plaintiff's claim does not amount to the statutory minimum." (cleaned up)).

**D.**     **This Court Has Personal Jurisdiction Over The Firms.**

      1.     **The Firms Waived Their Right To Challenge This Court's Jurisdiction By Seeking Affirmative Relief.**

Evidently the Firms believe that they can manufacture a scenario where they have the right to seek injunctive relief from this Court but Plaintiffs do not. The Firms are obviously wrong. As held by the D.C. Circuit, "when 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter[.]'" *Mann v. Castiel*, 681 F.3d 368, 374 (D.C. Cir. 2012) (quoting *PaineWebber Inc. v. Chase Manhattan Priv. Bank,* 260 F.3d 453, 460–61 (5th Cir. 2001)). That is exactly what happened here. The Firms did far more than simply defend against Plaintiffs' Complaint and Plaintiffs' motion for injunctive relief, or, as in *Mann* and *PaineWebber*, file a motion to stay this action on grounds that this Court lacked jurisdiction. Quite to the contrary, the Firms affirmatively invoked the Court's jurisdiction by asking it to (i) enjoin Plaintiffs from communicating with Claimants (*see* Proposed Order (ECF No. 12-1)), (ii) authorize the Firms to disseminate notices under the auspices of this Court's authority (*id.*), (iii) compel Plaintiffs to produce information pertaining to communications with Claimants (*id.*), (iv) enjoin the arbitrations pending before ADR Chambers (*see* Proposed Order (ECF No. 13-1)), and (v) preclude Plaintiffs from filing any new actions "without first making an application to and receiving the consent of *this Court* . . . " (*id.* (emphasis added)).

To state the obvious, the Firms cannot claim that this Court has no jurisdiction over them while they simultaneously seek affirmative relief from this Court. By choosing to invoke this Court's jurisdiction, they waived any personal jurisdiction defense. *See, e.g.*, *Bel-Ray Co. v.*

*Chemrite (Pty) Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999)[16] ("While the Individual Appellants timely raised their personal jurisdiction defense in their answer as required by the Federal Rules, they did far more than resist an application for a preliminary injunction.  They asked the District Court for affirmative relief before securing a determination on their personal jurisdiction defenses."); *Wright v. Interbank Cap., Inc.,* No. C 99–0091, 1999 WL 354516, at *2–3 (N.D. Cal. May 19, 1999) (defendant's request for temporary restraining order and immediate equitable relief resulted in waiver of personal jurisdiction defense).

2.       **On The Merits, The Firms' Personal-Jurisdiction Defense Fails.**

Even if the Firms had not waived any personal jurisdiction defense (and they did), the defense still would fail on the merits.  As a threshold matter, the Firms' defense is predicated on the notion that this Court does not have personal jurisdiction over "Claimants" or the "named defendants."  (Mov. Br. at 17-23.)  As established above, however, the Firms cannot seek relief on behalf of Claimants.  Even if successful, therefore, the Firms' defense would have no impact on Plaintiffs' claims against Claimants.  There is no question, however, that the Court has personal jurisdiction over both the Firms and the Claimants.

The Firms' contention that they (and the Claimants) have no connection to this District is false.  (Mov. Br. at 17, 18.)  This action arises out of more than 900 arbitrations that were improperly filed with the AAA based upon an arbitration provision that required arbitration ***in Washington, D.C***.  All of those arbitrations were filed by the Firms.  For a great many of those arbitrations, the Firms unilaterally filed them without the consent or approval of their so-called clients.  (*See* Compl. ¶¶ 61-69; Pls.' Mot. for Inj. Relief (ECF No. 3) ("Pls.' Inj. Mot.") at 11-12.)

---

[16] *Bel-Ray* was cited with approval by the D.C. Circuit in *Mann*, 681 F.3d at 374, and in the Fifth Circuit's opinion in *PaineWebber*, 260 F.3d at 460 n.9, 461 n.12.

In other words, the Firms improperly filed bogus arbitrations on their own and for their own benefit, not as an agent of anyone else. ***The Firms dispute none of these facts.***[17] Having chosen to (improperly) invoke for their own benefit the arbitration provision that required arbitration in Washington, D.C., the Firms subjected themselves to this Court's jurisdiction on any issues related to those arbitrations. (*See*, *infra*, Section I.G.) That includes Plaintiffs' request for injunctive relief seeking to preserve the integrity of the arbitration process by staying the arbitrations until and unless the Firms demonstrate they have the requisite authorization to proceed based on accurate disclosures. (Compl. ¶¶ 88; Pls.' Inj. Mot. at 23-24, 28.)

As the Complaint establishes in paragraph 11, by commencing arbitrations pursuant to an agreement that establishes, or previously established, Washington, D.C. as the arbitral venue, both the Firms and Claimants subjected themselves to the jurisdiction of this Court.[18] *See, e.g., HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 319 (W.D. Pa. 2020) ("The Courts of Appeals for at least the First, Second, Fifth, Sixth, and Eighth Circuits have agreed; each holding that, by agreeing to arbitrate in a particular forum, parties impliedly consent to the jurisdiction of courts in that location for litigation of matters arising out of the arbitration given that those courts have jurisdiction under the FAA to compel arbitration.") (cleaned up); *Ford Dealer Comput. Servs., Inc. v. Fullerton Motors, L.L.C.*, 42 F. App'x 770, 772 (6th Cir. 2002) (same); *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir. 2001) (same); *Victory*

---

[17] Even if the Firms had disputed these facts, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990).

[18] Alternatively, by invoking the arbitration agreement, it should have been foreseeable to the Firms that they would be bound by the forum-selection clause. *See Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 21, 34 (D.D.C. 2014) (noting that "a non-party may be subject to a forum selection clause if he or she is closely related to the dispute such that it becomes foreseeable that he or she will be bound" (cleaned up)).

*Transp. Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 363 (2d Cir.

1964) (same).  Courts in this District have adopted this rule.  *See, e.g.*, *Nat'l R.R. Passenger Corp.*

*v. Bos. & Maine Corp.*, No. CIV.A. 87-1507, 1987 WL 16842, at *1–2 (D.D.C. Sept. 1, 1987),

*aff'd*, 850 F.2d 756 (D.C. Cir. 1988); *Non-Dietary Exposure Task Force v. Tagros Chems. India,*

*Ltd.*, 309 F.R.D. 66, 68–69 (D.D.C. 2015).

The Firms make no attempt to dispute or distinguish any of these cases or identify case law

rejecting the rule they apply; instead, the Firms advance a series of baseless arguments intended

to sidestep the rule.  They contend that the forum-selection clause does not "automatically" confer

jurisdiction, "especially where, like here, the agreement was a form boilerplate agreement and not

signed by the Claimants."[19]  (Mov. Br. at 20.)  They conveniently claim that, "[a]t most," the

provision only allows Plaintiffs to compel arbitration in this Court, evidently believing that any

other request for relief related to those arbitrations are off the table.  (*Id.* at 21.)  The Firms are

wrong, which is why they cite nothing to support that assertion.  *See HealthplanCRM*, 458 F. Supp.

3d at 321 (jurisdiction extends to "all cases arising out of the parties' arbitration") (cleaned up);

*Zephyr Fluid Sols., LLC v. Scholle IPN Packaging, Inc.*, No. 22-CV-00475-SRF, 2023 WL

---

[19] The Firms do not seriously challenge the enforceability of clickwrap agreements, which are
repeatedly enforced by Courts.  (Pls.' Inj. Mot. at 18–19.)  In fact, the Firms do not cite a single
case in which a clickwrap agreement, in any context, was deemed unenforceable.  None of the
cases the Firms cite support such an assertion, nor do they concern applications to compel or enjoin
arbitrations in the jurisdiction in which the parties agreed to arbitrate.  *See Naegele v. Albers*, 110
F. Supp. 3d 126, 154 (D.D.C. 2015) (claims were unrelated to the contract and thus fell outside
the scope of forum-selection clause); *Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216,
222-24 (Mo. 2015) (matter did not involve arbitration); *M/S Bremen v. Zapata Off-Shore Co.*, 407
U.S. 1, 2–4 (1972) (same); *Casey v. Hill*, 79 Cal. App. 5th 937, 958, 969-70 (2022) (party sought
to evade a default judgement in a Missouri federal court by seeking to compel arbitration in
California); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 529,
541 (5th Cir. 2019) (court did not have personal jurisdiction over substantive claims that were
unrelated to compelling arbitration); *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp.,*
*Ltd.*, 818 F.3d 193, 198, 212 (5th Cir. 2016) (same).

1795798, at *2 (D. Del. Feb. 7, 2023) (party consents "for purposes of litigating disputes related to the arbitration agreement").  Indeed, it would make no sense to limit this Court's jurisdiction solely to motions to compel arbitration and leave it powerless to decide motions to enjoin arbitration or any other application related to the arbitration.  The Firms provide no principled reason for such an inequitable and unworkable limitation, nor is there one.[20]

Contrary to the Firms' assertion, Plaintiffs are not trying to "have it both ways[.]"  (Mov. Br. at 18.)  The Firms have taken the position that the operative version of the Terms & Conditions is the one requiring arbitration before the AAA in Washington, D.C.  While Plaintiffs disagree with that proposition, and contend that the majority of Claimants accepted a revision requiring arbitration before ADR Chambers via a clickwrap agreement, it nevertheless remains that all Claimants and the Firms subjected themselves to the jurisdiction of this Court by invoking the prior version of the arbitration provision requiring arbitration in Washington, D.C.  Moreover, not all of the Claimants accepted the new Terms & Conditions specifying ADR Chambers as the arbitral forum and, for those Claimants, Washington, D.C. today remains the chosen forum.

Next, the Firms claim that "[u]nder the AAA Rules, a forum selection provision is unenforceable in a consumer contract."  (Mov. Br. at 19.)  That assertion is wrong for a host of reasons.  For starters, the AAA Rules say no such thing.  The Firms rely on a AAA Statement of Principles, which, on its face, has no applicability here.  Principle 7's guideline regarding the

---

[20] Although the FAA speaks about motions to compel arbitration, courts have concluded that it applies equally to motions to enjoin arbitration.  *See PCS 2000 LP v. Romulus Telecomms., Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) ("We have held squarely that the power to enjoin an arbitration is the concomitant of the power to compel arbitration, and thus the same provision of the FAA, 9 U.S.C. § 4, authorizes both types of orders." (cleaned up)); *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 142 (2d Cir. 2011) (same).

location of arbitration hearings applies only "[i]n the case of face-to-face proceedings,"[21] but the Terms & Conditions that the Firms invoked in filing the AAA arbitrations make clear that any hearing would be virtual (and thus not a face-to-face proceeding). (German Decl., Ex. C, § 12.6(a).) Nor does the Principle even mention forum-selection clauses, much less deem them automatically "unenforceable," as the Firms falsely claim. To the contrary, the AAA has no authority to legally invalidate the forum-selection clause, as the very correspondence from the AAA in random, unrelated cases confirm. (*See* Kind Decl., Ex. 22 at 1 (noting that the AAA's review is "administrative" and "not an opinion" on whether "any part of the contract is legally enforceable").) That the AAA, as part of its *administrative* process, may decide to hold in-person hearings elsewhere does nothing to change the fact that the Terms and Conditions that the Firms and Claimants invoked included an agreement to arbitrate in Washington, D.C. and that, as a result, they consented to the jurisdiction of courts in this District for matters arising from their arbitrations. The Fims' argument is pure speculation, in any event, as the AAA has never made any decision regarding locale in any of *these* arbitrations.

Equally meritless is the notion that the Firms filed the arbitrations "in the AAA's San Diego, California office," which is of course a breach of the Terms & Conditions' requirement of Washington, D.C. (Mov. Br. at 18.) The notion of "filing" in San Diego is a construct that the Firms invented. The AAA does not have districts, like federal courts. The AAA's filing services are located in New Jersey. (*See* Kind Decl., Ex. 17, bottom of first page.) In reality, all the Firms (and Claimants) did was to improperly "request[]" San Diego as the locale (*id.* at Question 5),

---

[21] National Consumer Disputes Advisory Committee, *Consumer Due Process Protocol Statement of Principles*, Am. Arb. Assoc. 2 (1998), https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20Protocol%20(1).pdf.

when the Terms & Conditions they relied upon specify Washington, D.C.; but their attempt to unilaterally change the Terms and Conditions they chose to invoke is of no legal significance.

As a last ditch effort, the Firms argue that the forum-selection clause in the Terms & Conditions they invoked "is unenforceable under the laws of the states where **Claimants** reside[.]" (Mov. Br. at 21 (emphasis added).)  This argument fails for many reasons.  To begin with, the applicability of contractual defenses to enforceability are for the (correct) arbitrator to decide pursuant to the delegation clause of the applicable Terms & Conditions.  In order to sidestep that authority, the Firms would have to establish that the delegation clause itself is unenforceable.  *See Mercadante v. XE Servs., LLC*, 78 F. Supp. 3d 131, 137, 140 (D.D.C. 2015) ("contract defenses such as fraud in the inducement, duress, and unconscionability" "must be directed specifically at the delegation agreement and not at 'another provision of the contract, or to the contract as a whole'" (quoting *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010))).  Accordingly, the Firms public-policy argument "fails because it does not target the delegation agreement as *Rent–A–Center* requires." *Id.* at 141; *see also, e.g. Doctor's Assocs., Inc. v. Kirksey*, No. 3:18-CV-963 (JCH), 2018 WL 6061573, at *3, 5 (D. Conn. Nov. 20, 2018) (finding that claim challenging forum-selection clause was for the arbitrator, where party failed to challenge delegation provision); *HealthplanCRM*, 458 F. Supp. 3d at 321 (finding burden arguments "irrelevant" where party agreed to arbitrate in jurisdiction and thus impliedly consented to jurisdiction).

Even if the Court could decide contractual defenses, the Firms cannot seek relief on behalf of the "Claimants," as noted above.  (Mov. Br. at 21.)  As such, any public policy directed towards those defendants—who have not appeared in this case or filed motions to dismiss—would be irrelevant here.  The Firms identify no public policy that would bar enforcement of the Terms and Conditions against **them**, *i.e.*, sophisticated counsel who knowingly invoked Terms & Conditions

that set Washington, D.C. as the chosen locale to pursue phantom arbitrations without authorization from the parties they purported to represent.  Indeed, all the Firms offer to support their public-policy defense is conclusory and unsupported assertions about **Claimants** (*id*. at 21–22); they make no attempt to articulate any ground for invalidating the clause as to them.

In any event, there is no public policy that renders the forum-selection clause unenforceable, even as to Claimants.  In determining enforceability, courts in this District generally look to the federal standard established by the United States Supreme Court in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), and *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991).  *See, e.g.*, *Hara v. Hardcore Choppers, LLC*, 904 F. Supp. 2d 22, 25 (D.D.C. 2012); *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 59 (D.D.C. 2014); *Gipson v. Wells Fargo & Co.*, 563 F. Supp. 2d 149, 153-54 (D.D.C. 2008).  Under that standard, a party seeking to set aside a forum-selection clause must make a "strong showing" and bears "a heavy burden of proof[.]"  *Carnival*, 499 U.S. at 591–92.  The strong "presumption in favor of forum selection clauses includes clauses in non-negotiated boilerplate contracts." *Hardaway v. Syneron, Inc.*, 928 F. Supp. 2d 217, 219 (D.D.C. 2013) (cleaned up).  Accordingly, courts routinely enforce forum-selection clauses, even in adhesion contracts.  *See, e.g., Carnival*, 499 U.S. at 594–597 (upholding forum-selection clause in a non-negotiated boiler-plate contract where many potential plaintiffs may not even have been aware of the clause's existence); *Song fi*, 72 F. Supp. 3d at 63–64 (enforcing forum-selection clause in YouTube's Terms of Service).

The Firms do not, because they cannot, identify any hurdles recognized under the relevant standard.  On that basis alone, the Firms' argument fails.  The arguments they do advance, while irrelevant, are meritless too.  Relying on a Nevada statute and California case law, the Firms' sole ground for setting aside the forum-selection clause is the notion that any arbitral location outside

of the state where a claimant resides is *per se* unenforceable.  (Mov. Br. at 21-22.)  Not even the Firms believe that; indeed, they seek to transfer this action to *California*, even though the Claimants also reside in Nevada, Oregon, and across the country in New York and New Jersey. The Firms' motion has nothing to do with any actual burden on them or the Claimants, and instead has everything to do with the Firms trying to improperly rewrite the Terms & Conditions they chose to invoke because of some perceived strategic advantage.

This fatal deficiency aside, the Court need not even consider the public policy of Nevada or California.  *See M/S Bremen*, 407 U.S. at 15 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum *in which suit is brought*" (emphasis added)); *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 768 (D.C. Cir. 1992) (same).  As recently confirmed by the United States Supreme Court, "[a] federal presumption of enforceability would not be much of a presumption if it could be routinely swept aside based on 50 States' public policy determinations."  *Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 77 (2024).  As such, the *Great Lakes* Court confirmed that "state law was not relevant to" the Court's decision in *M/S Bremen*.  *Id.*

Even if state public policy was relevant, none of the authority the Firms cite supports their arguments.  The Nevada statute voids clauses in consumer contracts only that require litigation outside of Nevada.  But courts routinely conclude that statutes like this one are preempted by the FAA.  *See, e.g.*, *KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 52 (1st Cir. 1999) ("Section 19–28.1–14's requirement that all claims arising under the Rhode Island Franchise Investment Act be brought in Rhode Island does not apply to all contracts and does not establish a generally applicable contract defense.  Its prohibition of non-Rhode Island venues purports to restrict the enforcement of only one sort of contract provision, forum selection

clauses, in only one type of contract, franchise agreements. Under § 2 of the FAA, that is impermissible."); *OPE Int'l. LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 447 (5th Cir. 2001) (same); *Bradley v. Harris Research,* 275 F.3d 884, 889-90 (9th Cir. 2001) (same). Even if the Nevada statute was valid under the FAA, the Firms' argument would be moot because they do not want this case in Nevada, they want it in California. The Firms evidently believe that the statute applies only to preclude jurisdiction in Washington, D.C. but not California.

As for California law, it too does not help the Firms. *See Net2Phone, Inc. v. Super. Ct.*, 135 Cal. Rptr. 2d 149, 152 (Ct. App. 2003) ("California courts routinely enforce forum selection clauses even where the chosen forum is far from the plaintiff's residence."). "Given the importance of forum selection clauses, both the United States Supreme Court and the California Supreme Court have placed a heavy burden on a plaintiff seeking to defeat such a clause, requiring it to demonstrate that enforcement of the clause would be unreasonable under the circumstances of the case." *New Pride Corp. v. Lee*, No. G059583, 2021 WL 3855640, at *6 (Cal. Ct. App. Aug. 30, 2021) (cleaned up). The California Supreme Court has made clear that "[m]ere inconvenience or additional expense is not the test of unreasonableness[.]" *Smith, Valentino & Smith, Inc. v. Super. Ct.*, 17 Cal. 3d 491, 496 (1976). Rather, to meet the standard, the Ninth Circuit has adopted a very high standard of proof – that is, the party seeking to avoid the choice-of-forum provision must demonstrate that the chosen forum "will be so gravely difficult and inconvenient that the plaintiffs will for all practical purposes be deprived of their day in court[.]" *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1029 (9th Cir. 2016) (cleaned up). [22]

---

[22] The federal standard is the same. *See Gipson*, 563 F. Supp. 2d at 154 (noting that the "Supreme Court has clarified that a forum selection clause can only be invalidated under this exception [*i.e.*, 'unreasonable and unjust'] if the party seeking to avoid the clause can show that 'trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.'" (quoting *M/S Bremen*, 407 U.S. at 18)).

The Firms do not come anywhere close to meeting their heavy burden under *Tompkins*. They do not submit a shred of evidence that litigation in Washington, D.C. will be any burden either to the Firms or any Claimant, much less so gravely difficult that they will be deprived of their day in court. The Terms & Conditions are not contracts for essential services that Claimants had little to no choice but to execute. All Claimants wanted to access Plaintiffs' social gaming services via the internet, and they did so knowing that any claims they may have would have to be brought in the forum designated by the applicable Terms and Conditions. And by invoking the Terms and Conditions provision requiring arbitration in Washington, D.C., they impliedly consented to the jurisdiction of this Court for purposes related to their arbitration.

All of the California cases the Firms cite that address the enforceability of forum-selection clauses predate the Ninth Circuit's decision in *Tompkins*, which "refined the standard by which forum selection clauses are judged." *Copper Bend Pharmacy, Inc. v. OptumRx*, 2023 IL App (5th) 220211-U, ¶ 101 (2023). Those pre-*Tompkins* cases are, in any event, inapposite. *See Pope v. Sonatype, Inc.*, No. 5:15-CV-00956-RMW, 2015 WL 2174033, at *3–5 (N.D. Cal. May 8, 2015) (applying arbitration rule particular to employment in California); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1288-91 (9th Cir. 2006) (small "Mom and Pop" franchisees operating in California who were not given adequate notice that arbitration would take place outside of California; showing of "financial hardship");[23] *see also Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208, 1220-21 (D. Or. 2012) (relying on statute that invalidated foreign foreign-selection clauses, which as noted is preempted by the FAA; showing of financial inability, in any event);

---

[23] The Ninth Circuit in *Tompkins* specifically indicated *Nagrampa* was no longer viable in light of subsequent developments in the case law. 840 F.3d at 1029 n.6.

*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, 8213 Cal. Rptr. 3d 410, 418–19 (Ct. App. 2017) (nothing to do with arbitration or forum-selection clauses).

Although the court in *America Online, Inc. v. Superior Court*, 108 Cal. Rptr. 2d 699 (Ct. App. 2001), found that a forum-selection clause unenforceable because it waived nonwaivable rights under California's Consumers Legal Remedies Act ("CLRA"), the CLRA's anti-waiver provision is preempted by the FAA, *cf. Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 923-24 (2015). Thus, *America Online* has no applicability here, in the context of arbitration. Even if it did, the Demands plead no claims under the CLRA, and the Firms do not claim (much less establish) that the arbitration provision here would require them (or the Claimants) to waive an unwaivable statutory right. *See Run Them Sweet, LLC v. CPA Glob. Ltd.*, No. 16-CV-03662-JST, 2016 WL 6216874, at *3 (N.D. Cal. Oct. 25, 2016) ("'[n]o such express [anti-waiver] provision [as in the CLRA] exists in California's unfair competition law or in deceit claims'").

### E.  There Is No Basis To Transfer This Action To The Southern District Of California.

The Firms seek to transfer this action to the Southern District of California under the doctrine of forum *non conveniens* (Mov. Br. at 23-24), but that doctrine does not apply here. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (doctrine "has continuing application in federal courts *only* in cases where the alternative forum is abroad, and perhaps in rare instances where a state or territorial court serves litigational convenience best" (cleaned up) (emphasis added)). When seeking to transfer an action from one federal court to another, the proper vehicle is a motion to transfer under 28 U.S.C. § 1404. *Id.*

Once again, the Firms try to seek relief on behalf of the Claimants, which is improper. Regardless, the Firms present no basis to transfer this action. Because the Firms (by their conduct) and the Claimants (by agreement) consented to the personal jurisdiction of this Court, the Court

"should not consider arguments about the parties' private interests"; instead, the Court "must deem the private-interest factors to weigh ***entirely in favor of the preselected forum***." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013) (emphasis added). The Court "may consider arguments about public-interest factors only. Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id*. This is far from the unusual case that would warrant transfer based on the public-interest factors. Indeed, the Firms do not even mention those factors, much less establish that they "overwhelmingly" favor a transfer. *Id.* at 67.

The result would be the same even if the Firms (or the Claimants) had not consented to jurisdiction. As the Firms recognize, "[t]here is a substantial presumption in favor of a plaintiff's chosen forum." (Mov. Br. at 24) (quoting *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010)). The "plaintiff" in that equation is Plaintiffs, not the Firms. And the Firms provide no basis to disturb Plaintiffs' chosen forum. Their motion is based on the fallacy that "all the conduct occurred, and parties are based" in the Southern District of California. (Mov. Br. at 23.) That is not true. The arbitrations arise from Plaintiffs' operation of social gaming sites, none of which are operated out of California. Nor do Plaintiffs have any employees in California (or the United States). Moreover, one of the Firms and many of the Claimants are not from California either, and some also reside in jurisdictions that are much closer to Washington, D.C. than to California, including New Jersey and New York. The Firms cannot credibly claim that it would be inconvenient for Claimants to defend Plaintiffs' claims in this Court when many of the Claimants live in states far closer and convenient to Washington, D.C. and others have no problem traveling across the country to prosecute their claims in California. Indeed, the Firms' cries of so-

called "significant hardship" are conclusory and supported by no evidence whatsoever.[24]  (Mov. Br. at 24); *see also One on One Basketball, Inc. v. Glob. Payments Direct, Inc.*, 38 F. Supp. 3d 44, 48 (D.D.C. 2014) ("when evaluating motions to transfer under § 1404(a), a court should only consider undisputed facts supported by affidavits, depositions, stipulations, or other relevant documents").

As for the Firms' venue challenge (Mov. Br. at 24), it is equally meritless in light of their consent to jurisdiction in this Court.  *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) ("A party who agrees to arbitrate in a particular jurisdiction consents not only to personal jurisdiction but also to ***venue*** of the courts within that jurisdiction." (emphasis added)).

**F.**    **The Firms' Service Defense Is Moot.**

The Firms' service defense is moot (Mov. Br. at 26), given that they have now agreed to waive service under Rule 4.  To the extent the Firms are seeking to advance this defense on behalf of Claimants, they cannot do so, as noted above.  Regardless, Plaintiffs have 90 days to effectuate service under Rule 4(m).  Given that Plaintiffs filed their Complaint on September 27, 2024, the service window for Claimants remains open for another two months, or until December 26, 2024. Plaintiffs sent waivers of service to both Firms on the very same day they filed this action, and to Claimants (less certain individuals who had since communicated that they did not wish to proceeding with their arbitration claim), on the following business day.  (Barrowclough Decl. ¶¶ 2-3.)  Some Claimants have returned those waivers, thus fulfilling the service requirement under Rule 4(d).  (*Id.* ¶ 4.)  Plaintiffs subsequently mailed duplicate waivers of service to all Claimants who had not withdrawn their AAA arbitrations.  (*Id.* ¶ 7.)  The Firms have refused to extend the

---

[24] The Firms misleadingly state that "the claims involve claims under California law[.]"  (Mov. Br. at 23–24.)  The Demands plead three causes of action for alleged violations of federal statutes and claims under the laws of various states, including New Jersey, New York, Oregon, and Nevada (in addition to California).  (Kind Decl., Ex. 17.)

common courtesy of waiving service on behalf of the Claimants, no doubt to delay these proceedings and set the stage for the meritless argument they tried to advance in their Motion to Dismiss.  (*Id.* ¶ 8.)

### G. The Complaint States A Claim Against The Firms.

The Firms' only basis for seeking dismissal under Rule 12(b)(6) is the notion that the Complaint "bring[s] no claims against Claimants' Counsel."  (Mov. Br. at 27.)  That argument is demonstrably false, as the Complaint clearly pleads claims under the FAA, which "creates several federal causes of action relating to arbitration agreements," *Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1245 (D.C. Cir. 1999), including claims to enjoin arbitrations (*see supra*, page 22 n.19 (citing *PCS 2000 LP*, 148 F.3d at 35; *Am. Express Fin. Advisors*, 672 F.3d at 142)).  To that end, the Court is empowered to issue injunctions to preserve the "integrity of the arbitration process" and "in aid of arbitration[.]"  *Sprint Sols., Inc. v. Mobile Now, Inc.*, No. CV 19-3752 (JDB), 2020 WL 136285, at *3 (D.D.C. Jan. 13, 2020) (cleaned up).

Here, the Complaint alleges—and the Firms do not dispute—that they have been masterminding a web of baseless arbitrations for their own benefit and without authorization from the clients they purport to represent.  Plaintiffs learned of the Firms' playbook from the Claimants themselves, many of whom have disavowed any relationship with the Firms.  (Compl. ¶¶ 61-69.)  Just last week, one Claimant advised:

> I did not agree to be represented in this matter nor was I involved in anything against sportzino or zula. I gave no permission nor consent to anything having to do with either company listed in this complaint. What should I do? I enjoy both sites and I want nothing to do with this.

(Barrowclough Decl. ¶ 4, Ex. E.)  This is just one of many aggrieved Claimants who have been victimized by the Firms' scheme to file as many meritless arbitrations as possible in order to drum up AAA administrative fees and pressure Plaintiffs into paying them off.

Assuming the truth of these undisputed facts, as required, the Complaint pleads a viable claim under the FAA against the Firms. It is the Firms, not their purported clients, who are filing improper arbitrations without any authorization or approval. The Firms are threatening the "integrity" of the arbitration process, and Plaintiffs are entitled to enjoin their conduct and "the remaining arbitrations until and unless Kind Law and Ben Travis Law demonstrate they have the requisite authorization to proceed based on accurate disclosures." (Compl. ¶ 75.) Indeed, if the Firms would be insulated from liability, Plaintiffs may be left without a remedy, since the Claimants they purport to represent played no role in the prosecution of their claims.

## **CONCLUSION**

For the reasons stated above, the Firms' Motion to Dismiss should be denied in its entirety.

IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
(202) 524-4157
Attorneys for Plaintiffs

Dated: October 31, 2024                    By: /s/ George Calhoun

Of Counsel:

LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of October, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties authorized to receive electronically Notices of Electronic Filing.

<u>/s/ George Calhoun</u>
George Calhoun